1  Robert A. Rees [State Bar No. 94295]
   REES LAW FIRM P.C.
2  1925 Century Park East, Suite 2000
   Los Angeles, California 90067
3  Telephone:  (310) 277-7071
   Facsimile:  (310) 277-7067
4  E-mail: robertreeslaw@att.net

5  Steven P. Beltran, ESQ. [State Bar No. 75813]
   BELTRAN, SMITH & MACKENZIE, LLP
6  8200 Wilshire Blvd., Suite 200
   Beverly Hills, California 90211-2348
7  Telephone: (323) 935-5795
   Facsimile: (323) 935-5975
8  E-mail: sbeltran007@gmail.com

9  Attorneys for Plaintiffs

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13 | JOSE MURGUIA, for himself and for the | COMPLAINT FOR DAMAGES
   | Estates of MASON and MADDOX
14 | MURGUIA

15 |        Plaintiff,
   | vs.
16
   | HEATHER LANGDON, an individual
17 | COUNTY OF TULARE, a Governmental
   | Entity; CITY OF TULARE, a Governmental
18 | Entity; CITY OF VISALIA, a Governmental
   | Entity; DEPUTY LEWIS, an individual;
19 | ROXANNA TORRES, an individual;
   | SERGEANT GARCIA, an individual;
20 | OFFICER DAVIS, an individual; OFFICER
   | VALENCIA, an individual; FIRST
21 | ASSEMBLY OF GOD OF VISALIA, an
   | unknown business entity; and DOES 1--12,
22
   |        Defendants.
23

24        Plaintiff Jose Murgia ("Plaintiff" or "Jose"), for himself and for the estates of Mason

25 and Maddox Murguia alleges:

26

27 //

28

GENERAL ALLEGATIONS

*Parties*

1.   Jose is an individual the father, heir-at-law and the successor in interest of Mason and Maddox Murguia, decedents, who were born in 2018 and died on December 6, 2018.

2.   Mason and Maddox Murguia, born in 2018, were at all times mentioned, a resident of the County of Los Angeles, California. Prior to their deaths on December 6, 2018, each child was in excellent physical health.

3.   Defendant Heather Langdon ("Langdon") is an individual and at all relevant times was a resident of Tulare County, California.

4.   County of Tulare ("County") through its Sheriff's Department ("TCSD") and Child Welfare Services ("CWS") Department is and at all times mentioned was a public entity as defined by Government Code § 811.2. CWS is a County division responsible for protecting children whose safety is at risk.  At all times, County was acting as a public agency and county within the provision of Government Code § 811.2.

5.   TCSD Deputy Lewis, and Does1-3 (collectively "TCSD deputies") are individuals and at all relevant times were residents of Tulare County and employed by County as TCSD deputy sheriffs.

6.   Roxanna Torres, a social worker at the CWS, and Doe 4 (collectively "CWS workers") are individuals and at all relevant times were residents of Tulare County and employed by County as CWS workers.

7.   Plaintiff is informed, believes and alleges that at all times mentioned, each TCSD deputy and CWS worker was the agent of County and in doing the things alleged, each

agent was acting within the scope of such agency and with the permission and consent of the County.

8.   City of Visalia ("Visalia") through its Police Department ("VPD") is and at all times mentioned was a public entity as defined by Government Code § 811.2.  At all times, City was acting as a public agency and City within the provision of Government Code § 811.2.

9.   Does 5 through 8 (collectively "VPD officers") are individuals and at all relevant times were residents of Tulare County and employed by Visalia as police officers.

10.  Claimant is informed, believes and alleges that at all times mentioned, each VPD officer was the agent of Visalia and in doing the things alleged, each agent was acting within the scope of such agency and with the permission and consent of Visalia.

11.   City of Tulare ("Tulare") through its Police Department ("TPD") is and at all times mentioned was a public entity as defined by Government Code § 811.2.  At all times, City was acting as a public agency and City within the provision of Government Code § 811.2.

12.   TPD Sgt. Garcia, Officers Davis and Valencia and Does 9-12 (collectively "TPD officers") are individuals and at all relevant times were residents of Tulare County and employed by Tulare as police officers.

13. First Assembly of God of Visalia ("Church") is a business entity, the exact form of which is unknown.

14.   Plaintiff is informed, believes and alleges that at all times mentioned, each TPD officer was the agent of Tulare and in doing the things alleged, each agent was acting within the scope of such agency and with the permission and consent of Tulare.

*Overview*

15.  Safety rules are mandatory, not optional. This is obvious. When it comes to safety, the only acceptable choice is the safest choice. Nobody has the right to make the second-most safety choice. No one wants a surgeon who promises to perform "the second safest operation." STOP signs are not mere suggestions. It is equally obvious that people who violate safety rules should be held accountable. If someone runs a stop sign and hits another car, the first driver is liable.

16. Law enforcement is paid to enforce safety laws; their job is to protect citizens. When law enforcement violates safety rules, they needlessly endanger the people they are paid to protect. This is especially true for people who lack the capacity to protect themselves, like infants and people in mental crisis. When law enforcement officers violate safety laws, they should be held accountable just like anyone else.

17.  Here, state and local governments have created detailed safety rules for how law enforcement should help people in mental crisis and how law enforcement should protect infants. Unfortunately, each of the defendants violated these safety rules and, as a tragic consequence, a mentally disturbed mother drowned her two babies. Defendants should be held accountable for violating the applicable safety rules.

18. When peace officers and child welfare service personnel encounter someone who is in the midst of a mental crisis, these governmental employees have two simple missions: (1) get professional help for the person in distress and (2) protect others near the person, especially if those others are infants. While Langdon was experiencing an ongoing and escalating mental health crisis, she had her 10-month-old twin boys with her. Each and

every defendant had the duty and opportunity to accomplish these two missions, yet each defendant failed. None of the defendants got any professional help for Langdon or did anything to protect the twins. Instead each defendant enabled Langdon and the twins to go to a motel, where Langdon drowned Jose's babies.

19.   As a result of the each defendant's errors and omissions, each of the twins died a horrible death and Jose lost two children. Each of the defendants must now compensate the estates of the twins and Jose for their respective losses.

20.   On December 3, 2018, Langdon called her Church and falsely alleged that her son Jayden had threatened to shoot up a school. TCSD investigated this false report. On December 4, 2018, Jose called 911 and asked for someone to get professional mental help for Langdon because she was acting crazy. TCSD responded. Although the TCSD promised to get professional help for Langdon, it broke this promise.

21.   By December 5, 2018, TCSD had overwhelming evidence that Langdon was in a mental crisis and Langdon had agreed to go to the hospital. State law and County policy required TCSD to take Langdon in for evaluation at a mental health clinic, either voluntarily as she requested or involuntarily under Welfare and Institutions Code ("WIC") 5150.  Still, County employees did nothing. The County employees had the option of having mental health professionals evaluate Langdon in the field, but did not even make this minimal effort.

22.   TCSD policy also required the deputies to give custody of the babies to Jose, who begged the TCSD deputies to let him have his children. The TCSD deputies knew or should have known that Langdon had prior convictions for willful child cruelty and should not

have let her keep custody of the children in her current mental state. Instead the TCSD deputies told Jose to stay away from his children and prevented Jose from helping Langdon or protecting the twins. Jose was compelled by law to follow this order; if he had disobeyed it, he would have been arrested.

23.   Each County employee had a legal duty to help Langdon and protect the children and they all failed miserably. TCSD deputies completely ignored their mandatory duties and simply told Langdon's friend Rosa to take Langdon to her Church. The TCSD deputies triggered a cascade of events that ended tragically when Langdon drowned the babies.

24.   At the Church, Langdon asked Pastor John Walker to help her get to a mental health clinic. Rosa told the Church that the babies were in danger and asked the Church to help Rosa get the babies away from Langdon. The Church, however, did not provide any help for Langdon or protection for the twins, even though the Church is mandated by law to report to CWS whenever they suspect children are in danger. Instead the Church called the VPD and reported Langdon's bizarre behavior.

//

25.   The VPD officers also witnessed Langdon's bizarre behavior. By law, VPD should have assessed Langdon and taken her to a mental health facility for mental evaluation and treatment, voluntarily or involuntarily. VPD also knew or should have discovered Langdon's history of child cruelty, battery, and stay away orders and should have reported Langdon to CWS. VPD should have also placed the twins with their father, Jose, especially after Rosa had emphatically asked this of the Church.

26.   Instead, VPD provided no mental help for Langdon and no protection for the twins.

Responding VPD officers refused to take Langdon to a mental health clinic as Langdon requested earlier. VPD did not assess Langdon's mental crisis or the risks to the babies. VPD did not request assistance from any psychiatric emergency team or other trained professionals who would have come to the Church to evaluate Langdon's mental state. Instead, VPD took Langdon and the babies to Lighthouse Woman's Shelter ("Lighthouse") in Tulare.

27.   The Lighthouse employees immediately saw that Langdon was "acting crazy," yelling and creating a disturbance. During the intake process, Langdon behaved so bizarrely that Lighthouse called TPD. When the TPD officers arrived, Langdon yelled at them as well. After Langdon stop yelling at the TPD officers, they left.

28.   Less than 40 minutes later, Lighthouse called TPD again to remove Langdon and the babies because of Langdon's continuing bizarre behavior. TPD Sgt. Garcia also responded on this second call and called the Child Welfare Services (CWS) Hotline. According to CWS, TPD Sgt. Garcia falsely said Langdon had been taken to a hospital for a mental evaluation and denied. In fact, Langdon had asked TPD to take her to the hospital. Moreover, by law, TPD should have assessed Langdon and taken her to a hospital for mental evaluation and treatment. TPD should have also placed the twins with their father, Jose. TPD provided no mental help for Langdon and no protection for the twins.

29.   Instead TPD officers took Langdon to a local motel. Early the next morning, the babies were found dead and naked on the motel bed. Langdon had drowned the babies.

***Background***

30.   In or about 2004, Jose, then 21 years old, and Langdon, 22 years old, met and

married. During the marriage, Jose and Langdon had three boys: Jayden, now aged 15;

Josiah, who has autism, now aged 13; and Kaze now aged 6.

31.  Langdon has a long history of alcohol abuse and violence against children.

Langdon has a history of hospitalizations for overdoses, as well as attempted suicide. Also,

CWS opened one or more investigations of Langdon for negligent care of her children, and

CWS and the family law court had restricted Langdon's custodial rights of the older boys.

32.  In August 2014 Langdon had an affair and filed to dissolve her marriage to Jose.

33.  The parties initially had joint legal and physical custody.

34.  CWS opened a case against Langdon for child abuse against the oldest son, J, (case

no. 0461 – 9452 – 91826071485.)

35.  On December 31, 2014, Langdon hit Jose in the face and split open his lip.

Langdon went to jail and threatened to kill Jose when she got out. On January 5, 2015, the

court issued a TRO against Langdon with a stay away order. The court modified custody by

awarding physical and legal custody to Jose. Langdon had visitation rights only if

supervised. Langdon was required to participate in a mental health evaluation.

36.  On March 22, 2015 Langdon was driving drunk and hit a car pulling out of a

parking space, injuring the driver and her two children. Langdon later pleaded guilty to

drunk driving. [See Tulare Superior Court case no. VCM 329241]

37.  In April 2015, the marriage was terminated. The court initially awarded joint

custody and ultimately awarded custody of the three children to Jose with Langdon having

only rights to supervised visitation.

38. On January 22, 2016 Langdon was again arrested for drunk driving and also for

willful cruelty to a child. Langdon pleaded guilty to both counts. [See Tulare Superior Court case no. VCM 330744]

39.  On October 24, 2016, Langdon was arrested for willful cruelty to a child and inflicting injury on a child. Langdon pleaded guilty to both counts. Langdon was ordered to go to a 52-week child abuse class. [See Tulare Superior Court case no. VCM 342959]

40.  On October 28, 2016 Jose filed another request for a restraining order and for supervised visitation was because "mother is always drunk." On November 1, 2016, the Court awarded physical and legal custody to Jose and no visitation to Langdon.

41.  Many months later, in spring 2017, Jose and Langdon started seeing each other and Langdon became pregnant.

42.  On August 4, 2017, Langdon was arrested again for Battery on a Non-Cohabiting Partner. Langdon verbally abused Jose, punched him in the face many times and gave him a black eye. Langdon also hit Jose with a speaker, split his lip open and pulled out a body piercing. Langdon was sentenced to 45 days in jail and there was a criminal stay away order that Langdon not come w/in 50 yards of Jose's residence or employment. Langdon was also ordered to enroll in a domestic violence program. [Tulare Superior Court case nos. VCM354363; VFL257587.]

43.  On August 8, 2017, there was a TRO hearing and another stay away order. Langdon also was allowed visitation two times a week for one hour, "supervised by the Agency," apparently a reference to CWS.

44.  On January 12, 2018 Langdon gave birth to twin boys: Mason and Maddox Murguia.  There was no formal custody order for the twins. Langdon lived in an apartment

in Visalia with the twins and Jose lived in Goshen with the three older boys.

45.  In February 2018, Jose went to Langdon's apartment and saw that she was drunk while she was in charge of the twins. Jose reported Langdon to CWS.

46.  In March 2018, two of Langdon's girlfriends, Rosa & Brittany, visited her and saw that Langdon was so drunk, she was not capable of caring for the twins. Each of the friends took custody of one twin. Rosa and the other friend had taken custody of the babies on other occasions when Langdon was too drunk or stoned to care for the children. One of the friends called CWS and advised Raquel, a CWS social worker, that the friends were taking custody of the twins. Raquel agreed to this.

47.  In May 2018, Langdon called Jose and said the twins were too much work for her. Langdon asked Jose to take custody of all five children and Jose agreed.

48.  In about August 2018, Langdon and the twins moved back in with Jose and their other 3 children.

49.  In fall 2018 Langdon and Jose argued because Langdon wanted Jose to tithe 10% of his income to the Church. Jose refused.

***How Law Enforcement Must Interact With Someone In a Mental Crisis***.

50.  It is foreseeable that some members of any community will have mental crises. A person in crisis is someone whose level of distress or mental health symptoms has exceeded the person's internal ability to manage her behavior or emotions. Events or circumstances can cause a person to engage in erratic, disruptive or dangerous behavior that may be accompanied by impaired judgment.

51.  Sometimes a person in crisis has sufficient insight to seek voluntarily appropriate

evaluation and treatment from mental health care providers.  At other times, however, there can be an emergency situation where "action to impose treatment over the person's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others and it is impracticable to first obtain consent. It is not necessary for harm to take place or become unavoidable prior to treatment." [WIC §5008(m)]

52.    For these emergency situations, the Legislature has enacted a comprehensive set of laws for providing crisis intervention. The process has two steps. First, a peace officer assesses an individual's mental state to determine if there is a crisis or a need for further psychiatric evaluation and treatment. Second, where a peace officer finds that *probable cause* exists that a person is a danger to herself or to others, then the peace officer must place the person on a WIC §5150 hold and take the person to a qualified mental health facility.

53.    A WIC §5150, or 72-hour, hold, is a means by which someone who is in serious need of mental health treatment can be transported to a designated psychiatric inpatient facility for evaluation and treatment for up to 72-hours against their will. A "hold" is meant to be written by a non-clinical person and is NOT a diagnostic assessment. [WIC §5150.04]

54.    Two goals of a WIC §5150 hold are to provide prompt evaluation and treatment of persons with serious mental disorders and to protect public safety. [WIC§ 5001]

55.    *Probable cause* is a very low bar. To constitute probable cause to detain a person under WIC §5150, a state of facts must be known to the peace officer that would lead a

person of ordinary care and prudence to believe or entertain a strong suspicion that the person detained is mentally disordered and is a danger to himself or to others. Determining probable cause is a lay decision, not a clinical one, and does not require a diagnosis. The peace officer's role is to get the patient to an approved mental health facility for further evaluation and treatment.

56.   A WIC §5150 hold is an application for involuntary admission at a facility, not a direct admission form. The peace officer gets the person to the facility door, then "the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention." [WIC §5151]

57.   The law gives great authority to peace officers to assess and take individuals into custody and transport them to mental health professionals who will perform the evaluation and crisis intervention. The peace officer has immunity from any action by a person released at or before the end of the 72 hours. [WIC§5154 (c)]

58.   A peace officer *must* consider all available information when assessing whether a person is a danger to herself or others. Thus, the peace officer should consider the patient's words or actions indicating a serious intent to cause bodily harm to herself or another person.  The peace officer should also consider actions which place the person or others in serious physical jeopardy. WIC §5150.05 mandates that the peace officer *shall* consider available relevant information about the historical course of the person's mental disorder if

the peace officer determines that the information has a reasonable bearing on the determination as to whether the person is a danger to others, or to himself or herself.

59.   Historical information *must* be considered when it has direct bearing on what is currently happening with the person being assessed. The historical course may include, but not be limited to, evidence presented by family members or friends.

60.   Possible **signs** of a mental health crisis include:

- Words or actions that indicate the intent to harm the person or another person
- The appearance of being agitated, angry or explosive (even when not focused at a particular person)
- Acts or behavior of an irrational, impulsive or reckless nature
- A known history of mental illness
- Threats of or attempted suicide
- Loss of memory
- Incoherence, disorientation or slow response
- Delusions, hallucinations, perceptions unrelated to reality or grandiose ideas
- Social withdrawal
- Manic or impulsive behavior, extreme agitation, lack of control
- Lack of fear
- Anxiety, aggression, rigidity inflexibility or paranoia
- Gross neglect for personal safety or safety of others This list is not exhaustive.

61.   A peace officer and CWS also have access to a person's historical information on various data bases. California Law Enforcement Telecommunications System ("CLETS") is a digital portal connected to multiple databases including databases for:

- Domestic violence and restraining order history

- WIC §5150 history

- Criminal history

- History of call-outs to a specific address

- CWS records.

62.   All peace officers and CWS personnel in California can access CLETS either from their vehicles or through their communication center. There is a record of each CLETS inquiry and inquiries receive almost instantaneous responses. All law enforcement and CWS personnel are trained on the proper use of information systems like CLETS.

63.   If a peace officer suspects a citizen is in a mental crisis but is unsure about his or her assessment, there are several resources available to assist in making the assessment.

- The officer should call a supervisor.

- The officer should take the person to a designated mental health facility for further evaluation and treatment.

- The officers should use any other available community resources for assessing the person's mental state.

64.   These resources, such as a psychiatric evaluation team or a domestic violence high risk team, are staffed with specially trained people who are experienced in and familiar

with mental health issues. Tulare County has the Tulare County Psychiatric Emergency Team ("PET"), which can respond to crises in the field and assess, evaluate and respond appropriately to a person with a mental health crisis. TCSD also has a Domestic Violence High Risk Team ("DVHRT"), whose goal is to identify high risk situations and intervene to prevent homicides. TCSD deputies can call in DVHRT or PET for assistance in dealing with someone in a mental health crisis.

65.   When a peace officer takes someone into custody, such as on a WIC §5150 hold, he or she has a duty to ensure that children in that person's custody are not left without appropriate care. Separating a child from a parent is stressful to the child, and an important goal is to mitigate, to the extent possible, this stress. TCSD policy requires deputies to take all reasonable steps to ensure the safety of dependent minor children when taking a person into custody. Except when there is a court order limiting contact, the peace officer should place dependent children with the non-arrested parent. If the peace officer cannot do this, he must notify CWS, the field supervisor or lieutenant.

### TCSD Deliberately Disregards Langdon's Mental Crisis and Places the Twins in Mortal Danger.

66.   At the end of November 2018, Langdon experienced a mental crisis. Langdon became very dark; she told her oldest son, Jayden, then age 14, that she and he were special in the eyes of God and that these were "End Times" because a fire had destroyed the town of Paradise. Langdon also claimed her brain was "thinking at a higher power."

67.   Brittney M. is a friend of Langdon. On Monday, December 3, Langdon called Brittney and asked if the latter could watch the twins. When Brittney got to Langdon's

house, Langdon gave Brittney an evil look and told Brittney to leave because Brittney was not a believer and "not of God." Brittney quickly left because she had a bad feeling. Brittney called Rosa, another friend of Langdon, and reported that Langdon was acting much weirder than usual.

68.  On December 3 or 4, 2018, Langdon called someone at the Church and falsely stated that the oldest son, Jayden, had threatened to shoot up Linwood Elementary School. The Church reported the call to TCSD, who sent deputies to the Murguia residence. TCSD apparently concluded Langdon's report was false and took no action.

69.  At about 6:30 pm on December 4, 2018, Jose came home from work. Langdon told Jose to get ready to go to jail because the cops were on their way to arrest him. Langdon was acting erratic, repeatedly shouting "I refute you Satan." Jose called 911 and described Langdon's bizarre behavior. Jose did not know if Langdon was on drugs, or why she was acting erratically. Jose asked the 911 responder for someone to get mental health help for Langdon.

70.  Two TCSD deputies, including TCSD Deputy Lewis, responded to the December 4 call at the Murguia home. The TCSD deputies had probable cause for a WIC §5150 hold because knew about Langdon's false accusation made to the Church, Langdon's bizarre behavior and Jose's request for help. Yet, the TCSD deputies did not consult with a supervisor, the PET, the DVHRT, CLETS, or any other mental health experts to assess Langdon's mental state. Instead, the TCSD deputies told Jose that since Langdon did not appear to be a threat to herself or anyone else, the TCSD deputies could not take any action. The TCSD deputies including TCSD Deputy Lewis also stated that if Langdon threatened

anybody or herself, to call them back and they would take her in custody on a WIC §5150 hold. Jose told the TCSD deputies that he was going to take the next day off work, to get help for Langdon

71.  The next morning, on December 5, 2018, Langdon woke up at 4:00 a.m., complaining that her stomach hurt. Jose offered to take her to the clinic but Langdon declined. Later that morning, Jose was sleeping on the couch and when he woke up, he saw Langdon holding one of the babies up high towards the ceiling fan, shouting "haneeshewa," The oldest son, J, said this was a word referencing God in Hebrew. Langdon tried to quote Bible scripture and reference a Bible story that she claimed God had told her. Jose said that he had told her the same story the other day. Langdon said Jose was wrong and insisted God told her the story.

72.  Langdon said she would take a bath. After the bath Langdon put on her makeup. Langdon seemed agitated and indifferent. Langdon took a second bath or shower, and did her make up again. Jose told the oldest son, J, that the second and third sons should go to their schools but the oldest son, J, needed to stay home and watch the twins, so Jose could take Langdon to get help. Langdon took a third bath or shower, then sat on the couch with a towel wrapped around her, and put her make up on again. Langdon seemed very agitated. Jose asked her if she was ok and why was she acting so strange.

73.  At about 11:00 a.m., Langdon told Jose that Jesus told her to drink bleach and vinegar in order to cleanse the demons in her soul. Langdon said she had already drunk some bleach and Jose saw her drinking vinegar. Jose called 911 and reported what Langdon had said about drinking bleach and vinegar. This was the third call out in three days.

74.  County Paramedics, fire department, and TCSD deputies, including TCSD Deputy Lewis responded. Jose told the TCSD deputies about Langdon drinking vinegar and bleach, the multiple baths, and the other bizarre behavior. TCSD deputies could see Langdon putting on her makeup, then dropping to her knees and praying. Had the TCSD deputies or their communication center done a simple CLETS check they would have seen Langdon's many convictions for cruelty to her children and drunk driving and the restraining orders.

75.  TCSD deputies took charge of the scene. Jose told the TCSD deputies that Langdon was not okay and that she needed to be evaluated professionally. Jose said he wanted to take Langdon to the hospital or a clinic for a mental evaluation and the TCSD deputies said they would not permit it. Jose reminded the TCSD deputies of the previous night's call and their promise to put Langdon under a psychiatric hold. A TCSD deputy told Jose to go outside and stay out.

76.  The County paramedics took the gurney inside. Although paramedics are trained to assess whether a person is in a mental crisis, the TCSD deputies did not allow the County paramedics to assess Langdon. A TCSD deputy told the County paramedics to leave.

77.  While the TCSD deputies were still at the residence, Jose walked over to the home of Langdon's friend and neighbor, Rosa. Jose asked Rosa to come over and talk with Langdon because Langdon had been talking crazy. Rosa knew that Langdon had been very dark recently and much weirder than usual. For example, Rosa saw Langdon at Walmart. Langdon acted like she had talked with God and Langdon told Rosa that God will make revenge for Langdon. Rosa had also heard from Brittney about Langdon's bizarre behavior. Jose asked Rosa if she would take Langdon to the hospital to get help. Rosa agreed.

78.  When Rosa got to the Murguia home, there were two sheriff's cars and three TCSD deputies. The outside TCSD deputy told Rosa she could go in the house and told Jose that he had to stay outside.

79.  Rosa entered the house and within a few minutes formed the opinion that Langdon should be detained under a WIC §5150 hold. Rosa works at a hospital and has supervised people on WIC §5150 holds. Rosa is familiar with the standard of whether a person is a danger to herself or to others. Rosa thought TCSD deputies should take Langdon for mental help on a WIC §5150 hold. Rosa told the TCSD deputies that Langdon needed professional help and Langdon should not have the twins. A TCSD deputy in the house told Rosa that Langdon had voluntarily agreed to go to the hospital and was waiting for Rosa to take her.

80.  The TCSD deputies told Rosa that she, and not the TCSD deputies, should take Langdon to the hospital and then Rosa should take custody of the babies. Neither Rosa nor the TCSD deputies believed the babies were safe with Langdon. TCSD policy required the TCSD deputies to give custody of the children to Jose, but TCSD deputies deliberately disregarded policy and told Rosa to take the babies from Langdon at the hospital. Rosa did not challenge TCSD deputies because they were experts and Rosa wanted to help Langdon.

81.  Rosa said: "Okay, we are going to the hospital." Langdon said: "No, we're taking the babies to Church."

82.  The TCSD deputies were surprised to hear this and told Langdon: "This is a new deal. You said you were going to the hospital." Under TCSD policy, where a person changes her mind about a voluntary mental evaluation, the TCSD deputy should proceed

with the involuntary WIC §5150 hold. This is what the TCSD deputies should have done.

83. TCSD deputies had more than sufficient probable cause to take Langdon in under WIC §5150 for further evaluation and treatment. This was the third call out in three days on the issue of Langdon's mental status. Langdon's words and actions, such as drinking bleach and vinegar, further showed Langdon was a danger to herself. The history from Jose and Rosa showed most elements of a mental crisis were present. A neutral and experienced third party, Rosa, had recommended the hold. TCSD deputies deliberately disregarded their mandatory duties in disobeying policy and letting Langdon leave.

84. TCSD deputies also ignored the many resources available to help them in their assessment. The TCSD deputies prevented the paramedics from making an assessment. The TCSD deputies did not do a CLETS search or call a supervisor, the PET, CWS, or DVHRT. As a result, no one with education, training or expertise assessed Langdon's mental state.

85. The TCSD deputies should never have allowed Langdon to leave with the children. The TCSD deputies agreed with Rosa that it was not in the twins' best interests to be in Langdon's custody. The TCSD deputies did not even bother to do a simple database check that would have revealed Langdon's multiple convictions, restraining orders, and CWS supervision. TCSD policy required the deputies to give Jose, as the non-arrested parent, custody of his children. Jose repeatedly begged the TCSD deputies to let him have custody and they refused. The TCSD deputies did not even call CWS to detain the twins. Instead, TCSD deputies illegally and unreasonably shifted the burden to Rosa to protect the twins.

86. Rosa told Langdon: "Okay, let's get it together." Langdon had packed a bag that had only nail polish in it. Rosa told Langdon that she had no food or water. Langdon said

"the Church has all I need." The oldest son, J, brought Rosa some water, diapers, and two cans of milk. Rosa, Langdon and the twins walked to Rosa's house.

87.  Outside, one of the TCSD deputies asked Jose if Langdon was on any drugs. Jose said he did not know. The TCSD deputy scolded Jose: "You should know your wife better. You have been married longer than me and my wife and I would know this about my wife."

88.  Jose again asked the TCSD deputies not to let Langdon leave with the babies and to let Jose have custody of the babies. Jose told the TCSD deputies the twins were not safe with Langdon and asked the TCSD deputies to stop Langdon from taking the twins. Instead, the TCSD deputies stopped Jose from following Langdon and the twins. TCSD deputies told Rosa and Jose that the deputies were going to let Langdon take the babies. One TCSD deputy said "just let her go."

89.  To Rosa it seemed like the deputies were tired of the call and wanted Langdon to leave so they could leave. After Langdon left with the twins, TCSD deputies stayed parked outside of the house for 30 minutes, watching Jose. Jose was afraid that if he followed the twins, the TCSD deputies would arrest him. Jose never saw his twins alive again.

***The Church Fails to Help Langdon or Protect the Twins.***

90.  Langdon told Rosa that she needed to get to the Church because Murguia's house was hexed. Rosa said they first needed to wait for the school bus with Rosa's five year old son.  Langdon got angry at Rosa and said she want to leave. One of the babies started crying. Langdon said the baby was crying because he felt the bad spirits in Rosa's house.

91.  The group went to the bus stop. Langdon was playing very loud Christian music. Langdon was also saying things like "follow the yellow brick road" and "follow the

bunnies." Langdon also said the San Andreas Fault was going to destroy the world. Langdon said she saw demons in her house and the Church needed to come and help her get rid of them. After the bus arrived, the group drove to the Church at about 2:45 p.m.

92. At the Church, Langdon walked into the lobby without the babies. Rosa brought the babies in their carriers. There were two receptionists. Langdon went into the office with Pastor John Walker, who realized that Langdon had called two days earlier about the false threat of J shooting up Linwood elementary.

93. Langdon told the Pastor she was homeless and the Pastor said he would call around to find a place for her to stay. The Church knew about Jose and the three older children because they had attended the Church in the past and one Pastor had even given Jose a book. Pastor Walker found Lighthouse, a woman's shelter in Tulare.

94. Langdon then told Pastor Walker that she needed mental help. The Pastor asked her if she would go to Cypress Mental Health Center for evaluation and Langdon said yes.

95. At the same time Rosa told the receptionists that the twins were in danger and asked the Church to help Rosa get the twins away from Langdon. Rosa told them that she was Langdon's friend/neighbor and that Rosa and the twins' father were worried about the babies. Rosa also said they were worried about Langdon's state of mind. One receptionist replied: "okay, I will take the phone numbers down." The person wrote down numbers for Rosa and Kara, another friend of Langdon. One receptionist told Rosa the Pastor would take good care of Langdon and not to worry because the twins were in good hands.

96. California Penal Code 11166 requires clergy to report to an agency like CWS any time it has reason to believe or know that a child is a victim of neglect or in danger.

97.  The Church knew or should have known that the twins were in danger because the Pastor knew about the false report of the school threat, had witnessed Langdon's bizarre behavior, knew Langdon had asked for help in getting to a mental health clinic, and Rosa had told the Church that Jose and Rosa were very concerned for the twins' safety.

98.  Notwithstanding this knowledge, the Church did not call CWS, help Langdon, or help Rosa with the twins.

**The Visalia PD Failed to Help Langdon or Protect the Twins**.

99.  The Pastor called VPD and when the officer arrived, the Pastor told the VPD officer that Langdon wanted to go to Cypress Mental Health Center to get some mental help. VPD knew about the false report of the alleged school threat. VPD did not take Langdon voluntarily to Cypress Mental Health Center for help. VPD did not run a CLETS check or find Langdon's history of convictions and restraining orders, or the recent callouts to TCSD. VPD did not place a WIC §5150 hold on Langdon. VPD did nothing to protect the twins. Instead, VPD took Langdon to Lighthouse Shelter and left Langdon and the twins there without even staying for Langdon's intake interview. VPD said nothing to Lighthouse about Langdon's request for mental help, Langdon's willingness to go to Cypress Mental Health Center, Langdon's CLETS history or Langdon's bizarre behavior.

**The Tulare PD Failed to Help Langdon or Protect the Twins**.

100.     At Lighthouse, Irma Briseno, director, and/or Simone Mayer, office manager, conducted an intake interview and thought Langdon was "crazy." Langdon was acting bizarre from the moment she arrived. The Lighthouse has door chimes on the doors and Langdon told her, "That noise. That's going to happen as long as I am here." Mayer's

computer screen went into sleep mode and Langdon said the same statement. Langdon was "all over the place" and told the interviewer, "I don't like your spirit." Langdon was very argumentative and if Langdon had been alone, Mayer would have refused to let her stay.

101.     Mayer asked Langdon if she had ever been accused of child abuse, and Langdon said yes. Langdon then said the allegation was not true. Mayer did not call CWS.

102.     Langdon told Mayer that Langdon had been raped the night before and that Langdon needed to go to the hospital for an emergency abortion, to have the baby removed from her. Lighthouse called an ambulance service and when the ambulance arrived, the EMTs advised Langdon that they could transport Langdon to the hospital but not the twins. Langdon created a disturbance and Lighthouse called the TPD.

103.   Langdon yelled at Mayer and the TPD officers. TPD described Langdon as very loud and almost belligerent. When Langdon said she "felt" pregnant, TPD Officer Davis asked Langdon if she had taken a pregnancy test. Langdon then became even more upset. Langdon yelled at TPD Officer Davis and told him that he needed to read the Bible. Langdon shouted that he was not in charge of this situation and that God was. Langdon stated that her "Father" was going to take care of her and her children. Langdon then refused to go to the hospital so she could be evaluated by a crisis worker.

104.   The Lighthouse manager told Langdon that if she did not stop creating a disturbance, she would be forced to leave. At least one TPD officer considered that Langdon needed mental assistance but did nothing about this. The TPD did not ask the EMT for his assessment of Langdon's mental state but instead dismissed the ambulance. TPD did not consider a WIC §5150 hold or call for any field assessment from any

psychiatric emergency team or other similar resource. TPD did not look at Langdon's

CLETS history.

105.   Langdon calmed down and the TPD officers left.

106.   After the TPD officers left, Langdon continued yelling at Lighthouse personnel.

About 40 minutes later, the same TPD officers were dispatched to Lighthouse again. When

the TPD officers returned, Lighthouse staff told the police that Langdon was being

uncooperative, loud, and disruptive, and was talking "crazy." Lighthouse staff also said that

the twins looked like they had not been fed, and Langdon did not have a diaper bag,

diapers, changes of clothing or baby bottles, all of which Lighthouse provided her.

107.   Langdon attempted to exit Lighthouse through the rear door so she could go

outside to pray. When TPD Officer Valencia told Langdon that she had to remain in the

dining area, she collapsed on the floor and stated she was having contractions. Langdon

began repeating, "Yeshua, Yeshua, Yeshua," as TPD officers tried to speak with her.

Langdon then attempted to scoot herself towards the door as she was sitting down, and she

said it was "sucking her out" of the front door. TPD Officer Valencia then called for TPD

Sgt. Garcia to respond and updated Garcia on the prior call.

108.   Later, Langdon again collapsed on the floor and stated she was going into labor.

Langdon then got up a few minutes later and began to sift through her makeup bag.

Langdon began having a conversation with another female at Lighthouse and asked if she

wanted to have her nails done.

109.   TPD illegally failed to place Langdon on a WIC §5150 hold. TPD had more than

sufficient evidence to place Langdon on a WIC §5150 hold. TPD had seen ample bizarre

behavior such as Langdon acting agitated, angry or explosive, acts or behavior of an irrational nature, incoherence, disorientation, delusions, hallucinations, perceptions unrelated to reality or grandiose ideas, lack of control, rigidity inflexibility and gross neglect for safety. TPD had further reports from Shelter staff. TPD had access to the CLETS portal with the history of Langdon's convictions and restraining orders, and more recent history of the callouts to TCSD.

110.   TPD negligently failed to seek any help in making their WIC §5150 assessment. Although paramedics are trained to assess whether a person is in a mental crisis and professional evaluation and treatment, the TPD officers did not allow the paramedics to assess Langdon. TPD officers did not call in the PET or any other mental health professionals to assess Langdon in the field.

111.   TPD did not contact Jose to assess his availability to care for the twins. Had TPD placed Langdon on a hold, CWS would have taken custody of the children and in all likelihood would have arranged for the children to go to Jose.

### *CWS Failed to Help Langdon or Protect the Twins*.

112.   The State through its Department of Social Services mandates that CWS have protocols in place for investigating child endangerment claims and keeping records. The County's protocols failed to protect the twins either because they were inadequate or because its emergency response social worker, Ms. Torres, was not properly trained and supervised, and did not follow the mandated emergency response protocols.

### *State Investigation Mandates*

113.   "The County shall respond to all referrals for service which allege that a child is

endangered by abuse, neglect, or exploitation." [DSS Reg. 31-101.1]

114. "The social worker responding to a referral shall be skilled in emergency response." [DSS Reg. 31-101.2]

115. "The social worker shall conduct an in-person investigation of all referrals received from a law enforcement agency which allege abuse, neglect, or exploitation." [DSS Reg. 31-101.4]

116. "The social worker shall immediately initiate and complete the Emergency Response Protocol process when it is necessary to determine whether an in-person investigation is required. The social worker shall record all available and appropriate information on the Emergency Response Protocol form" …with "A description of the alleged incident, including consideration of the following risk factors:

    a) Precipitating incident including the following:

       (1) Severity and frequency;

       (2) Location and description of injury on child's body; and

       (3) History of child abuse, neglect, or exploitation.

    b) Child characteristics including the following:

       (1) Age, vulnerability, special circumstances; and

       (2) Behavior, interaction with caretakers, siblings, and peers.

    c) Caretaker characteristics including the following:

       (1) Ability to care for child;

       (2) Interaction with children, other caretakers;

       (3) Parenting skill/knowledge; and

(4) Substance abuse, criminal behavior, and mental health.

d) Family factors including the following:

(1) Relationships, support systems;

(2) History of abuse, neglect, or exploitation;

(3) Presence of parent substitute;

(4) Environmental conditions; and

(5) Family strengths." [DSS Regs. 31-105.1 & 31-105.112]

117.  "The social worker shall conduct an in-person investigation for all law enforcement referrals either immediately or within 10 calendar days after receipt of a referral, as appropriate." [DSS Reg. 31-110.4]

118.  "The social worker shall conduct an in-person immediate investigation when: The emergency response protocol indicates the existence of a situation in which imminent danger to a child, such as physical pain, injury, disability, severe emotional harm or death, is likely; The law enforcement agency making the referral states that the child is at immediate risk of abuse, neglect or exploitation; The social worker determines that the child referred by a law enforcement agency is in immediate risk of abuse, neglect, or exploitation. [DSS Regs. 31-115.1, 31-115.11, 31-115.12 & 31-115.13]

119.  "The social worker initially investigating a referral shall determine the potential for or the existence of any conditions(s) which places the child, or any other child in the family or household, at risk and in need of services and which would cause the child to be a person described by WIC §§300(a) through (g)." [DSS Reg. 31-125.1]

120.  "The social worker investigating the referral shall have in-person contact with all

of the children alleged to be abused, neglected or exploited, and at least, one adult who has information regarding the allegations." [DSS Reg. 31-125.2]

121.   "If as a result of the investigation the social worker determines that the referral is unfounded pursuant to Penal Code §11165. 12, the social worker shall document the determination in the case record." [DSS Reg. 31-125.21]

122.   "If as a result of the investigation the social worker does not find the referral to be unfounded, the social worker shall:

".221 Conduct an in-person investigation with:

(a) All children present at the time of the initial in-person investigation.

(b) All parents who have access to the child(ren) alleged to be at risk of abuse, neglect or exploitation."

". 222 Make necessary collateral contacts with persons having knowledge of the condition of the children."

"If as a result of the investigation it is determined that neither child welfare services nor a referral to any other community agency is necessary, the social worker shall document this determination." [DSS Reg. 31-125.3]

***Record Keeping Mandates***

123.   "The county shall develop and maintain a current case record for each request or referral that requires child welfare services beyond the emergency response protocol specified in Section 31 -105." [DSS Reg. 31-075.1]

124.   "Case records shall be retained at a minimum of three years in accordance with Manual of Policies and Procedures Section 23-353." [DSS Reg. 31-075. 2]

125.  "Each case record shall contain at least the following information:

    (a)  A face sheet with identification information regarding the child; family; and placement services provider, if any.

    (b)  Documentation of all contacts with the child, family, or other individuals regarding the child or family.

    (h)  All assessments, case plans, and case plan updates.

        (1) Documentation of the date a copy of the case plan/case plan update was provided to the parent(s)/guardian(s).

        (2)  Assessments include written assessments of relatives as required by Welfare and Institutions Code §§309 and 361.3.

    (j) Any data or documents, relating to the child or family, which have been received or sent by the county." [DSS Reg. 31-075.3]

126.  CWS violated these mandates. On or about December 5, 2018, at about 1950 hours TPD's Sgt. Garcia called the CWS Hotline and spoke with CWS' Roxanna Torres. At all times, CWS was required to have a skilled emergency social worker to follow the mandated Emergency Response Protocol described in DSS Regs. 31-105, and to conduct an in-person investigation. The CWS worker Ms. Torres should have searched CLETS and the CWS database. These searches should have revealed Langdon's history of child abuse and domestic violence, as well as her address and Jose's availability to take the twins. CWS' Ms. Torres did not conduct the searches and did not make any in-person investigation.

127.  Sgt. Garcia reported that CWS' Ms. Torres told him they would not take the babies unless TPD arrested the mother or put her on a psychiatric hold.  CWS social worker

Roxanna Torres alleges TPD Sgt. Garcia told her that Langdon had been taken to a hospital for a mental evaluation and denied. Torres told TPD Sgt. Garcia that there were no resources for the mother, but CWS could place the twins if the mother were arrested and that CWS had no prior history of Langdon in the CWS system, including but not limited to any prior child abuse cases. CWS' Ms. Torres had access to the CLETS portal and to CWS' own internal database with the history of Langdon's convictions and restraining orders and CWS involvement. CWS' Ms. Torres did not report Langdon's history of child abuse investigations or supervised visitations. CWS' Ms. Torres did not tell TPD that Jose was an available parent who could take the children.

128.   TPD Officers Davis, Valencia & Sgt. Garcia took Langdon and the babies to the Virginia Motor Lodge in their TPD vehicles. TPD Chaplain Dyst met them at the motel.

129.   Early the next morning, December 6, 2018, Langdon was screaming for someone to call 911. Eventually a bystander called 911. Paramedics responded and found the babies wet, dead and naked on the hotel bed. Langdon had drowned them.

FEDERAL CLAIMS FOR RELIEF

FIRST CLAIM

(Civil Rights Violation-42 U.S.C. §1983 By Estate of Mason Murguia

against Defendants Deputy Lewis, Roxanna Torres and Does 1-4)

130.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

131.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

132.   TCSD deputies deprived this plaintiff of his right to life by leaving him with his mentally unstable mother, without getting her any professional evaluation or treatment. More significantly, the TCSD deputies unlawfully isolated Jose and prevented him from protecting his own children.  TCSD deputies had more than sufficient evidence that Langdon was in a mental crisis including:

 a. The false alarm about the school shooting.

 b. The 911 call from the night before.

 c. The history of bizarre behavior reported by Jose and Rosa.

 d. Jose's report that Langdon had consumed bleach and vinegar.

 e. CLETS information about prior child cruelty and domestic violence.

 f. Langdon's care bag for the twins had only nail polish in it.

 g. Langdon agreed to go to a hospital voluntarily, if Rosa took her.

133.   The obvious next step was to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the hospital, the TCSD deputies were duty bound by County policy to take her to the hospital even if she changed her mind.

134.   Even if TCSD deputies were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the on-site paramedics, a supervisor, the PET, or the DVHRT. The TCSD deputies took none of these mandated and reasonable steps. Instead, the TCSD deputies told the neighbor to take Langdon and the babies to the Church.

135.   Also, the law and County policy required TCSD deputies to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

Instead, TCSD deputies sent Jose outside, and ordered him in words and conduct to stay put and not follow his children. That was the last time Jose saw his children alive.

136.   CWS employees, including Roxanna Torres, also violated the civil rights of the twins and Jose. After TPD contacted CWS, the emergency worker, by law, had to make an in-person investigation. CWS did not do this. CWS had enough information including the criminal and domestic violence history of Langdon, to know that Langdon posed a danger to the children. CWS also should have known that it did not have to permanently detain the children but merely take them to their father. Instead, CWS denied having any information about Langdon. CWS' laziness was a substantial factor in the twins' death.

137.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

138.   From the time of his drowning on until his death, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

139.   At the time of his death, this decedent had a life expectancy of 76.5 years, and was in excellent health.

140.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

141.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

SECOND CLAIM

(Civil Rights Violation-42 U.S.C. §1983 By Estate of Maddox Murguia

against Defendants Deputy Lewis, Roxanna Torres and Does 1-4)

142.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

143.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

144.   TCSD deputies deprived Maddox of his right to life by leaving him with his mentally unstable mother, without getting her any professional evaluation or treatment. More significantly, the TCSD deputies unlawfully isolated Jose and prevented him from protecting his own children.

145.   TCSD deputies had more than sufficient evidence that Langdon was in a mental crisis including:

    a.   The false alarm about the school shooting.

    b.   The 911 call from the night before.

    c.   The history of bizarre behavior reported by Jose and Rosa.

    d.   Jose's report that Langdon had consumed bleach and vinegar.

    e.   CLETS information about prior child cruelty and domestic violence.

    f.   Langdon's care bag for the twins had only nail polish in it.

    g.   Langdon agreed to go to a hospital voluntarily, if Rosa took her.

146.   The obvious next step was to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the hospital, the TCSD deputies were duty bound by County policy to take her to the hospital even if she changed her mind.

147.   Even if TCSD deputies were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the on-site paramedics, a supervisor, the PET, or the DVHRT. The TCSD deputies took none of these mandated and reasonable steps. Instead, the TCSD deputies told the neighbor to take Langdon and the babies to a Church.

148.   Also, the law and County policy required TCSD deputies to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none. Instead, TCSD deputies sent Jose outside, and ordered him in words and conduct to stay put and not follow his children. That was the last time Jose saw his children alive.

149.   CWS employees, including Roxanna Torres, also violated the civil rights of the twins and Jose. After TPD contacted CWS, the emergency worker, by law, had to make an in-person investigation. CWS did not do this. CWS had enough information including the criminal and domestic violence history of Langdon, to know that Langdon posed a danger to the children. CWS also should have known that it did not have to permanently detain the children but merely take them to their father. Instead, CWS denied having any information about Langdon. CWS' laziness was a substantial factor in the twins' death.

150.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

151.   From the time of his drowning on until his death, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

152.   At the time of his death, this decedent had a life expectancy of 76.5 years, and was in excellent health.

153.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

154.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

THIRD CLAIM

(Civil Rights Violation-42 U.S.C. §1983 By Jose Murguia

against Defendants Deputy Lewis, Roxanna Torres and Does 1-4)

155.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

156.   Jose has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

157.   TCSD deputies deprived Jose's twins of their rights to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. More significantly, the TCSD deputies unlawfully isolated Jose and prevented him from protecting his own children.

158.   TCSD deputies had more than sufficient evidence that Langdon was in a mental crisis including:

   a.   The false alarm about the school shooting.

   b.   The 911 call from the night before.

   c.   The history of bizarre behavior reported by Jose and Rosa.

   d.   Jose's report that Langdon had consumed bleach and vinegar.

e.   CLETS information about prior child cruelty and domestic violence.

f.   Langdon's care bag for the twins had only nail polish in it.

g.   Langdon agreed to go to a hospital voluntarily, if Rosa took her.

159.   The obvious next step was to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the hospital, the TCSD deputies were duty bound by County policy to take her to the hospital even if she changed her mind.

160.   Even if TCSD deputies were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the on-site paramedics, a supervisor, the PET, or the DVHRT. The TCSD deputies took none of these mandated and reasonable steps. Instead, the TCSD deputies told the neighbor to take Langdon and the babies to a Church.

161.   Also, the law and County policy required TCSD deputies to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none. Instead, TCSD deputies sent Jose outside, and ordered him in words and conduct to stay put and not follow his children. That was the last time Jose saw his children alive.

162.   CWS employees, including Roxanna Torres, also violated the civil rights of the twins and Jose. After TPD contacted CWS, the emergency worker, by law, had to make an in-person investigation. CWS did not do this. CWS had enough information including the criminal and domestic violence history of Langdon, to know that Langdon posed a danger to the children. CWS also should have known that it did not have to permanently detain the children but merely take them to their father. Instead, CWS denied having any information about Langdon. CWS' laziness was a substantial factor in the twins' death.

163.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

164.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss according to proof.

FOURTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Mason Murguia Against Defendant County of Tulare)

165.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

166.   Mason Murguia has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

167.   Tulare County has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TCSD deputies, including Deputy Lewis, to ensure that the activities of TCSD are run in a lawful manner, preserving to the citizens of the County the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The County's written policies required the TCSD deputies to do the following when dealing with someone in a mental crisis:

- Call for a supervisor.

- Assess a mental crisis by listening to family members and friends.

- Where a person has agreed to go to the hospital and then changes her mind, the TCSD deputy must proceed to take the person to the hospital.

- Where the person has children in her care, the TCSD deputies must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

168. The County did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TCSD deputies on written County policies when dealing with someone in a mental crisis. The County permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its TCSD deputies, particularly TCSD deputy Lewis, violating the constitutional rights of the public at large, including Jose.

169. The TCSD deputies ignored requests by Jose and the neighbor to help Langdon by placing her on a psychiatric hold.

170. The TCSD deputies ignored requests by Jose and the neighbor to protect the twins.

171. The TCSD deputies had the ability to consult with experts trained in crisis intervention including a supervisor, the paramedics, the PET, the DVHRT, the CWS and CLETS.

172. The TCSD deputies deprived Jose and the twins of their rights without any due process of law.

173. The County is directly liable for Jose's damages due to the following policies, practices or customs of TCSD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

a. TCSD failed to adequately and properly train and educate its TCSD deputies (including TCSD Deputy Lewis) with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

b. TCSD failed to adequately monitor and evaluate the performance of its TCSD deputies (including TCSD Deputy Lewis) and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c. TCSD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to

thwart citizen efforts to understand the field events and to deny the investigation of TCSD deputy misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TCSD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TCSD deputy or TCSD.

d. TCSD failed to have an early warning system to identify, counsel and discipline TCSD deputies involved in improper and unconstitutional conduct allowing TCSD deputies to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

174.   Also, the County failed to properly train, supervise and otherwise ensure that CWS personnel properly identified and investigated children in danger and took steps to protect those children. The County's customs, policies, and practices at CWS were so inadequate that Ms. Torres dismissed Sgt. Garcia with a phone call, instead of making the state-mandated in-person investigation and retrieving information from CLETS and CWS' own records.

175.   As a direct and proximate result of the foregoing policies, practices and customs of the County, the violation of the constitutional rights of citizens was substantially certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the County, Jose's and the twins' rights were violated.

176.   At all times, the County developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. County acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. There is no evidence that the County cautioned or disciplined any TCSD deputy or social worker in connection with this tragic case.

177.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

178.   From the time of his drowning on until his death, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

179.   At the time of his death, this decedent had a life expectancy of 76.5 years, and was in excellent health.

180.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

181.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

FIFTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Maddox Murguia Against Defendant County of Tulare)

182.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

183.   Maddox Murguia had a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

184.   Here, Tulare County has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TCSD deputies, including Deputy Lewis, to ensure that the activities of TCSD are run in a lawful manner, preserving to the citizens of the County the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The County's written policies required the TCSD deputies to do the following when dealing with someone in a mental crisis:

- Call for a supervisor.

- Assess a mental crisis by listening to family members and friends.

- Where a person has agreed to go to the hospital and then changes her mind, the TCSD deputy must proceed to take the person to the hospital.

- Where the person has children in her care, the TCSD deputies must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

185.   The County did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TCSD deputies on written County policies when dealing with someone in a mental crisis. The County permitted, encouraged, tolerated, and knowingly

acquiesced to an official pattern, practice or custom of its TCSD deputies, particularly TCSD deputy Lewis, violating the constitutional rights of the public at large, including Jose.

186.   The TCSD deputies ignored requests by Jose and the neighbor to help Langdon by placing her on a psychiatric hold.

187.   The TCSD deputies ignored requests by Jose and the neighbor to protect the twins.

188.   The TCSD deputies had the ability to consult with experts trained in crisis intervention including a supervisor, the paramedics, the PET, the DVHRT, the CWS and CLETS.

189.   The TCSD deputies deprived Jose and the twins of their rights without any due process of law.

190.   The County is directly liable for Jose's damages due to the following policies, practices or customs of TCSD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

a.   TCSD failed to adequately and properly train and educate its TCSD deputies (including TCSD Deputy Lewis) with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

b.  TCSD failed to adequately monitor and evaluate the performance of its TCSD deputies (including TCSD Deputy Lewis) and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.  TCSD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of TCSD deputy misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TCSD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TCSD deputy or TCSD.

d.   TCSD failed to have an early warning system to identify, counsel and discipline TCSD deputies involved in improper and unconstitutional conduct allowing TCSD deputies to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

191.  Along the same lines, the County failed to properly train, supervise and otherwise ensure that CWS personnel properly identified and investigated children in danger and took steps to protect those children. The County's customs, policies, and practices at CWS were so inadequate that Ms. Torres dismissed Sergeant Garcia with a phone call, instead of making the state-mandated in-person investigation and retrieving lifesaving information from CLETS and CWS' own records.

192.  As a direct and proximate result of the foregoing policies, practices and customs of the County, the violation of the constitutional rights of citizens by the county including TCSD Deputy Lewis was substantially certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the County, Jose's and the twins' rights were violated.

193.  At all times, the County developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. County acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference

in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the County cautioned or disciplined any TCSD deputy in connection with this tragic case.

194.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

195.   From his drowning until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

196.   At the time of his death, this decedent had a life expectancy of 76.5 years, and was in excellent health.

197.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

198.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

SIXTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Jose Murguia Against Defendant County of Tulare)

199.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

200.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

201.   Here, Tulare County has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TCSD deputies, including Deputy Lewis, to ensure that the activities of TCSD are run in a lawful manner, preserving to the citizens of the County the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The County's written policies required the TCSD deputies to do the following when dealing with someone in a mental crisis:

- Call for a supervisor.

- Assess a mental crisis by listening to family members and friends.

- Where a person has agreed to go to the hospital and then changes her mind, the TCSD deputy must proceed to take the person to the hospital.

- Where the person has children in her care, the TCSD deputies must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

202.   The County did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TCSD deputies on written County policies when dealing with someone in a mental crisis. The County permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its TCSD deputies, particularly TCSD deputy Lewis, violating the constitutional rights of the public at large, including Jose.

203.   The TCSD deputies ignored requests by Jose and the neighbor to help Langdon by placing her on a psychiatric hold.

204.   The TCSD deputies ignored requests by Jose and the neighbor to protect the twins.

205. The TCSD deputies had the ability to consult with experts trained in crisis intervention including a supervisor, the paramedics, the PET, the DVHRT, the CWS and CLETS.

206. The TCSD deputies deprived Jose and the twins of their rights without any due process of law.

207. The County is directly liable for Jose's damages due to the following policies, practices or customs of TCSD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

    a. TCSD failed to adequately and properly train and educate its TCSD deputies (including TCSD Deputy Lewis) with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

    b. TCSD failed to adequately monitor and evaluate the performance of its TCSD deputies (including TCSD Deputy Lewis) and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the

DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.   TCSD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of TCSD deputy misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TCSD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TCSD deputy or TCSD.

d.   TCSD failed to have an early warning system to identify, counsel and discipline TCSD deputies involved in improper and unconstitutional conduct allowing TCSD deputies to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

208.   Along the same lines, the County failed to properly train, supervise and otherwise ensure that CWS personnel properly identified and investigated children in danger and took steps to protect those children. The County's customs, policies, and practices at CWS were so inadequate that Ms. Torres dismissed Sergeant Garcia with a phone call, instead of making the state-mandated in-person investigation and retrieving lifesaving information from CLETS and CWS' own records.

209.   As a direct and proximate result of the foregoing policies, practices and customs of the County, the violation of the constitutional rights of citizens was substantially certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the County, Jose's and the twins' rights were violated.

210.   At all times, the County developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. County acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the County cautioned or disciplined any TCSD deputy in connection with this tragic case.

211.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

212.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

SEVENTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Mason Murguia against Defendants Does 5-8)

213.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

214.   Mason Murguia had a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

215.   VPD officers deprived the twins of their right to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. VPD officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious next step would be to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the mental health clinic, VPD officers were duty bound to take her to the hospital even if she changed her mind.

216.   Even if VPD officers were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the the PET,

the DVHRT, the CWS and CLETS. VPD officers took none of these mandated and reasonable steps. Instead, the VPD officers took everyone to Lighthouse, which would not accept Langdon because she was obviously crazy. Lighthouse employees determined Langdon was mentally unstable even though VPD did not tell Lighthouse about any of Langdon's history of bizarre behavior.

217.   Also, the law and City policy required VPD officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

218.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

219.   From the time of his drowning on until his death, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

220.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

221.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

222.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

EIGHTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Maddox Murguia against Defendants Does 5-8)

223.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

224.   Maddox Murguia a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.

225.   VPD officers deprived the twins of their right to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. VPD officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious next step would be to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the mental health clinic, VPD officers were duty bound to take her to the hospital even if she changed her mind.

226.   Even if VPD Officers were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the PET, the DVHRT, the CWS and CLETS. VPD officers took none of these mandated and reasonable steps. Instead, the VPD officers impotently took everyone to Lighthouse, which would not accept Langdon because she was obviously crazy. Lighthouse employees determined Langdon was mentally unstable even though VPD did not tell them about any of Langdon's history of bizarre behavior.

227.   Also, the law and City policy required VPD officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

228.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

229.   From the time of his drowning on until his death, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

230.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

231.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

232.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

NINTH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Jose Murguia against Defendants Does 5-8)

233.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

234.   This plaintiff has a right to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

235.   VPD officers deprived the twins of their right to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. VPD officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious next step would be to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the mental health clinic, VPD officers were duty bound to take her to the hospital even if she changed her mind.

236.   Even if VPD Officers were unsure about assessing Langdon, which would

show an enormity of incompetence, they had multiple options including consulting with the PET, CWS or the DVHRT. VPD officers took none of these mandated and reasonable steps. Instead, the VPD officers took everyone to Lighthouse, which would not accept Langdon because she was obviously crazy. Lighthouse employees determined Langdon was mentally unstable even though VPD did not tell them about any of Langdon's history of bizarre behavior.

237.   Also, the law and City policy required VPD officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

238.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

239.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

10th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Mason Murguia Against Defendant City of Visalia)

240.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

241.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

242.    City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline VPD Officers to ensure that the activities of VPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require VPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the VPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the VPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

243.   The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the VPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its VPD Officers violating the constitutional rights of the public at large, including Jose. The VPD Officers had the ability to consult with experts trained in crisis intervention including the paramedics, the PET, the DVHRT and CLETS. The VPD Officers deprived Jose and the twins of their rights without any due process of law.

244.   The City is directly liable for Jose's damages due to the following policies, practices or customs of VPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

    a.  VPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

    b.  VPD failed to adequately monitor and evaluate the performance of its VPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c. VPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of VPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to VPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a VPD officer or VPD.

d. VPD failed to have an early warning system to identify, counsel and discipline VPD officers involved in improper and unconstitutional conduct allowing VPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

245. As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

246. At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with

deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any VPD officer in connection with this tragic case.

247.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

248.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

249.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

250.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

251.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

11th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Maddox Murguia Against Defendant City of Visalia)

252.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

253.   Here, City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline VPD Officers to ensure that the activities of VPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require VPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the VPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the VPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

254.   The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the VPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its VPD Officers violating the constitutional rights of the public at large, including Jose. The VPD Officers had the ability

to consult with experts trained in crisis intervention including the paramedics, the PET, the DVHRT and CLETS. The VPD Officers deprived Jose and the twins of their rights without any due process of law.

255.   The City is directly liable for Jose's damages due to the following policies, practices or customs of VPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

a.   VPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

b.   VPD failed to adequately monitor and evaluate the performance of its VPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with

a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.  VPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of VPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to VPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a VPD officer or VPD.

d.  VPD failed to have an early warning system to identify, counsel and discipline VPD officers involved in improper and unconstitutional conduct allowing VPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

256.  As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially

certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

257.   At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any VPD officer in connection with this tragic case.

258.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

259.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

260.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

261.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

262.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

## 12th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Jose Murguia Against Defendant City of Visalia)

263.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

264.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

265.   Here, City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline VPD Officers to ensure that the activities of VPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require VPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the VPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the VPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

266.   The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the VPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its VPD Officers violating the constitutional rights of the public at large, including Jose.

267.   The VPD Officers had the ability to consult with experts trained in crisis intervention including the paramedics, the PET, the DVHRT and CLETS. The VPD Officers deprived Jose and the twins of their rights without any due process of law.

268.   The City is directly liable for Jose's damages due to the following policies, practices or customs of VPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

>    a. VPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;
>
>    b. VPD failed to adequately monitor and evaluate the performance of its VPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis,

responding appropriately to a call involving someone with a mental crisis, using available resources including the PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c. VPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of VPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to VPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a VPD officer or VPD.

d. VPD failed to have an early warning system to identify, counsel and discipline VPD officers involved in improper and unconstitutional conduct allowing VPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

269.   As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

270.   At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any VPD officer in connection with this tragic case.

271.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

272.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

13TH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Mason Murguia against Defendants Sgt. Garcia, Officer Davis, Officer

Valencia and Does 9-12)

273.  This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

274.  This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

275.  TPD Officers deprived the twins of their right to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. TPD Officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious next step would be to get Langdon evaluated by a mental health professional. Once Langdon agreed to go to the hospital, TPD Officers were duty bound to take her to the hospital even if she changed her mind.

276.  Even if TPD Officers were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the on-site paramedics, PET, the DVHRT, the CWS and CLETS. TPD Officers took none of these mandated and reasonable steps. Instead, the TPD Officers took everyone to the motel, where the twins died.

Also, the law and City policy required TPD Officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

277.  The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018

278.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

279.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

280.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

By reason of the death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

14TH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Maddox Murguia against Defendants Sgt. Garcia, Officer Davis, Officer

Valencia and Does 9-12)

281.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

282.   This plaintiff has a right to life and to familial companionship and society and this right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818 F.2d 1411, 1418-20.]

283.   TPD Officers deprived the twins of their right to life by leaving them with their mentally unstable mother, without getting her any professional evaluation or treatment. TPD Officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious next step would be to get Langdon evaluated by a mental health professional. Once Langdon

agreed to go to the hospital, TPD Officers were duty bound to take her to the hospital even if she changed her mind.

284.   Even if TPD Officers were unsure about assessing Langdon, which would show an enormity of incompetence, they had multiple options including consulting with the on-site paramedics, PET, the DVHRT, the CWS and CLETS. TPD Officers took none of these mandated and reasonable steps. Instead, the TPD Officers took everyone to the motel, where the twins died. Also, the law and City policy required TPD Officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none.

285.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

286.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

287.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

288.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

289.   By reason of the death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

## 15TH CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Jose Murguia against Defendants Sgt. Garcia, Officer Davis, Officer Valencia and

Does 9-12)

290.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

291.   This plaintiff has a right to life and to familial companionship and society and this

right is protected under the constitution. [*See Smith v. City of Fontana*, (9th Cir.1987) 818

F.2d 1411, 1418-20.]

292.   TPD Officers deprived the twins of their right to life by leaving them with their

mentally unstable mother, without getting her any professional evaluation or treatment. TPD

Officers had more than sufficient evidence that Langdon was in a mental crisis. The obvious

next step would be to get Langdon evaluated by a mental health professional. Once Langdon

agreed to go to the hospital, TPD Officers were duty bound to take her to the hospital even if

she changed her mind.

293.   Even if TPD Officers were unsure about assessing Langdon, which would show an

enormity of incompetence, they had multiple options including consulting with the on-site

paramedics, PET, the DVHRT, the CWS and CLETS. TPD Officers took none of these

mandated and reasonable steps. Instead, the TPD Officers took everyone to the motel, where

the twins died. Also, the law and City policy required TPD Officers to leave the twins with

Jose, their father, unless there was a court order to the contrary, and there was none.

294.   Jose's intestates were killed by the careless, negligent, and wanton conduct of

defendants' agents and servants, and plaintiff has been damaged, by reason of the careless,

negligent, and wanton conduct of defendant's agent, according to proof.

295.   As a direct and proximate result of the death of the decedents, Jose has been

deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

16th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Mason Murguia against Defendant City of Tulare)

296.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

297.   Here, City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TPD Officers to ensure that the activities of TPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require TPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the TPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the TPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

298.   The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly

acquiesced to an official pattern, practice or custom of its TPD Officers violating the constitutional rights of the public at large, including Jose. The TPD Officers had the ability to consult with experts trained in crisis intervention including the paramedics, PET, the DVHRT, the CWS and CLETS. The TPD Officers deprived Jose and the twins of their rights without any due process of law.

299.   The City is directly liable for Jose's damages due to the following policies, practices or customs of TPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

a.   TPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

b.   TPD failed to adequately monitor and evaluate the performance of its TPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental

crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.   TPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of TPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TPD officer or TPD.

d.   TPD failed to have an early warning system to identify, counsel and discipline TPD officers involved in improper and unconstitutional conduct allowing TPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

300.   As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially

certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

301.   At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any TPD officer in connection with this tragic case.

302.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

303.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

304.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

305.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

306.  By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

17th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Estate of Maddox Murguia Against Defendant City of Tulare)

307.  This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

308.  Here, City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TPD Officers to ensure that the activities of TPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require TPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the TPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the TPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

309.  The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its TPD Officers violating the

constitutional rights of the public at large, including Jose. The TPD Officers had the ability to consult with experts trained in crisis intervention including the paramedics, PET, the DVHRT, the CWS and CLETS. The TPD Officers deprived Jose and the twins of their rights without any due process of law.

310. The City is directly liable for Jose's damages due to the following policies, practices or customs of TPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

    a.    TPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

    b.    TPD failed to adequately monitor and evaluate the performance of its TPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a

mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.   TPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of TPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TPD officer or TPD.

d.   TPD failed to have an early warning system to identify, counsel and discipline TPD officers involved in improper and unconstitutional conduct allowing TPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

311.   As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially

certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

312.   At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any TPD officer in connection with this tragic case.

313.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

314.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

315.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

316.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

317.  By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

18th CLAIM

(Civil Rights Violation-42 U.S.C. §1983

By Jose Murguia Against Defendant City of Tulare)

318.  This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

319.  Here, City has a duty to train, screen, discipline, supervise, assign, control, counsel and/or discipline TPD Officers to ensure that the activities of TPD are run in a lawful manner, preserving to the citizens the rights, privileges and immunities guaranteed to them by the Constitutions and the laws of the United States and the State of California. The City's written policies require TPD Officers to do the following when dealing with someone in a mental crisis:

- Assess a mental crisis by listening to those around her.

- Where a person has agreed to go to the hospital and then changes her mind, the TPD Officer must proceed to take the person to the hospital.

- Where the person has children in her care, the TPD Officer must make arrangements to have the other custodial parent take the children unless there is an order to the contrary.

320.  The City did not properly train, screen, discipline, supervise, assign, control, counsel and/or discipline the TPD Officers on written City policies when dealing with someone in a mental crisis. The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice or custom of its TPD Officers violating the

constitutional rights of the public at large, including Jose. The TPD Officers had the ability to consult with experts trained in crisis intervention including the paramedics, PET, the DVHRT, the CWS and CLETS. The TPD Officers deprived Jose and the twins of their rights without any due process of law.

321.   The City is directly liable for Jose's damages due to the following policies, practices or customs of TPD which were in effect at the time of this incident and which were a substantial factor in causing the twins' deaths:

    a.   TPD failed to adequately and properly train and educate its officers with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others;

    b.   TPD failed to adequately monitor and evaluate the performance of its TPD officers and their compliance with the laws and policies, practices and customs with respect to recognizing when a citizen has a mental illness or crisis, responding appropriately to a call involving someone with a mental crisis, using available resources including PET, the DVHRT, the CWS and CLETS, or other available assessment or crisis team when dealing with someone with a mental crisis, identifying appropriate responses when dealing with someone with a

mental crisis, assessing the safety of everyone at the scene, considering the statements made by credible third persons about the subject's danger to herself or others.

c.   TPD has a policy, practice and custom of refusing to respond to proper public records requests for reports and other documents regarding field contact with someone in a mental crisis. This policy, practice and custom is designed to thwart citizen efforts to understand the field events and to deny the investigation of TPD officer misconduct in an effort to escape liability, thus creating a policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is ratified, condoned or approved, in deliberate indifference and reckless disregard to the rights of the public at large, including Jose. Accordingly, a person like Jose, who has suffered a loss due to TPD's misconduct, is significantly disadvantaged in any effort to make a formal complaint against a TPD officer or TPD.

d.   TPD failed to have an early warning system to identify, counsel and discipline TPD officers involved in improper and unconstitutional conduct allowing TPD officers to violate the civil rights of citizens without fear of discipline in reckless disregard and deliberate indifference to the rights of the public, including the Jose.

322.   As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the City was substantially

certain to occur. In addition, as a direct and proximate result of the policies, practices and customs of the City, Jose's and the twins' rights were violated.

323.   At all times, the City developed, encouraged and tolerated the unlawful policies and practices described in the foregoing allegations. City acted knowingly and with deliberate indifference to the Constitutional rights of citizens, of plaintiff in particular, and maintained and permitted an official policy, custom and practice of permitting the occurrence of the types of wrongs set forth. These policies, customs and practices include, but are not limited to, knowingly permitting its agents and employees to act with deliberate indifference in the implementation of and in the failure to implement the various alleged laws, enactments, statutes, and regulations for its minor dependents such as plaintiffs. In fact, there is no evidence that the City cautioned or disciplined any TPD officer in connection with this tragic case.

324.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

325.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

STATE CLAIMS FOR RELIEF

19th CLAIM

(Public Employee Liability- Govt. Code §820

By Estate of Mason Murguia against Defendants Deputy Lewis, Roxanna Torres

and Does 1-4)

326.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

327.   The County employees, like any other citizens, owed a duty of reasonable care to each plaintiff. The County employees also had special relationships with Jose and the twins and thus owed a higher level of duty.  The County employees engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, a special relationship existed because the TCSD deputies, through their statements and affirmative conduct, imparted a false sense of security to Jose making him more vulnerable to injury. By voluntarily rendering assistance, each TCSD deputy assumed a duty to exercise ordinary care to protect against the foreseeable danger posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon.

328.   Jose twice asked TCSD deputies to help Langdon and protect the twins. The TCSD deputies promised Jose the night before that they would get help for Langdon and told Jose not to interfere.  The TCSD deputies shut Jose out and prevented him from protecting his children or helping Langdon. These facts created a special relationship placing an affirmative duty on TCSD deputies to help Langdon and protect the children. The TCSD deputies ordered Jose to stay away from Langdon and the twins. Jose was compelled by law to follow this order; if he had disobeyed it, he would have been arrested.

329.   The individual TCSD deputies are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and County laws

and regulations. This negligence was a substantial factor in causing the twins' deaths.

330.   The CWS employees are also guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and County laws and regulations. After TPD contacted CWS, Roxanna Torres, the emergency worker, was required to make or initiate an in-person investigation. CWS had ample information about Langdon, including the criminal and domestic violence history, CLETS, and its own CWS records, to know that Langdon posed a danger to the children. CWS also should have known that it did not have to detain the children but simply take them to their father, Jose. Instead, CWS apparently lied to TPD and did nothing to protect the twins.

331.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

332.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

333.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

334.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

335.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

20th CLAIM

(Public Employee Liability- Govt. Code §820

By Estate of Maddox Murguia against Defendants Deputy Lewis, Roxanna Torres

and Does 1-4)

336.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

337.   The County employees, like any other citizens, owed a duty of reasonable care to each plaintiff. The County employees also had special relationships with Jose and the twins and thus owed a higher level of duty.  The County employees engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, a special relationship existed because the TCSD deputies, through their statements and affirmative conduct, imparted a false sense of security to Jose making him more vulnerable to injury. By voluntarily rendering assistance, each TCSD deputy assumed a duty to exercise ordinary care to protect against the foreseeable danger posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon.

338.   Jose twice asked TCSD deputies to help Langdon and protect the twins. The TCSD deputies promised Jose the night before that they would get help for Langdon and told Jose not to interfere.  The TCSD deputies shut Jose out and prevented him from protecting his children or helping Langdon. These facts created a special relationship placing an affirmative duty on TCSD deputies to help Langdon and protect the children. The TCSD deputies ordered Jose to stay away from Langdon and the twins. Jose was compelled by law to follow this order; if he had disobeyed it, he would have been arrested.

339.   The individual TCSD deputies are guilty of negligence *per se* pursuant to Evidence

Code §669 because they violated the above duties and violated written state and County laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

340.   The CWS employees are also guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and County laws and regulations. After TPD contacted CWS, Roxanna Torres, the emergency worker, was required to initiate or make an in-person investigation. CWS had ample information about Langdon, including the criminal and domestic violence history, CLETS, and its own CWS records, to know that Langdon posed a danger to the children. CWS also should have known that it did not have to detain the children but simply take them to their father, Jose. Instead, CWS apparently lied to TPD and did nothing to protect the twins.

341.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

342.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

343.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

344.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

345.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

21st CLAIM

(Public Employee Liability- Govt. Code §820

By Jose Murguia against Defendants Deputy Lewis, Roxanna Torres and Does 1-4)

346.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

347.    The County employees, like any other citizens, owed a duty of reasonable care to each plaintiff. The County employees also had special relationships with Jose and the twins and thus owed a higher level of duty.  The County employees engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, a special relationship existed because the TCSD deputies, through their statements and affirmative conduct, imparted a false sense of security to Jose making him more vulnerable to injury. By voluntarily rendering assistance, each TCSD deputy assumed a duty to exercise ordinary care to protect against the foreseeable danger posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon.

348.    Jose twice asked TCSD deputies to help Langdon and protect the twins. The TCSD deputies promised Jose the night before that they would get help for Langdon and told Jose not to interfere.  The TCSD deputies shut Jose out and prevented him from protecting his children or helping Langdon. These facts created a special relationship placing an affirmative duty on TCSD deputies to help Langdon and protect the children. The TCSD deputies ordered Jose to stay away from Langdon and the twins. Jose was compelled by law to follow this order; if he had disobeyed it, he would have been arrested.

349.    The individual TCSD deputies are guilty of negligence *per se* pursuant to

Evidence Code §669 because they violated the above duties and violated written state and County laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

350.     The CWS employees are also guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and County laws and regulations. After TPD contacted CWS, Roxanna Torres, the emergency worker, was required to initiate or make an in-person investigation. CWS had ample information about Langdon, including the criminal and domestic violence history, CLETS and its own CWS records to know that Langdon posed a danger to the children. CWS also should have known that it did not have to detain the children but simply take them to their father, Jose. Instead, CWS apparently lied to TPD and did nothing to protect the twins.

351.     The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

352.     Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

353.     As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

22nd CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Estate of Mason Murguia against Defendant County of Tulare)

354.     This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

355.     The County is liable for the negligent acts and omissions of its TCSD deputies and CWS workers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, County employees were negligent and under section 815.2, the County is vicariously liable for this negligence, which resulted in the twins' death.

356.     The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

357.     From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

358.     At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

359.     By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

360.     By reason of the injury and death of decedent, decedent's estate has become liable

for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

23rd CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Estate of Maddox Murguia against Defendant County of Tulare)

361.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

362.   The County is liable for the negligent acts and omissions of its TCSD deputies and CWS workers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, County employees were negligent and under section 815.2, the County is vicariously liable for this negligence, which resulted in the twins' death.

363.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

364.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

365.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

366.   By reason of the death of decedent, decedent's estate has been deprived of the

present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

367.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

24th CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Jose Murguia against Defendant County of Tulare)

368.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

369.    The County is liable for the negligent acts and omissions of its TCSD deputies and CWS workers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, County employees were negligent and under section 815.2, the County is vicariously liable for this negligence, which resulted in the twins' death.

370.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

371.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society,

protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

## 25th CLAIM

(Public Entity Liability- Government Code § 815.6

By Estate of Mason Murguia against Defendant County of Tulare)

372.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

373.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Counties have many mandatory duties. Counties have a non-delegable duty to train and provide TCSD deputies and CWS workers that do not violate federal and state laws and Constitutions. Counties must train their TCSD deputies and CWS workers to follow state and departmental policies and procedures. The County failed to meet these mandatory duties.

374.    TCSD deputies completely ignored their mandatory duties to assess Langdon, to take Langdon to the hospital for further evaluation when she voluntarily agreed to go, and to give Jose custody of the twins. Similarly, CWS workers breach their mandatory duty to investigate the TPD referral in person and to keep and access records that would have provided lifesaving information.

375.    Also, TCSD deputies are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim

of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§ 11165.7; 11166; 11166.05]

376.    The County can act only through its employees. As explained above in great detail, the County employees breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins even though, by isolating Jose, County employees created a situation where Langdon, a person in an active, severe and long-lasting mental crisis was the only one responsible for the children.

377.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

378.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

379.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

380.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

381.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

26th CLAIM

(Public Entity Liability- Government Code § 815.6

By Estate of Maddox Murguia against Defendant County of Tulare)

382.  This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

383.  Government Code § 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Counties have many mandatory duties. Counties have a non-delegable duty to train and provide TCSD deputies and CWS workers that do not violate federal and state laws and Constitutions. Counties must train their TCSD deputies and CWS workers to follow state and departmental policies and procedures. The County failed to meet these mandatory duties.

384.  TCSD deputies completely ignored their mandatory duties to assess Langdon, to take Langdon to the hospital for further evaluation when she voluntarily agreed to go, and to give Jose custody of the twins. Similarly, CWS workers breach their mandatory duty to investigate the TPD referral in person and to keep and access records that would have provided lifesaving information.

385.  Also, TCSD deputies are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§11165.7; 11166; 11166.05]

386.  The County can act only through its employees. As explained above in great

detail, the County employees breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins even though, by isolating Jose, County employees created a situation where Langdon, a person in an active, severe and long-lasting mental crisis was the only one responsible for the children.

387.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

388.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

389.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

390.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

391.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

27th CLAIM

(Public Entity Liability- Government Code § 815.6

By Jose Murguia against Defendant County of Tulare)

392.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

393.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular

kind of injury." Counties have many mandatory duties. Counties have a non-delegable duty to train and provide TCSD deputies and CWS workers that do not violate federal and state laws and Constitutions. Counties must train their TCSD deputies and CWS workers to follow state and departmental policies and procedures. The County failed to meet these mandatory duties.

394.   TCSD deputies completely ignored their mandatory duties to assess Langdon, to take Langdon to the hospital for further evaluation when she voluntarily agreed to go, and to give Jose custody of the twins. Similarly, CWS workers breach their mandatory duty to investigate the TPD referral in person and to keep and access records that would have provided lifesaving information.

395.   Also, TCSD deputies are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§11165.7; 11166; 11166.05]

396.   The County can act only through its employees. As explained above in great detail, the County employees breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins even though, by isolating Jose, County employees created a situation where Langdon, a person in an active, severe and long-lasting mental crisis was the only one responsible for the children.

397.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

398.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

## 28th CLAIM

(Public Employee Vicarious Liability- Government Code §820

By Estate of Mason Murguia against Defendants Does 5-8)

399.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

400.   VPD officers, like any other citizens, owed a duty of reasonable care to each plaintiff. The VPD officers also had special relationships with Jose and the twins and thus owed a higher level of duty.  The VPD officers engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, by voluntarily rendering assistance, each VPD officer assumed a duty to exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon. These duties included, but are not limited to, calling for mental health professionals to evaluate Langdon, either in the field or at a mental health facility, and arranging for the twins to be with their father or calling CWS to evaluate whether the twins should be detained from Langdon.

401.    The individual VPD officers are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and City laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

402.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

403.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

404.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

405.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

406.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

29th CLAIM

(Public Employee Liability- Government Code §820

By Estate of Maddox Murguia against Defendants Does 5-8)

407.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

408.    VPD officers, like any other citizens, owed a duty of reasonable care to each plaintiff. The VPD officers also had special relationships with Jose and the twins and thus owed a higher level of duty.  The VPD officers engaged in conduct that created a risk of

harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, by voluntarily rendering assistance, each VPD officer assumed a duty to exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon. These duties included, but are not limited to, calling for mental health professionals to evaluate Langdon, either in the field or at a mental health facility, and arranging for the twins to be with their father or calling CWS to evaluate whether the twins should be detained from Langdon.

409.    The individual VPD officers are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and City laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

410.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

411.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

412.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

413.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

414.    By reason of the injury and death of decedent, decedent's estate has become liable

for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

30th CLAIM

(Public Employee Liability- Government Code §820

By Jose Murguia against Defendants Does 5-8)

415.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

416.   VPD officers, like any other citizens, owed a duty of reasonable care to each plaintiff. The VPD officers also had special relationships with Jose and the twins and thus owed a higher level of duty.  The VPD officers engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, by voluntarily rendering assistance, each VPD officer assumed a duty to exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon. These duties included, but are not limited to, calling for mental health professionals to evaluate Langdon, either in the field or at a mental health facility, and arranging for the twins to be with their father or calling CWS to evaluate whether the twins should be detained from Langdon.

417.   The individual VPD officers are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and City laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

418.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

419.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

31st CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Estate of Mason Murguia against Defendant City of Visalia)

420.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

421.    Visalia is liable for the negligent acts and omissions of its VPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, VPD officer were negligent and under section 815.2, Visalia is vicariously liable for this negligence, which resulted in the twins' death.

422.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

423.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

424. At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

425. By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

426. By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

32nd CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Estate of Maddox Murguia against Defendant City of Visalia)

427. This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

428. Visalia is liable for the negligent acts and omissions of its VPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, VPD officer were negligent and under section 815.2, Visalia is vicariously liable for this negligence, which resulted in the twins' death.

429. The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

430.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

431.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

432.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

433.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

33rd CLAIM

(Public Entity Liability- Government Code §815.2

By Jose Murguia against Defendant City of Visalia)

434.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

435.    Visalia is liable for the negligent acts and omissions of its VPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, VPD officer were negligent and under section 815.2, Visalia is vicariously liable for

this negligence, which resulted in the twins' death.

436.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

437.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

34th CLAIM

(Public Entity Liability- Government Code § 815.6)

By Estate of Mason Murguia against Defendant City of Visalia)

438.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

439.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Visalia has a non-delegable duty to train and provide VPD officers that do not violate federal and state laws and Constitutions. Visalia must train its VPD officers to follow state and departmental policies and procedures. Visalia failed to meet these mandatory duties.

440.    VPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to arrange for the twins to be with their father or to call CWS to evaluate whether the twins should be detained from Langdon.

441.    Also, VPD officers are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§11165.7; 11166; 11166.05]

442.    Visalia can act only through its employees. As explained above in great detail, the VPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

443.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

444.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

445.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

446.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

447.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

35th CLAIM

(Public Entity Liability- Government Code § 815.6

By Estate of Maddox Murguia against Defendant City of Visalia)

448.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

449.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Visalia has a non-delegable duty to train and provide VPD officers that do not violate federal and state laws and Constitutions. Visalia must train its VPD officers to follow state and departmental policies and procedures. Visalia failed to meet these mandatory duties.

450.    VPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to arrange for the twins to be with their father or to call CWS to evaluate whether the twins should be detained from Langdon.

451.    Also, VPD officers are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§11165.7; 11166; 11166.05]

452.    Visalia can act only through its employees. As explained above in great detail, the

VPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

453.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

454.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

455.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

456.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

457.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

36th CLAIM

(Public Entity Liability- Government Code § 815.6

by Jose Murguia against Defendant City of Visalia)

458.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

459.    Government Code § 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Visalia has a non-delegable duty to train and provide VPD officers that do not violate federal and state laws and Constitutions. Visalia

must train its VPD officers to follow state and departmental policies and procedures. Visalia failed to meet these mandatory duties.

460.    VPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to arrange for the twins to be with their father or to call CWS to evaluate whether the twins should be detained from Langdon.

461.    Also, VPD officers are mandated reporters under the Child Abuse and Neglect Reporting Act ("CANRA.") A mandated CANRA reporter is a person who is required to report known or suspected instances of child abuse and neglect if they, in their professional capacity or within the scope of their employment, observe a child who appears to be a victim of abuse, neglect, or exploitation. A mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect is guilty of a misdemeanor and subject to imprisonment or fine. [Penal Code §§ 11165.7; 11166; 11166.05]

462.    Visalia can act only through its employees. As explained above in great detail, the VPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

463.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

464.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss,

according to proof.

## 37th CLAIM

(Public Employee Liability- Government Code §820

By Estate of Mason Murguia against Defendants Sgt. Garcia, Officer Davis, Officer

Valencia and Does 9-12)

465.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

466.    TPD officers, like any other citizens, owed a duty of reasonable care to each

plaintiff. The TPD officers also had special relationships with Jose and the twins and thus

owed a higher level of duty.  The TPD officers engaged in conduct that created a risk of

harm to the victim that required each employee to act affirmatively to avoid or prevent injury

to the victim. Also, by voluntarily rendering assistance, each TPD officer assumed a duty to

exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This

duty included the obligation not to expose the twins to an unreasonable risk of injury by

Langdon. These duties included, but are not limited to, calling for mental health

professionals to evaluate Langdon, either in the field or at a mental health facility, and

arranging for the twins to be with their father or calling CWS to evaluate whether the twins

should be detained from Langdon.

467.    The individual TPD officers are guilty of negligence *per se* pursuant to Evidence

Code §669  because they violated the above duties and violated written state and City laws

and regulations. This negligence was a substantial factor in causing the twins' deaths.

468.    The above-described wrongful acts of these defendants were the legal cause of

decedent's drowning and subsequent death on December 6, 2018.

469.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

470.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

471.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

472.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

38th CLAIM

(Public Employee Liability- Government Code §820

By Estate of Maddox Murguia against Defendants Sgt. Garcia, Officer Davis,

Officer Valencia and Does 9-12)

473.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

474.    TPD officers, like any other citizens, owed a duty of reasonable care to each plaintiff. The TPD officers also had special relationships with Jose and the twins and thus owed a higher level of duty.  The TPD officers engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, by voluntarily rendering assistance, each TPD officer assumed a duty to exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by

Langdon. These duties included, but are not limited to, calling for mental health professionals to evaluate Langdon, either in the field or at a mental health facility, and arranging for the twins to be with their father or calling CWS to evaluate whether the twins should be detained from Langdon.

475.   The individual TPD officers are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and City laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

476.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

477.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

478.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

479.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

480.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

39th CLAIM

(Public Employee Liability- Government Code §820

By Jose Murguia against Defendants Sgt. Garcia, Officer Davis,

Officer Valencia and Does 9-12)

481.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

482.    TPD officers, like any other citizens, owed a duty of reasonable care to each plaintiff. The TPD officers also had special relationships with Jose and the twins and thus owed a higher level of duty.  The TPD officers engaged in conduct that created a risk of harm to the victim that required each employee to act affirmatively to avoid or prevent injury to the victim. Also, by voluntarily rendering assistance, each TPD officer assumed a duty to exercise ordinary care to protect against the foreseeable dangers posed by Langdon. This duty included the obligation not to expose the twins to an unreasonable risk of injury by Langdon. These duties included, but are not limited to, calling for mental health professionals to evaluate Langdon, either in the field or at a mental health facility, and arranging for the twins to be with their father or calling CWS to evaluate whether the twins should be detained from Langdon.

483.    The individual TPD officers are guilty of negligence *per se* pursuant to Evidence Code §669 because they violated the above duties and violated written state and City laws and regulations. This negligence was a substantial factor in causing the twins' deaths.

484.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

485.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss,

according to proof.

40th CLAIM

(Public Entity Vicarious Liability- Government Code §815.2

By Estate of Mason Murguia against Defendant City of Tulare)

486.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

487.    Tulare is liable for the negligent acts and omissions of its TPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, each TPD officer was negligent and under section 815.2, Tulare is vicariously liable for this negligence, which resulted in the twins' death.

488.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

489.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

490.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

491.    By reason of the death of decedent, decedent's estate has been deprived of the

present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

492.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

41th CLAIM

(Public Entity Liability- Government Code §815.2

By Estate of Maddox Murguia against Defendant City of Tulare)

493.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

494.   Tulare is liable for the negligent acts and omissions of its TPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Govt Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, each TPD officer were negligent and under section 815.2, Tulare is vicariously liable for this negligence, which resulted in the twins' death.

495.   The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

496.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

497.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

498.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

499.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

42nd CLAIM

(Public Entity Liability- Government Code § 815.2

By Jose Murguia against Defendant City of Tulare)

500.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

501.   Tulare is liable for the negligent acts and omissions of its TPD officers under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, and respondeat superior. Government Code§ 815.2 provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."[ Government Code § 815.2; *M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 128 (2009)] As explained above, each TPD officer was negligent and under section 815.2, Tulare is vicariously liable for this negligence, which resulted in the twins' death.

502.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless,

negligent, and wanton conduct of defendant's agent, according to proof.

503.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

43rd CLAIM

$$43^{rd} \text{ CLAIM}$$

(Public Entity Liability- Government Code § 815.6

By Estate of Mason Murguia against Defendant City of Tulare)

504.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

505.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Tulare has a non-delegable duty to train and provide TPD officers that do not violate federal and state laws and Constitutions. Tulare must train its TPD officers to follow state and departmental policies and procedures. Tulare failed to meet these mandatory duties.

506.    TPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to arrange for the twins to be with their father. Tulare can act only through its employees. As explained above in great detail, the TPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

507.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

508.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

509.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

510.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

511.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

44th CLAIM

(Public Entity Liability- Government Code § 815.6

By Estate of Maddox Murguia against Defendant City of Tulare)

512.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

513.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Tulare has a non-delegable duty to train and provide TPD officers that do not violate federal and state laws and Constitutions. Tulare must train its TPD officers to follow state and departmental policies and procedures. Tulare failed to meet these mandatory duties.

514.    TPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to

arrange for the twins to be with their father. Tulare can act only through its employees. As explained above in great detail, the TPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

515.    The above-described wrongful acts of these defendants were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

516.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

517.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

518.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

519.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

45th CLAIM

(Public Entity Liability- Government Code § 815.6

By Jose Murguia against Defendant City of Tulare)

520.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

521.    Government Code§ 815.6 imposes liability on "a public entity ... under a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury." Cities have many mandatory duties. Tulare has a non-delegable duty to train

and provide TPD officers that do not violate federal and state laws and Constitutions. Tulare must train its TPD officers to follow state and departmental policies and procedures. Tulare failed to meet these mandatory duties.

522. TPD officers completely ignored their mandatory duties to have mental health professionals evaluate Langdon, either in the field or at a mental health facility, and to arrange for the twins to be with their father. Tulare can act only through its employees. As explained above in great detail, the TPD officers breach their mandatory duties by failing to get any mental help for Langdon despite her own requests and by failing to protect the twins.

523. Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

524. As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

46th CLAIM

(Negligence by Estate of Mason Murguia against First Assembly of God of Visalia)

525. This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

526. The Church has a duty to use reasonable care to prevent harm to oneself or to others. Also, the Church understood Langdon's request for help in getting professional mental health treatment and undertook to assist Langdon. The Church represents that with respect to children, safety is their number one priority. The Church observed and understood,

directly from Langdon's friend Rosa, that the children were in danger as long as they were in Langdon's custody. The Church promised to protect the twins and, by law, the Church was a mandated reporter under CANRA. Thus, the Church had a duty to act reasonably to help Langdon and protect the twins.

527.    The Church breached these duties in multiple respects because among other things it failed to get mental health treatment for Langdon and it failed to protect the twins from the risk of injury by Langdon.

528.    The above-described wrongful acts of this defendant was the legal cause of decedent's drowning and subsequent death on December 6, 2018.

529.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

530.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

531.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

532.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

### 47th CLAIM

(Negligence by Estate of Maddox Murguia against First Assembly of God of Visalia)

533.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

534.    The Church has a duty to use reasonable care to prevent harm to oneself or to others. Also, the Church understood Langdon's request for help in getting professional mental health treatment and undertook to assist Langdon. The Church represents that with respect to children, safety is their number one priority. The Church observed and understood, directly from Langdon's friend Rosa, that the children were in danger as long as they were in Langdon's custody. The Church promised to protect the twins and, by law, the Church was a mandated reporter under CANRA. Thus, the Church had a duty to act reasonably to help Langdon and protect the twins.

535.    The Church breached these duties in multiple respects because among other things it failed to get mental health treatment for Langdon and it failed to protect the twins from the risk of injury by Langdon.

536.    The above-described wrongful acts of this defendant were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

537.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

538.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

539.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

540.    By reason of the injury and death of decedent, decedent's estate has become liable

for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

48th CLAIM

(Negligence by Jose Murguia against First Assembly of God of Visalia)

541.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

542.    The Church has a duty to use reasonable care to prevent harm to oneself or to others. Also, the Church understood Langdon's request for help in getting professional mental health treatment and undertook to assist Langdon. The Church represents that with respect to children, safety is their number one priority. The Church and understood, directly from Langdon's friend Rosa, that the children were in danger as long as they were in Langdon's custody. The Church promised to protect the twins and, by law, the Church was a mandated reporter under CANRA. Thus, the Church had a duty to act reasonably to help Langdon and protect the twins.

543.    The Church breached these duties in multiple respects because among other things it failed to get mental health treatment for Langdon and it failed to protect the twins from the risk of injury by Langdon.

544.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

545.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

49th CLAIM

(Negligence By Estate of Mason Murguia against Heather Langdon)

546.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

547.    Langdon has a duty to use reasonable care to prevent harm to others, including her children. Also, Langdon had a special relationship with her children that required her to prevent harming them.

548.    Langdon breached these duties in multiple respects because among other things she drowned her children.

549.    The above-described wrongful acts of this defendant were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

550.    From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

551.    At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

552.    By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

553.    By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

50th CLAIM

(Negligence By Estate of Maddox Murguia against Heather Langdon)

554.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

555.   Langdon has a duty to use reasonable care to prevent harm to others, including her children. Also, Langdon had a special relationship with her children that required her to prevent harming them.

556.   Langdon breached these duties in multiple respects because among other things she drowned her children.

557.   The above-described wrongful acts of this defendant were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

558.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

559.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

560.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

561.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

51st CLAIM

(Negligence by Jose Murguia against Heather Langdon)

562.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

563.   Langdon has a duty to use reasonable care to prevent harm to others, including her

children. Also, Langdon had a special relationship with her children that required her to prevent harming them.

564.    Langdon breached these duties in multiple respects because among other things she drowned her children.

565.    Jose's intestates were killed by the careless, negligent, and wanton conduct of defendants' agents and servants, and plaintiff has been damaged, by reason of the careless, negligent, and wanton conduct of defendant's agent, according to proof.

566.    As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

## 52nd CLAIM

(Intentional misconduct By Estate of Mason Murguia against Heather Langdon)

567.    This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

568.    At the time of decedent's death, Langdon knew or should have known that a 10 month old infant should not be unsupervised in a filled bathtub without supervision. Langdon further knew or should have known that where a 10-month-old infant is unsupervised in a filled bathtub, there is a substantial likelihood that the infant could drown.  Langdon consciously disregarded this risk to the decedent.

569.    The above-described wrongful acts of this defendant were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

570.    From the time of his drowning on until his death on December 6, 2018, decedent

suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

571.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

572.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

573.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

53rd CLAIM

(Intentional misconduct By Estate of Maddox Murguia against Heather Langdon)

574.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

575.   At the time of decedent's death, Langdon knew or should have known that a 10 month old infant should not be unsupervised in a filled bathtub without supervision. Langdon further knew or should have known that where a 10-month-old infant is unsupervised in a filled bathtub, there is a substantial likelihood that the infant could drown.  Langdon consciously disregarded this risk to the decedent.

576.   The above-described wrongful acts of this defendant were the legal cause of decedent's drowning and subsequent death on December 6, 2018.

577.   From the time of his drowning on until his death on December 6, 2018, decedent suffered great physical and mental pain, shock, and agony, all to his damage according to proof.

578.   At the time of his death, decedent had a life expectancy of 76.5 years, and was in excellent health.

579.   By reason of the death of decedent, decedent's estate has been deprived of the present value of the accumulations that the decedent would have made to his estate had decedent lived out his life expectancy, to its damage according to proof.

580.   By reason of the injury and death of decedent, decedent's estate has become liable for hospital bills, doctors' bills, nursing bills, and funeral expenses according to proof.

54th CLAIM

(Intentional misconduct By Jose Murguia against Heather Langdon)

581.   This plaintiff re-alleges the allegations in Paragraphs 1- 129 above.

582.   At the time of decedent's death, Langdon knew or should have known that a 10 month old infant should not be unsupervised in a filled bathtub without supervision. Langdon further knew or should have known that where a 10-month-old infant is unsupervised in a filled bathtub, there is a substantial likelihood that the infant could drown.  Langdon consciously disregarded this risk to the decedent.

583.   Jose's intestates were killed by the careless, negligent, and wanton conduct of defendant, and Jose has been damaged, by reason of the careless, negligent, and wanton conduct of defendant according to proof.

584.   As a direct and proximate result of the death of the decedents, Jose has been deprived of decedents' future love, companionship, care, comfort, assistance, society, protection, affection, and moral support, and thus has suffered loss, including economic loss, according to proof.

585.   As additional damages against these defendants, plaintiff alleges they were guilty of oppression, fraud, and malice as defined in Civil Code § 3294 and plaintiffs should recover additional damages to punish and make an example of defendants.

**WHEREFORE**, Plaintiff pray against each defendant, for each respective cause of action as set forth, as follows:

1.   For Each and Every Claim for Relief:

    a.   for general and non-economic damages for emotional distress and mental suffering according to proof;

    b.   for a medical, psychological and related expenses according to proof;

2.   For the Claims for Relief, for compensatory damages, attorney fees and other remedies, all of which are provided for in 42 U.S.C. § 1983, et seq.;

3.   For the Claims for Relief, for punitive damages sufficient to punish and make an example of defendants;

4.   For all causes of action:

    a.   for pre-judgment interest according to proof;

    b.   for costs of suit incurred; and

5.   For such other and further relief as the Court may deem proper.

DATED:  July 9, 2019

BELTRAN, SMITH & MACKENZIE, LLP
REES LAW FIRM P.C.
/s/
By: _____
    Robert A. Rees
    Attorneys for Plaintiff
    Jose Murgia, for himself and for the estates of
    Mason and Maddox Murguia

1

## JURY DEMAND

2

Plaintiff Jose Murgia, for himself and for the estates of Mason and Maddox Murguia

3

demands a jury trial on all issues which may be tried by a jury.

4

DATED:  July 9, 2019                          BELTRAN, SMITH & MACKENZIE, LLP

5                                                                        REES LAW FIRM P.C.
                                                                         /s/
6                                                                        By: _____
                                                                              Robert A. Rees
7                                                                        Attorneys for Plaintiff
                                                                              Jose Murgia, for himself and for the estates of
8                                                                        Mason and Maddox Murguia

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28