UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MURGUIA, for himself and for the Estates of Mason and Maddox Murguia,<br><br>Plaintiff,<br><br>v.<br><br>HEATHER LANGDON, et al.,<br><br>Defendants. | No.  1:19-cv-00942-DAD-BAM<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION FOR A MORE DEFINITE STATEMENT<br><br>(Doc. Nos. 9, 12, 29) |

    This matter came before the court on motions to dismiss for failure to state a claim and a motion for a more definite statement filed on behalf of defendants Tulare County Sheriff's Department ("TCSD"), Child Welfare Services ("CWS"), Deputy Lewis and Roxanna Torres (collectively "county defendants") and First Assembly of God Church of Visalia ("First Assembly").  (Doc. Nos. 9, 12.)  On November 5, 2019, a hearing on the county defendants and defendant First Assembly's motions to dismiss was held.  Appearing telephonically at the hearing were attorneys Robert Rees and Steven Beltran on behalf of plaintiffs; attorney Kathleen Taylor, on behalf of the county defendants; attorney Leonard Herr, on behalf of defendant City of Visalia; and attorney Michael Lehman, on behalf of defendant First Assembly.  After the hearing, defendant City of Visalia filed its own motion to dismiss, (Doc. No. 29), which the court took under submission pursuant to Local Rule 230(g) on March 11, 2020.  (Doc. No. 34.)  For the

reasons set forth below, the court will grant defendants' motions to dismiss with leave to amend and deny the county defendants' motion for a more definite statement.

## BACKGROUND[1]

In the complaint plaintiffs allege the following. Plaintiff Jose Murguia and defendant Heather Langdon had three sons during their marriage. (Doc. No. 1 ("Compl.") at ¶¶ 30, 31.) Defendant Langdon had a history of alcohol abuse, violence toward her children, and hospitalizations for overdoses and attempted suicide. (*Id.* at ¶ 31.) In the past, CWS had opened one or more investigations of Langdon for negligent care of her children, and her custodial rights with respect to her sons had been restricted by CWS and the family law court. (*Id.*) Langdon had filed to dissolve her marriage to plaintiff Murguia in August 2014. (*Id.* at ¶ 32.) In the years that followed, Langdon had a CWS case opened against her for child abuse and multiple temporary restraining orders issued against her, as well as suffered multiple arrests for drunk driving. (*Id.* at ¶¶ 33–40.) Ultimately, plaintiff Murguia ended up with physical and legal custody of the couples' three sons, and Langdon was denied any visitation rights. (*Id.* at ¶ 40.)

In the Spring of 2017, plaintiff Murguia and Langdon began to see each other again and Langdon became pregnant. (*Id.* at ¶ 41.) Their relationship continued to involve verbal and physical abuse, with Langdon eventually being arrested for battery and having a temporary restraining order and stay away order issued against her. (*Id.* at ¶¶ 42, 43.) On January 12, 2018, Langdon gave birth to Mason and Maddox Murguia (collectively, "the decedents").[2] (*Id.* at ¶ 44.) No formal custody order was entered with respect to the decedents. (*Id.*) On two occasions in early 2018, Langdon was reported to CWS for being drunk while the decedents were in her care.

/////

---

[1] Due to its lengthy, verbose, and confusing nature, this factual background is the court's best attempt to synthesize the factual allegations of the 131-page complaint. The court "cannot be sure that [it] ha[s] correctly understood all the averments," but if it has not, "plaintiffs have only themselves to blame." *McHenry v. Renne*, 84 F.3d 1172, 1174 (9th Cir. 1996).

[2] Because plaintiff Jose Murguia is bringing this action on behalf of himself and on behalf of the decedents' estates, this order will refer to him individually as "plaintiff Murguia" and collectively with the decedents as "plaintiffs."

(*Id.* at ¶¶ 45, 46.)  Although the decedents originally lived with Langdon and the three older boys lived with plaintiff Murguia, all seven were living together in August 2018.  (*Id.* at ¶¶ 44–47.)

On December 3 or 4, 2018, Langdon called First Assembly and falsely stated that her oldest son had threatened to shoot up Linwood Elementary School.  (*Id.* at ¶ 68.)  First Assembly reported the call to TCSD, which sent deputies to the Murguia home.  (*Id.*)  TCSD apparently concluded that Langdon's report was false and took no action.  (*Id.*)  On December 4, 2018 when plaintiff Murguia came home from work, Langdon was acting erratic and shouting at him.  (*Id.* at ¶ 69.)  He called 911 and described Langdon's behavior.  (*Id.*)  Plaintiff Murguia asked the 911 responder for someone to get mental health help for Langdon.  (*Id.*)  Two TCSD deputies, including defendant Lewis, responded to the call.  (*Id.* at ¶ 70.)  The TCSD deputies did not consult with a supervisor or any other mental health experts to assess Langdon's mental state.  (*Id.*)  Instead, the TCSD deputies told plaintiff that since Langdon did not appear to be a threat to herself or anyone else, they could not take any action.  (*Id.*)  The TCSD deputies also stated that if Langdon threatened anybody or herself, to call them back and they would take her into custody on a Welfare and Institutions Code ("WIC") § 5150 hold.  (*Id.*)  Plaintiff Murguia told the TCSD deputies that he was going to take the next day off work to get help for Langdon.  (*Id.*)

On December 5, 2018, plaintiff Murguia again called 911 to report Langdon's behavior.  (*Id.* at ¶ 71–74.)  County paramedics, the fire department, and TCSD deputies, including defendant Lewis, responded.  (*Id.* at ¶ 74.)  Plaintiff Murguia described Langdon's behavior to the TCSD deputies, who could see Langdon acting strangely.  (*Id.*)  Nonetheless, neither TCSD deputies nor their communication center conducted a database check.  (*Id.*)  Plaintiff Murguia told the TCSD deputies that Langdon needed to be evaluated professionally.  (*Id.* at ¶ 75.)  Plaintiff Murguia said he wanted to take Langdon to the hospital or a clinic for a mental evaluation, but the TCSD deputies said they would not permit it.  (*Id.*)  Plaintiff Murguia reminded the TCSD deputies of the previous night's call and their promise to put Langdon under a psychiatric hold.  (*Id.*)  A TCSD deputy told plaintiff Murguia to go outside and stay there.  (*Id.*)  Although the county paramedics took the gurney inside, the TCSD deputies did not allow the county paramedics to assess Langdon and instead told the paramedics to leave.  (*Id.* at ¶ 76.)

While the TCSD deputies were still at the residence, plaintiff Murguia walked to the home of Rosa, Langdon's friend. (*Id.* at ¶ 77.) Plaintiff Murguia asked Rosa if she would take Langdon to the hospital to get help, and Rosa agreed. (*Id.*) When Rosa got to the Murguia home, there were two sheriff's cars and three TCSD deputies. (*Id.* at ¶ 78.) The TCSD deputy outside the home told Rosa she could enter the house and told plaintiff Murguia that he had to remain outside. (*Id.*) A TCSD deputy inside the house told Rosa that Langdon had voluntarily agreed to go to the hospital and was waiting for Rosa to take her. (*Id.*) The TCSD deputies told Rosa that she, and not the TCSD deputies, should take Langdon to the hospital and that Rosa should then take custody of the decedent children. (*Id.* at ¶ 80.) TCSD policy required the TCSD deputies to give custody of the children to plaintiff Murguia, but TCSD deputies told Rosa to take the decedent children from Langdon at the hospital. (*Id.*) Although Rosa agreed to take Langdon to the hospital, Langdon insisted that they were instead taking the decedent children to church. (*Id.* at ¶ 81.) The TCSD deputies were surprised to hear this. (*Id.* at ¶ 82.) Under TCSD policy, where a person changes her mind about a voluntary mental evaluation, the TCSD deputy should proceed with placing a hold on the individual. (*Id.*) The TCSD deputies agreed with Rosa that it was not in the best interests of the decedents to be in Langdon's custody. (*Id.* at ¶ 85.) TCSD policy required the deputies to give plaintiff Murguia, as the non-arrested parent, custody of his children. (*Id.*) Plaintiff Murguia begged the TCSD deputies to let him have custody and they refused. (*Id.*) The TCSD deputies did not call CWS to detain the children. (*Id.*) Instead, TCSD deputies shifted the burden to Rosa to protect the children. (*Id.*)

Defendant Langdon, Rosa, and the decedents walked to Rosa's house. (*Id.* at ¶ 86.) Plaintiff Murguia again asked the TCSD deputies not to let Langdon leave with the children and to instead give him custody of them. (*Id.* at ¶ 88.) Plaintiff Murguia told the TCSD deputies the decedents were not safe with Langdon and asked the deputies to stop Langdon from taking them. (*Id.*) Instead, the TCSD deputies stopped plaintiff Murguia from following Langdon and the decedents. (*Id.*) TCSD deputies told Rosa and plaintiff Murguia that the deputies were going to let Langdon take the decedents. (*Id.*) After Langdon left with the children, TCSD deputies stayed parked outside of the house for 30 minutes, watching plaintiff Murguia. (*Id.* at ¶ 89.)

1  Plaintiff Murguia was afraid that if he followed the decedents, the deputies would arrest
2  him. (*Id.*)

3      Langdon and Rosa took the decedents to First Assembly. (*Id.* at ¶ 91.) There, Langdon
4  told Pastor John Walker she was homeless, and the pastor found Lighthouse, a women's shelter in
5  Tulare for Langdon. (*Id.* at ¶ 93.) Langdon then told Pastor Walker that she needed mental help.
6  (*Id.* at ¶ 94.) The pastor asked her if she would go to Cypress Mental Health Center for
7  evaluation and she agreed. (*Id.*) The pastor called Visalia Police Department ("VPD"), and when
8  the officers arrived, the pastor told them that Langdon wanted to go to Cypress Mental Health
9  Center to receive mental help. (*Id.* at ¶ 99.) VPD knew about the false report of the alleged
10 school threat, but the VPD officers did not take Langdon to Cypress Mental Health Center. (*Id.*)
11 Instead, they took her and the decedents to Lighthouse Shelter. (*Id.*)

12     At Lighthouse, Langdon's behavior during her intake interview resulted in both an
13 ambulance and Tulare Police Department ("TPD") being called multiple times. (*Id.* at ¶¶ 100,
14 102–06.) TPD Sergeant Garcia called the CWS Hotline and spoke with defendant Torres. (*Id.* at
15 ¶ 126.) Defendant Torres did not conduct an in-person investigation or perform the database
16 searches that would have revealed Langdon's history of child abuse and domestic violence, as
17 well as her address and plaintiff Murguia's availability to take custody of the children. (*Id.*)
18 Defendant Torres told Sergeant Garcia that CWS would not take the children unless TPD arrested
19 the mother or put a psychiatric hold on her. (*Id.* at ¶ 127.) Sergeant Garcia told Torres that
20 Langdon had been taken to a hospital for mental evaluation. (*Id.*) Defendant Torres told Garcia
21 that there were no resources for the mother, but CWS could place the children if the mother were
22 arrested. (*Id.*) Defendant Torres also said that CWS had no prior history regarding Langdon in
23 their system with respect to prior reports of child abuse or otherwise. (*Id.*) Defendant Torres did
24 not report Langdon's history involving child abuse investigations or supervised visitations, nor
25 did she tell TPD that plaintiff Murguia was an available parent who could take the children. (*Id.*)
26 TPD officers took Langdon and the children to the Virginia Motor Lodge. (*Id.* at ¶ 128.) Early
27 the next morning, on December 6, 2018, a bystander called 911 as Langdon was screaming for
28 /////

5

someone to call 911.  (*Id.* at ¶ 129.)  Paramedics responded and found the children on the hotel bed.  (*Id.*)  Tragically, defendant Langdon had drowned them.  (*Id.*)

On July 9, 2019, plaintiffs filed a 131-page complaint asserting fifty-four claims against twenty-two defendants.  (Compl.)  On September 17, 2019, defendant First Assembly filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 9.)  On September 26, 2019, the county defendants filed a motion to dismiss under Rules 8 and 12(b)(6), and in the alternative, a motion for a more definite statement.  (Doc. No. 12.)  Plaintiffs filed their opposition briefs on October 21, 2019.  (Doc. Nos. 19, 20.)  Defendant First Assembly and the county defendants replied on October 29, 2019.  (Doc. Nos. 23, 24.)  On February 10, 2020, defendant City of Visalia filed a motion to dismiss under Rules 8 and 12(b)(6).  (Doc. No. 29.)  Plaintiffs filed their opposition on February 28, 2020.  (Doc. No. 30.)  Defendant City of Visalia replied on March 10, 2020.  (Doc. No. 33.)

**LEGAL STANDARDS**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation omitted).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  *Naruto v. Slater*, 888 F.3d 418, 421 (9th Cir. 2018) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).  However, the court need not accept as true allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell*, 266 F.3d at 988 (citations omitted).  Neither must the court "assume the truth of legal conclusions cast in the form of factual

6

allegations." *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008) (citation omitted).

While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In ruling on such a motion, the court may consider material which is properly submitted as part of the complaint, as well as documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiff's complaint necessarily relies on them, and matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## ANALYSIS

Defendants First Assembly, City of Visalia, and county defendants move to dismiss plaintiffs' complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**A.     Federal Claims**

Plaintiffs bring eighteen separate claims for violation of their constitutional rights to familial companionship and decedents' right to life under 42 U.S.C. § 1983. (Compl. at ¶¶ 130–325.) Each of these claims is brought against individual defendants Lewis, Torres, Does 1–4, and

/////
/////
/////
/////
/////

7

Does 5–8.³ Plaintiffs have also asserted *Monell* claims against defendants City of Visalia and Tulare County.

        1.    *Claims Against the Individual Defendants*

Defendants move to dismiss the complaint, arguing that plaintiffs have failed to allege facts sufficient to state a claim upon which relief could be granted. To succeed on a § 1983 claim, a plaintiff must allege and ultimately show that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (citing *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006)). Relevant to plaintiffs' claims here, the Ninth Circuit has explained as follows:

> "[T]he general rule is that [a] state is not liable for its omissions." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir.2000). In that vein, the Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests. *DeShaney [v. Winnebago Cty. Dep't of Soc. Servs*, 489 U.S. [189,] 196, 109 S. Ct. 998 [(1989)]. As a corollary, the Fourteenth Amendment typically "does not impose a duty on [the state] to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir.2007).
>
> There are two exceptions to this rule: (1) when a "special relationship" exists between the plaintiff and the state (the special-relationship exception), *DeShaney*, 489 U.S. at 198–202, 109 S. Ct. 998; and (2) when the state affirmatively places the plaintiff in danger by acting with "deliberate indifference" to a "known or obvious danger" (the state-created danger exception), *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996). If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim.

*Id.*

/////

---

³ On October 4, 2019, the parties filed a stipulation and proposed order for plaintiffs to file an amended complaint naming defendant Doe 5 as Visalia Police Officer Oscar Hernandez. (Doc. No. 15.) On March 5, 2020, the parties filed another stipulation and proposed order for plaintiffs to file an amended complaint naming defendant Doe 1 as Tulare County Sheriff Sergeant Cerda. (Doc. No. 32.) Because the pending motions to dismiss will be granted and plaintiffs are given leave to amend, the court will not give effect to the parties' stipulations but instead directs plaintiffs to file any amended complaint in accordance with those stipulations and this order.

The special-relationship exception "applies when a state 'takes a person into its custody and holds him there against his will.'" *Id.* at 972 (quoting *DeShaney*, 489 U.S. at 200); *see also Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir, 2012) ("[W]hen a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being."). "The types of custody triggering the exception are 'incarceration, institutionalization, or other similar restraint of personal liberty.'" *Patel*, 648 F.3d at 972. "The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id.* The other exception, the state-created danger exception, has two requirements: (1) there must be "affirmative conduct on the part of the state in placing the plaintiff in danger," and (2) the state must act "with deliberate indifference to a known or obvious danger." *Id.* at 974 (internal quotations and citations omitted); *see also Henry A.*, 678 F.3d at 1002; *Kennedy* v. Ridgefield, 439 F.3d 1055, 1062–64 (9th Cir. 2006).

Here, plaintiffs assert in the complaint a constitutional right to life and to familial companionship and society. (*See, e.g.*, Compl. at ¶¶ 131–32, 143–44, 156–57). The Ninth Circuit recognizes that a parent has a Fourteenth Amendment liberty interest in the companionship and society of his or her child, *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010), "and that a child's interest in [their] relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (internal citation and quotation marks omitted). Likewise, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one' s life.'" *Lee*, 250 F.3d at 685.[4]

/////

---

[4] The complaint does not clarify under which constitutional amendment plaintiffs are attempting to bring their deprivation of familial companionship claims. However, in their oppositions to the pending motions plaintiffs state that the claims arise under both the First and Fourteenth Amendments. (Doc. Nos. 19 at 20; 30 at 17.) Plaintiffs' failure to identify the constitutional amendment upon which they base their claim does not change the analysis.

9

Plaintiffs also allege that the individual defendants named in this action were acting under color of state law. (Compl. at ¶¶ 5, 6, 7, 10, 14.) Thus, the sole issue posed by the pending motions to dismiss this cause of action is whether plaintiffs have adequately alleged that any of the individual defendants' conduct deprived them of a constitutional right. Below, the court will consider the claims brought against each group of individual defendants separately.

### 1. TCSD Deputies

Plaintiffs each bring a claim against defendant Lewis and Does 1 through 3 (collectively hereafter, "TCSD deputies"). (*See* Compl. at ¶¶ 5, 130–64.) County defendants move to dismiss that claim, arguing that plaintiffs have failed to allege an exception to the rule that failure to protect an individual against private acts of violence does not constitute a violation of the Due Process Clause of the Fourteenth Amendment. (Doc. No. 12 at 14.)

Here, plaintiffs do not allege that any parties to this action were taken into custody by the TCSD deputies, which is a prerequisite of the special-relationship exception. Although plaintiffs argue that "[t]he deputies promised Jose and Langdon to provide § 5150 help," (Doc. No. 19 at 22), the other allegations of the complaint contradict this assertion. (*See* Compl. at ¶ 70) (alleging that the officers would not take Langdon into custody on a Welfare & Institutions Code § 5150 hold unless she threatened to harm herself or another). Plaintiffs also contend that a special-relationship was created once "[t]he deputies gave custody of the twins to a mentally unstable, thrice-convicted child abuser and ordered Jose out of his own home," but their complaint does not allege that the decedents were ever in the custody of a TCSD deputy. (*See* Compl. at ¶¶ 66–89.) Additionally, plaintiffs assert that by telling plaintiff Murguia to let Langdon go and by parking outside Murguia's home for 30 minutes, TCSD deputies restrained plaintiff Murguia through a show of authority. (Doc. No. 19 at 23.) Even assuming *arguendo* that based on these allegations plaintiff Murguia could be found to have effectively been in custody, application of the special-relationship exception requires *harm* befalling the party in custody as distinguished from them being deprived of their constitutional right. *See, e.g.*, *DeShaney*, 489 U.S. at 199–200 (defining the special-relationship exception as imposing a "duty to assume some responsibility for [the custodied person's] safety and general well-being"); *Patel*, 648 F.3d at 973 (listing cases

10

discussing whether compulsory school attendance can give rise to a special-relationship between schools and students); *J.P. by & through Villanueva v. County of Alameda*, 803 F. App'x 106, 108 (9th Cir. 2020)[5] ("The state-created danger exception "only applies in situations where the plaintiff was *directly* harmed by a *third* party."). Here, plaintiffs fail to allege in their complaint that plaintiff Murguia was harmed, and there is no allegation that the decedent children were ever in custody.

Plaintiffs' complaint also fails to allege facts supporting application of the state-created danger exception. Plaintiffs ague that defendants played a role in increasing the vulnerability of the decedent children because plaintiff Murguia was restrained and "the deputies let Langdon, a mentally unstable person with a history of child cruelty, have the twins and ordered Jose, the capable parent, to stay away." (Doc. No. 19 at 23–24.) However, according to the complaint, there was no formal custody order regarding the decedent children, and at the time of these events they lived with both plaintiff Murguia and Langdon. (Compl. at ¶¶ 44, 48.) In other words, the complaint lacks allegations of affirmative conduct on the part of TCSD deputies. Rather, the children were always in Langdon's custody and it cannot be alleged that the deputies placed them there. *See Enyart ex rel. Chally v. Kerper*, No. CIV. 97-1725, 1999 WL 803319, at *5 (D. Or. Oct. 8, 1999) (finding the state was not liable under the state-created dangers exception because the state did not place plaintiff, who was sexually abused while in the custody of her convicted sex offender father, in her father's custody in violation of his probation); *DeShaney*, 489 U.S. at 190 ("No [affirmative duty to protect] existed here, for the harms petitioner suffered occurred not while the State was holding him in its custody, but while he was in the custody of his natural father, who was in no sense a state actor.")

Because the complaint does not allege facts supporting a cognizable failure to protect claim against the TCSD deputies, their motion to dismiss claims one through three against them will be granted.

/////

---

[5] Citation to this and all other unpublished Ninth Circuit opinions in this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

2.      CWS Employees

Plaintiffs also bring claims one through three against defendant Torres and Doe 4 (collectively hereafter, "CWS employees"). (*See* Compl. at ¶¶ 6, 130–64.) Similar to their arguments as to the TCSD deputies, county defendants argue that plaintiffs have failed to allege facts supporting application of an exception to the rule against liability for failure to act as to the CWS employees. (Doc. No. 12 at 14.)

In opposing this aspect of the motion to dismiss, plaintiffs clarify that their claim against the CWS defendants is based on a state-created danger theory. According to plaintiffs, the decedent children's vulnerability to harm at the hands of their mother was increased because defendant Torres had a duty to make an in-person investigation, evaluate all risk factors, and convey Langdon's negative history to TPD. (Doc. No. 19 at 23.) The children were in their mother's custody before and after defendant Torres failed to act and the complaint does not allege that the children were ever in CWS's custody. It therefore cannot be asserted that defendant Torres affirmatively placed the decedents in danger under the facts alleged. *See Kerper*, 1999 WL 803319 at *5; *DeShaney*, 489 U.S. at 190.

As with TCSD deputies, plaintiffs have failed to allege that they were deprived of a constitutional right by CWS's failure to act. The court will therefore dismiss claims one through three as to the CWS employees.

3.      VPD Officers

Plaintiffs bring claims seven through nine against Does 5 through 8 (collectively hereafter, "VPD officers"), individuals who were employed as police officers by the City of Visalia. (*See* Compl. at ¶¶ 9, 213–39.) In moving to dismiss those claims, defendant City of Visalia argues that plaintiffs have failed to allege facts showing a denial of substantive due process based on a failure of those defendants to act.[6]

---

[6] In its motion to dismiss, defendant City of Visalia argues that "[t]he pleadings do not specify whether the due process claims are based on substantive or procedural due process." (Doc. No. 29-1 at 14.) In their opposition, plaintiffs respond that both are alleged. (*See* Doc. No. 30 at 18.) This is one of several instances in which plaintiffs have clearly formulated the legal theories underlying their claims for the first time in their oppositions to the pending motions. Plaintiffs' allegations against TCSD deputies and VPD officers are nearly identical, (*compare* Compl. at

Plaintiffs assert in their complaint that they were deprived of their right to life and familial companionship because VPD officers left the decedent children "with their mentally unstable mother, without getting her any professional evaluation or treatment." (*Id.* at ¶ 215.) Plaintiffs further contend that "[o]nce Langdon agreed to go to the mental health clinic, VPD officers were duty bound to take her to the hospital even if she changed her mind." (*Id.*) According to the complaint, "the law and City policy required VPD officers to leave the twins with Jose, their father, unless there was a court order to the contrary, and there was none." (*Id.* at ¶ 217.)

These allegations, however, are insufficient to state a cognizable claim that VPD officers deprived plaintiffs of their right to life and familial companionship. In their opposition to the pending motion, plaintiffs argue that their complaint alleges facts supporting application of both the special-relationship and the state-created danger exceptions to the rule against liability for omissions or failures to act on the part of public officials. (Doc. No. 30 at 19–20.) Notably, however, plaintiffs have simply failed to allege that any party involved in this tragic incident was taken into custody and held by authorities against their will. *See Patel*, 648 F.3d at 972. As plaintiffs allege in their complaint, the decedent children were "left" in their mother's custody. (Compl. at ¶ 215.) Although VPD officers allegedly took Langdon to Lighthouse Shelter and left her and the children there, (*id.* at ¶ 99), this factual allegation is insufficient, even if proven, to establish that they were taken into "custody" for purposes of establishing a special relationship between the decedents and the police. The complaint fails to suggest that this interaction was in any way involuntary, since it is alleged that Langdon had requested a place to stay. Under the facts alleged in the complaint, it cannot be said that the VPD officers undertook a special relationship with respect to the decedent children. *See Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 844 (9th Cir. 2011) ("The state's performance of the very

---

¶¶ 130–64 *with id.* at ¶¶ 213–39), yet procedural due process as a basis for this claim was never raised until defendant City of Visalia mentioned it months after the first round of briefing. Plaintiffs now argue that a procedural due process claim is alleged because VPD officers failed to conduct a mandatory psychological assessment of defendant Langdon under WIC § 5150. (Doc. No. 30 at 21.) As defendant City of Visalia correctly notes, there is no mandatory duty to conduct a § 5150 assessment. (Doc. No. 33 at 4.) *See also* Cal. Welf. & Inst. Code § 5150(a) (stating that a peace officer *may* cause a person to be taken in for an assessment).

13

acts for which an individual voluntarily enters state care does not transform the custodial relationship into an involuntary one."); *Patel*, 648 F.3d at 974 ("In the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs.").

For this same reason, the complaint fails to allege facts sufficient to find the state-created danger exception applicable. As noted above, under the facts alleged in the complaint, the decedent children were always in their mother's custody and Langdon was never in VPD's custody. VPD officers therefore played no affirmative role in placing the decedent children in greater danger than they otherwise faced. *See DeShaney*, 489 U.S. at 190; *Kerper*, 1999 WL 803319 at *5. Thus, the court concludes that plaintiffs have not alleged sufficient facts to state a cognizable claim for deprivation of the right to life and familial companionship under the Due Process Clause. Claims seven through ten will therefore be dismissed.

2.  Monell *Claims Against the City of Visalia and Tulare County*

Plaintiffs bring claims four through six against defendant Tulare County (*see* Compl. at ¶¶ 165–212), and claims ten through twelve against defendant City of Visalia (*see id.* at ¶¶ 240–72). In moving to dismiss those claims, defendants Tulare County and City of Visalia argue that plaintiffs have failed to allege sufficient facts to state a cognizable *Monell* claim against them. (Doc. Nos. 12 at 17–18; 29-1 at 19–21.)

It is well-established that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

> In order to establish liability for governmental entities under *Monell*, a plaintiff must prove (1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal citations and quotation marks omitted).

A *Monell* claim can be established in one of three ways. First, a local government may be held liable for "an expressly adopted official policy." *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Second, a public entity may be held liable for a "longstanding practice or custom." *Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). Such circumstances may arise when, for instance, the public entity "fail[s] to implement procedural safeguards to prevent constitutional violations" or when it fails to adequately train its employees. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (requiring a plaintiff asserting a *Monell* claim based on a failure to train to allege facts showing that defendants "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights") (internal brackets omitted) (quoting *Connick*, 563 U.S. at 61)). "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier v. Cty. of Santa Clara*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*).

Defendants Tulare County and City of Visalia both argue that plaintiffs have not alleged the existence of any specific policies in place or of ratification of an unconstitutional action. (Doc. Nos. 12 at 18; 29-1 at 19–20.) Defendant City of Visalia also argues that plaintiffs have failed to allege facts showing a failure to train on its part. (Doc. No. 29-1 at 20–21.) In opposing the pending motion to dismiss, plaintiffs argue that both Tulare County and City of Visalia had a pattern or practice of its officers violating constitutional rights, which arose from a failure to properly train the officers on official county policies for dealing with someone suffering from a mental crisis. (Doc. Nos. 19 at 25–26; 30 at 18.) Because plaintiffs' *Monell* claims against

defendants Tulare County and City of Visalia are based on nearly identical allegations, the court will assess them together.

The Ninth Circuit has made clear that *Monell* claims "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). In addition, some district courts have required plaintiffs to also identify the particular policy or custom that caused the constitutional violation without resorting to conclusory allegations. *See, e.g.*, *Johnson v. Cate*, No. 1:10-cv-00803-AWI, 2012 WL 1076209, at *3 (E.D. Cal. Mar. 29, 2012) (requiring plaintiff to "describ[e] in detail a county policy that was the moving force behind the alleged constitutional violations"). Other courts have adopted a more lenient pleading standard, holding that while a complaint must include a sufficient quantum of factual material to plausibly suggest the existence of a policy or custom, the policy or custom itself need not be specifically alleged, or may be alleged only in a general fashion. *See Duenez v. City of Manteca*, No. CIV. S-11-1820 LKK, 2012 WL 4359229, at *9 (E.D. Cal. Feb. 23, 2012) ("Plaintiffs need not articulate the intricacies of the alleged policy further at the pleading stage.").

In any event, a complaint must contain sufficient factual allegations to plausibly suggest a policy or custom, as opposed to merely random, unconnected acts of misconduct. Collectively, the factual allegations of a complaint asserting a *Monell* claim must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 843–44 (S.D. Tex. 2011) ("Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy."). Thus, "[a] complaint alleging a *Monell* claim must pair general averments of a policy or custom with particular examples." *Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (internal citation and quotation marks omitted).

Here, the allegations of plaintiffs' complaint fail to satisfy this pleading standard. Plaintiffs vaguely allege that defendants Tulare County and the City of Visalia "permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern and practice of [TCSD] deputies, [including] Deputy Lewis, [and VPD Officers] violating constitutional rights of the public, including Jose and the twins." (Doc. Nos. 19 at 25; 30 at 23; *see also* Compl. at ¶¶ 173–76, 242–44, 255–57, 268–69.) Plaintiffs do allege that defendant Tulare County's customs "at CWS were so inadequate that Ms. Torres dismissed Sergeant Garcia with a phone call, instead of making the state-mandated in-person investigation and retrieving information from CLETS and CWS' own records." (Compl. at ¶ 174.) However, plaintiffs have not alleged any prior instances of alleged misconduct by defendants Tulare County or the City of Visalia. Thus it remains unclear from the allegations of the complaint in what way defendants have allegedly adopted a pattern or practice of this behavior. Additionally, the complaint summarily alleges that these actions occurred due to a lack of personnel training on city and county policies. (*See, e.g.*, *id.* at ¶¶ 173, 174 and 244 (alleging that defendant Tulare County failed to properly train CWS personnel and to ensure that they could properly identify and investigate children in danger). However, a failure to train claim requires plaintiffs to allege deliberate indifference, or "a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim.'" *Flores*, 758 F.3d at 1158 (internal citations omitted). The complaint lacks any such allegations against either defendant.

The vague descriptions of the policies and customs at issue, paired with the lack of any examples of either defendant having any of the policies or customs that plaintiffs allege, are insufficient to place defendants on notice of the nature of the claims against them and allow them to prepare an adequate defense. Thus, the court will dismiss claims four through six against defendant Tulare County and claims ten through twelve against defendant City of Visalia.

**B.     State Claims**

This case was originally filed in this court based on federal question jurisdiction. (*See* Doc. No. 2 at 1.) The court has concluded that defendants' motions to dismiss must be granted as to plaintiffs' federal claims, leaving only state law causes of action remaining against them. Once

all federal claims have been dismissed from a case, whether to retain jurisdiction over any remaining state law claims is left to the discretion of the district court.[7] *See* 28 U.S.C. § 1367(c)(3); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 537 (9th Cir. 1989). Generally, if federal claims are dismissed prior to trial, state law claims should be remanded to state court "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Acri*, 114 F.3d at 1000. If the court declines to exercise supplemental jurisdiction over the state-law claims in a case initially filed in federal court, the court must dismiss those claims without prejudice. *See Carnegie-Mellon Univ.*, 484 U.S. at 350–51 ("When the balance of these factors indicates that a case properly belongs in state court, . . . the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice . . . [where] the plaintiff [has] filed his suit in federal court, remand [is] not an option."); *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994). The factors to be weighed are "the values of judicial economy, convenience, fairness, and comity." *Id.* at 350.

Because the court is not persuaded that plaintiffs have any federal claims, the court will not consider the merits of plaintiffs' state law claims at this time. The court will therefore defer

/////
/////
/////
/////

---

[7] The court acknowledges that defendants City of Tulare, Sergeant Garcia, Officer Davis, and Officer Valencia answered the complaint on October 18, 2019 (Doc. No. 17), and there are federal claims against those defendants. (Compl. at ¶¶ 273–325.) Although the court has not yet considered those claims, plaintiffs are warned that the district court has discretion to *sua sponte* dismiss for failure to state a claim. *See Barnard v. U.S. Gov't*, 635 F. App'x 388 (9th Cir. 2016).

18

its determination as to whether it will retain supplemental jurisdiction over plaintiffs' remaining state law claims until it can determine whether plaintiffs can state any federal claims.[8]

**C.     Leave to Amend**

In addition to asserting that the complaint should be dismissed, county defendants and defendant City of Visalia argue that any dismissal should be with prejudice.  (Doc. Nos. 12 at 35; 29-1 at 8.)  Defendant City of Visalia argues that the complaint reveals on its face that amendment will not cure its defects.  (Doc. No. 29-1 at 8.)

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave when justice so requires" and that rule is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  Nevertheless, leave to amend need not be granted where the amendment:  (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile.  *See Amerisource Bergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citing *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999)).  "Prejudice to the opposing party is the most important factor."  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31 (1971)).

Here, the court does not find that granting further leave to amend would be futile.  As discussed above, the undersigned has concluded that the complaint is deficient due to the insufficiency of the factual allegations.  However, while the court expresses no opinion on the matter, it is at least conceivable that the deprivations of constitutional rights alleged in the complaint could survive a motion to dismiss if pled sufficiently.  Accordingly, plaintiffs will be granted thirty days from the date of service of this order in which to file a first amended complaint, should they wish to do so.

---

[8] The court also notes that any applicable statute of limitations under state law has been tolled during the pendency of this action.  *See* 28 U.S.C. § 1367(d) (tolling the limitation period for any claim asserted in a federal action by way of supplemental jurisdiction both while the claim is pending "and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"); *Artis v. District of Columbia*, ____U.S. ___, ___, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, i.e., to stop the clock.").

19

Plaintiffs are, however, cautioned to comply with Rule 8's requirements. Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). After considerable time, the court was able to separate the relevant factual allegations from the irrelevant ones. But as explained at the hearing on the motion, plaintiffs' 131-page complaint is not the type of complaint contemplated by the Federal Rules of Civil Procedure. *See Kassman v. Bank of Am.*, No. 2:16-cv-00425-JAM-CKD, 2016 WL 4126727, at *1 (E.D. Cal. Aug. 3, 2016) ("The FAC is unnecessarily lengthy and repetitive, and it lacks "simple, concise, and direct" allegations."). Because plaintiffs devote substantial space to an overview and a background, the complaint is "mostly 'narrative ramblings' and 'storytelling'" *McHenry*, 84 F.3d at 1176. In other words,

> The Complaint . . . says "too much." The allegations are at times rambling and repetitive and are interspersed with unnecessary legal conclusions. **A complaint is not a brief.**

*Fournerat v. Veterans Admin.*, No. EDCV 19-0961 AB (AS), 2019 WL 8810110, at *3 (C.D. Cal. Dec. 19, 2019) (emphasis added). Plaintiffs are granted leave to amend but must comply with Rule 8's requirements or risk having the complaint dismissed with prejudice. *See McHenry*, 84 F.3d at 1176.

## CONCLUSION

For the reasons set forth above:

1. Defendants' motions to dismiss (Doc. Nos. 9, 12, 29) are granted;
2. Plaintiffs' complaint (Doc. No. 1) is dismissed with leave to amend;
3. Defendants' motion for a more definite statement (Doc. No. 12) is denied; and
4. Any first amended complaint that plaintiffs elect to file in this action shall be filed within thirty (30) days after the issuance of this order.

IT IS SO ORDERED.

Dated: **June 30, 2020**         /s/ Dale A. Drozd
UNITED STATES DISTRICT JUDGE