1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE MURGUIA, for himself and for the          No.  1:19-cv-00942-DAD-BAM
     Estates of Mason and Maddox Murguia,
12
                Plaintiff,
13                                                   ORDER GRANTING DEFENDANTS'
          v.                                         MOTIONS TO DISMISS
14
     HEATHER LANGDON, et al.,                        (Doc. Nos. 38, 40, 41, 43)
15
                Defendants.
16

17

18          Before the court are four motions to dismiss filed by defendants City of Visalia and

19   Officer Hernandez (Doc. No. 38), defendant First Assembly of God of Visalia ("First Assembly")

20   (Doc. No. 40), defendants Cerda, Lewis, Torres, and County of Tulare (collectively "county

21   defendants") (Doc. No. 41), and defendants Davis, Garcia, Valencia, and City of Tulare

22   (collectively "city defendants") (Doc. No. 43).  Pursuant to General Order No. 617 addressing the

23   public health emergency posed by the COVID-19 pandemic, the motions were taken under

24   submission on the papers.  (Doc. Nos. 39, 42, 44.)  For the reasons explained below, the court will

25   grant the motions to dismiss.

26                                     **BACKGROUND**

27          The factual background of this case has been discussed at length in the court's prior order

28   granting defendants' previous motions to dismiss.  (Doc. No. 35.)  In its prior order, the court

                                                  1

1   synthesized plaintiffs' original 131-page complaint with considerable difficulty.  Indeed, in

2   dismissing plaintiffs' original complaint with leave to amend the court cautioned plaintiffs to

3   comply with Rule 8's requirements for a short and plain statement of their claims showing that

4   they are entitled to relief, or risk having an amended complaint dismissed with prejudice.  (Doc.

5   No. 35 at 20.)  Despite the court's instruction, plaintiffs' first amended complaint ("FAC") is 98-

6   pages in length and asserts thirty-six causes of action.  (Doc. No. 36.)  In any event, the court will

7   only briefly repeat plaintiffs' undeniably tragic factual allegations here.

8          Plaintiff Jose Murguia and defendant Heather Langdon married in 2004 and had three

9   children.  (FAC at ¶ 24.)  Following reports of domestic violence committed by Langdon against

10  Jose, the state court issued a TRO against Langdon on January 5, 2015 and then "awarded sole

11  physical and legal custody of their three children to Jose."  (*Id.* at ¶¶ 25–26.)  The couple

12  terminated their marriage in April of 2015.  (*Id.* at ¶ 27.)  However, in Spring of 2017 plaintiff

13  Murguia and defendant Langdon started seeing each other again and Langdon become pregnant

14  with twins.  (*Id.* at ¶ 31.)  On January 12, 2018, Langdon gave birth to twin boys, Mason and

15  Maddox, but there was no formal custody order for the twins.  (*Id.* at ¶ 33.)

16         On December 5, 2018, defendant Langdon was experiencing an ongoing and escalating

17  mental health crisis.  (*Id.* at ¶ 17.)  Defendant Langdon, plaintiff Murguia, and their twin infants

18  ("decedents") had been living together in plaintiff Murguia's home with the couple's three older

19  children since August of 2018.  (*Id.*)  Plaintiff Murguia called 911 on December 5, 2018 and

20  requested psychological help for Langdon.  (*Id.*)  The Tulare County Sheriff's officers were the

21  first to respond.  (*Id.* at ¶ 18.)  The officers did not take defendant Langdon into custody.  Instead,

22  plaintiffs' neighbor took Langdon and the decedents to the First Assembly church.  (*Id.*)  Shortly

23  after Langdon and the decedents arrived at First Assembly, the church called the Visalia Police

24  Department ("VPD").  (*Id.* at ¶ 20.)  Rather than taking Langdon into custody or placing her

25  under a § 5150 hold, the VPD officers drove Langdon and the decedents to a shelter for women.

26  (*Id.*)  The shelter refused to admit Langdon because "Langdon was disruptive and in the shelter's

27  opinion, acting 'crazy.'"  (*Id.* at ¶ 21.)  The shelter then called the Tulare Police Department

28  ("TPD") twice in order to get help dealing with Langdon.  (*Id.*)  Allegedly, the TPD called Child

2

1   Welfare Services ("CWS") and "*falsely* told them that Langdon had gone to a hospital for a psych

2   evaluation and that the hospital concluded that Langdon did not meet the criteria for an

3   involuntary commitment." (*Id.*) (emphasis in original.)  CWS told the TPD officers that it could

4   take custody of the decedents, but only if Langdon was taken into custody.  (*Id.* at ¶ 22.)  The

5   TPD officers refused to take Langdon into custody.  (*Id.*)  Believing that Langdon was not

6   capable of finding her own shelter, the TPD officers arranged for a motel to give a free night's

7   lodging to her and the decedents.  (*Id.*)  The TPD officers then drove defendant Langdon and the

8   decedents to the motel, where defendant Langdon drowned the decedents sometime thereafter.

9   (*Id.* at ¶ 23.)

10      On June 30, 2020, the court granted defendants' motions to dismiss plaintiffs' original

11   complaint but also granted plaintiffs leave to amend.  (Doc. No. 35.)  Plaintiffs filed their FAC on

12   July 30, 2020.  (Doc. No. 36.)  On August 20, 2020, both defendant City of Visalia and defendant

13   First Assembly each filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

14   (Doc. Nos. 38, 40.)  On September 3, 2020, the county defendants also filed a motion to dismiss

15   under Rule 12(b)(6) (Doc. No. 41) and on September 18, 2020, city defendants did the same

16   (Doc. No. 43).  Plaintiffs filed their oppositions to City of Visalia, First Assembly, and county

17   defendants' motions on September 22, 2020 (Doc. Nos. 45, 46, 47) and their opposition to city

18   defendants' motion on October 5, 2020 (Doc. No. 54).  County defendants, City of Visalia, and

19   First Assembly each filed replies on September 29, 2020 (Doc. Nos. 49, 50, 51) and city

20   defendants filed their reply on October 12, 2020 (Doc. No. 55).

21                                    **LEGAL STANDARD**

22      The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

23   sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

24   1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

25   sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

26   F.2d 696, 699 (9th Cir. 1990).  A claim for relief must contain "a short and plain statement of the

27   claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Though Rule 8(a)

28   does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state

a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).  It is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## DISCUSSION

Defendants City of Visalia and Officer Hernandez, First Assembly, county defendants, and city defendants each move to dismiss plaintiffs' respective claims against them pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Below, the court will address the pending motions with respect to plaintiffs federal and state law claims separately.

### A.    Federal Claims

Plaintiffs bring twelve separate federal claims pursuant to 42 U.S.C. § 1983 for violation of their constitutional rights.  (FAC at ¶¶ 119–339) (claims 1–12.)  Plaintiffs' twenty-four additional claims are all brought under state law.  (FAC at ¶¶ 340–502) (claims 13–36.) Plaintiffs' federal claims are brought against both the individual defendants as well as against City of Visalia, City of Tulare, and County of Tulare pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978).  As was the case when the court issued its previous order (Doc. No. 35), "the sole issue posed by the pending motions to dismiss this [case] is whether plaintiffs have adequately alleged that any of the individual defendants' conduct deprived them of a constitutional right." (*Id.* at 10.)  The court concluded in its prior order that plaintiffs had not adequately alleged a constitutional violation in their original complaint.  With respect to the FAC, the court finds that plaintiffs have again failed to adequately allege constitutional violations

4

against the individual defendants.  Moreover, because a *Monell* claim requires an underlying constitutional violation as an essential element of the claim, the court concludes plaintiffs' *Monell* claims against the municipal entity defendants must also be dismissed.  The court will address the federal claims brought against each group of defendants in turn below.

        1.    <u>Claims Against the Individual Defendants</u>

      Plaintiffs bring the same federal claims against each individual defendant.  Defendants move to dismiss those claims, arguing that plaintiffs have failed to allege facts sufficient to state a claim upon which relief could be granted.  Specifically, plaintiffs bring their claims under § 1983, alleging violations of the due process clause of the Fourteenth Amendment, violations of their Fourth Amendment right to be free from unreasonable seizure, and violations of their First Amendment right to familial association.  To succeed on a § 1983 claim, a plaintiff must allege and ultimately show that:  (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right.  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (citing *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006)).  Relevant to plaintiffs' claims here, the Ninth Circuit has explained as follows:

> "[T]he general rule is that [a] state is not liable for its omissions." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000).  In that vein, the Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*, 489 U.S. 189, 196 (1989).  As a corollary, the Fourteenth Amendment typically "does not impose a duty on [the state] to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007).
>
> There are two exceptions to this rule:  (1) when a "special relationship" exists between the plaintiff and the state (the special relationship exception), *DeShaney*, 489 U.S. at 198–202; and (2) when the state affirmatively places the plaintiff in danger by acting with "deliberate indifference" to a "known or obvious danger" (the state-created danger exception), *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).  If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim.

*Id.*

5

The special-relationship exception "applies when a state 'takes a person into its custody and holds him there against his will.'"  *Id.* at 972 (quoting *DeShaney*, 489 U.S. at 200); *see also Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) ("[W]hen a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being.").  "The types of custody triggering the exception are 'incarceration, institutionalization, or other similar restraint of personal liberty.'"  *Id.* at 972.  "The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id.*  The other exception, the state-created danger exception, has two requirements:  (1) there must be "affirmative conduct on the part of the state in placing the plaintiff in danger," and (2) the state must act "with deliberate indifference to a known or obvious danger."  *Id.* at 974 (internal quotations and citations omitted); *see also Henry A.*, 678 F.3d at 1002; *Kennedy v. Ridgefield*, 439 F.3d 1055, 1062–64 (9th Cir. 2006).

In their FAC, as in their original complaint, plaintiffs assert a constitutional right to life and to familial companionship.  (*See, e.g.*, FAC at ¶ 207.)  The Ninth Circuit recognizes that a parent has a Fourteenth Amendment liberty interest in the companionship and society of his or her child, *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010), "and that a child's interest in [their] relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest."  *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (internal citation and quotation marks omitted).  Likewise, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life.'"  *Lee*, 250 F.3d at 685.  Plaintiffs also allege that the individual defendants named in this action were acting under color of state law.  (*See, e.g.*, FAC at ¶ 120.)  Thus, the lone issue posed by the pending motions to dismiss is whether plaintiffs have adequately alleged that any of the individual defendants deprived plaintiffs of their constitutional rights.

/////

/////

6

a.      *County of Tulare Officers*

Plaintiffs bring their first and second claims under § 1983 against defendants Cerda and

Lewis, both officers with the Tulare County Sheriff's Department, asserting violations of

plaintiffs' substantive due process rights under of the Fourteenth Amendment[1], violations of their

right to be free from unreasonable seizures under the Fourth Amendment, and violations of their

right to familial association under the First Amendment.  (FAC at 29, 33.)  The County

defendants move to dismiss those claims, arguing that plaintiffs have failed to allege an exception

to the rule that the failure to protect an individual against private acts of violence does not

constitute a violation of the Due Process Clause of the Fourteenth Amendment.  (Doc. No. 41-1 at

13.)

In this regard, plaintiffs advance three arguments in response to the pending motion to

dismiss.  First, plaintiffs argue that a person may be held liable under § 1983 if he omits to

perform an act which he is legally required to perform that causes the deprivation of which

complaint is made.  (Doc. No. 46 at 7) (citing *Preschooler II v. Clark Cnty. Sch. Bd. Of Trs.*, 479

F.3d 1175, 1183 (9th Cir. 2007)).  Plaintiffs contend that under various internal policies and

California statutes, defendants were legally obligated to assist the decedents, the omission of

---

[1]  Plaintiffs also bring claims for violation of their procedural due process rights.  (*See, e.g.*, Doc.
No. 47 at 20–21.)  Although somewhat unclear, the basis for their claims in this regard appears to
be that defendants had a duty to call the decedents' father but did not give him notice or an
opportunity to be heard about getting the decedents back.  (*Id.* at 20.)  For the reasons articulated
throughout this order, no such duty existed as a matter of law.  Plaintiffs also appear to contend
that defendants were mandatory reporters under California law and thus "had to investigate and
report when a reasonable person would consider a child in danger."  (*Id.*)  However, as plaintiffs
note, in determining what procedural due process is constitutionally due under the Fourteenth
Amendment to the United States Constitution, courts look to whether there is a protected liberty
interest and whether there is a denial of adequate procedural protections.  *Thornton v. City of St.
Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005).  As to the protected liberty interest, courts ask
"whether there exists a liberty or property interest which has been interfered with by the state."
*Ky. Dep't of Corr. V. Thompson*, 490 U.S. 454, 460 (1989).  Notwithstanding the failure of
plaintiffs to allege what liberty interest was interfered with *by the state*, they also fail to specify
"the particular outcome that must be reached if the substantive predicates of [a mandatory
reporter] have been met."  *Slusher v. City of Napa*, No. 15-cv-2394-SBA, 2015 WL 8527411, at
*6 (N.D. Cal. Dec. 11, 2015) (noting that there, the plaintiffs "do not allege that any of the cited
authority mandates a particular outcome—or what that outcome would be.")  In the absence of
such allegations, the court cannot conclude that plaintiffs have alleged a plausible claim for
violation of their procedural due process rights.

1    which led to the violation of plaintiffs' constitutional rights.  Second, plaintiffs argue that

2    defendants had *de facto* custody over the decedents and therefore the "special-relationship"

3    exception to the omission doctrine applies.  (*Id.* at 11.)  Third, plaintiffs argue that through their

4    actions defendants created a more dangerous situation for the decedents and therefore the "state-

5    created danger" exception applies.  (*Id.* at 11–12.)

6                    i.    Failing to Perform a Legally Required Act

7         Plaintiffs assert that the FAC "alleges multiple mandatory duties that, if performed by

8    defendants, would have saved the twins."  According to plaintiffs, under *Preschooler II*, 479 F.3d

9    at 1183, these omissions are actionable.  Specifically, plaintiffs argue that the County of Tulare

10   Sheriff's Department policies required defendants to be alert to signs of mental health issues

11   such as "known history of mental illness," "[t]hreats of or attempted suicide," and "[d]elusions,

12   hallucinations, perceptions unrelated to reality or grandiose ideas."  (Doc. No. 46 at 9.)  Plaintiffs

13   also point out that The Commission on Peace Officer Standards and Training ("POST"), which

14   the County of Tulare Sheriff's Department requires its officers to participate in, required

15   defendants to consider similar factors that might raise red flags as to Langdon's mental state.

16   (*Id.*)  Lastly, plaintiffs argue that California Welfare & Institutions Code §§ 305, 627, 5008

17   (h)(1)(a), and 5150 required defendants to act in this situation and they failed to do so.  (*Id.* at

18   17.)  For all of these reasons, plaintiffs aver that defendants were required by law to act and that

19   their failure to do so led to the alleged constitutional harms being suffered.

20        The Ninth Circuit has held that "a person 'subjects' another to the deprivation of a

21   constitutional right, within the meaning of § 1983, 'if he does an affirmative act, participates in

22   another's affirmative act, or omits to perform an act which he is legally required to do that causes

23   the deprivation of which the complaint is made.'"  *Preschooler II*, 479 F.3d at 1183 (quoting

24   *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)) (citation omitted).  Here, plaintiffs have not

25   pointed to any law, statute, or regulation that legally required defendants to act in this situation.

26   Plaintiffs cite California Welfare and Institutions Code § 305, which provides:  "Any officer may,

27   without a warrant take into temporary custody a minor . . . when the officer has reasonable cause

28   for believing . . . that the minor has an immediate need for medical care, or the minor is in

                                             8

immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety."  However, the plain language of this statute clearly states only that an officer "may" act under such circumstances, not that the officer "must" act.  Thus, § 305 does not create any mandatory duty.

Plaintiffs also cite California Welfare and Institutions Code § 627 (*see* Doc. No. 46 at 17), which states:  "When an officer takes a minor before a probation officer at a juvenile hall or to any other place of confinement pursuant to this article, he shall take immediate steps to notify the minor's parent, guardian, or a responsible relative that such minor is in custody and the place where he is being held."  Cal. Welf. & Inst. Code § 627(a).  It is unclear in what way plaintiffs believe this statute would apply under the circumstances presented in this case.  First, the decedents were never taken to a place of confinement akin to those examples listed in the statute. Second, there was no need or requirement to notify a parent because the decedents were at all times with their mother.  Thus, the court concludes that § 627(a) does not apply to situations like the one at issue in this action.

Plaintiffs next cite California Welfare and Institutions Code §§ 5008(h)(1)(a) and 5150. (Doc. No. 46 at 8.)  California Welfare and Institutions Code § 5008(h)(1)(a) defines the term "gravely disabled" as a condition "in which a person, as a result of a mental health disorder is unable to provide for his or her basic personal needs for food, clothing, or shelter."  California Welfare and Institutions Code § 5150 in turn states that "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probably cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention . . . ."  As the court noted in its previous order, "there is no mandatory duty to conduct a § 5150 assessment."  (Doc. No. 35 at 13 n. 6.)  As with respect to § 305, an officer "may" take a person suspected of being a danger due to their mental health disorder into custody, but the officer is not required by that statute to do so.  In short, none of the statutes cited by plaintiffs creates a mandatory duty that defendants failed to adhere to in this case.

/////

9

The internal policies cited by plaintiffs likewise do not create a legally mandatory duty and plaintiffs have provided no legal support for their contention that they do.  Indeed, California law suggests just the opposite.  California Government Code § 815.6 states in pertinent part: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  An enactment creates a mandatory duty if it requires a public agency to take a particular action.  *County of Los Angeles v. Superior Court*, 102 Cal. App. 4th 627, 639 (2002).  "An enactment does not create a mandatory duty if it merely recites legislative goals and policies that must be implemented through a public agency's exercise of discretion."  *Id.*  The policies that plaintiffs appear to refer to are not enactments imposing mandatory duties.  Rather, they are more akin to legislative goals and policies within the department's discretion.  *See, e.g.*, *Asberry v. Salinas Valley State Prison Facility-D Male Dentist "G.,"* No. 19-cv-06311-YGR, 2021 WL 121124, at *2 (N.D. Cal. Jan. 13, 2021) ("[S]ome of these regulations appear to be general declarations of policy goals, and thus do not impose a mandatory duty within the meaning of section 815.6."); *Bearden v. Alameda County*, No. 19-cv-04264-SI, 2020 WL 1503656, at *5 (N.D. Cal. Mar. 30, 2020) ("The County of Alameda's internal workplace violence prevention policy is not an enactment and thus cannot qualify as the basis for a § 815.6 claim."); *Quiroz v. Cate*, No. 11-cv-0016-LHK, 2012 WL 3236490, at *3 (N.D. Cal. Aug. 6, 2012) ("[T]hese policy regulations appear to be general declarations of policy goals, and thus do not impose a mandatory duty within the meaning of § 815.6.").  Comparing the alleged policy involved here to those involved in the cases cited above, the court concludes that the Tulare County Sheriff's Department policy did not establish a mandatory legal duty falling within the definition expressed in *Preschool II*.  Plaintiffs have simply pointed to no "mandatory duty 'phrased in explicit and forceful language.'"  *Bearden*, 2020 WL 1503656, at *5 (quoting *Collins v. Thurmond*, 41 Cal. App. 5th 879, 914 (2019)).

For all of the reasons expressed above, the court finds plaintiffs have not alleged that defendants omitted to perform acts which they were legally required to perform.  Accordingly,

1   plaintiffs have failed to state a cognizable claim under this theory of liability.

2                              ii.        Special-Relationship Exception

3           In its previous order, the court stated that

4                   according to the complaint, there was no formal custody order
                    regarding the decedent children, and at the time of these events they
5                   lived with both Murguia and Langdon. . .. In other words, the
                    complaint lacks allegations of affirmative conduct on the part of
6                   TCSD deputies.   Rather, the children were always in Langdon's
                    custody and it cannot be alleged that the deputies placed them there.
7

8   (Doc. No. 35 at 11) (citing *Enyart ex rel. Chally v. Kerper*, No. 97-cv-1725, 1999 WL 803319, at

9   *5 (D. Or. Oct. 8, 1999)).

10          In an apparent effort to circumvent the court's reasoning in this regard, plaintiffs now

11  contend in their FAC that by separating the decedents from their father, defendants "assumed *de*

12  *facto* custody and control over the twins, [creating] a special relationship and a duty to protect."

13  (Doc. No. 46 at 6.)  Plaintiffs also argue that juveniles are always in some form of custody

14  because of their incapacity to provide self-care.  (Doc. No. 46 at 17.)  Furthermore, according to

15  plaintiffs, defendants were "authorized to take temporary custody because 'the fact that the child

16  is left unattended poses an immediate threat to the child's health or safety.'"  (*Id.*) (citing Cal.

17  Welf. & Inst. Code § 305).  Lastly, defendants cite the decision in *Doe v. United States Youth*

18  *Soccer Association., Inc.*, 8 Cal. App. 5th 1118, 1129–30 (2017) for the proposition that "[a]

19  special relationship is created when 'the plaintiff is particularly vulnerable and dependent upon

20  the defendant who, correspondingly, has some control over the plaintiff's welfare.'"  (*Id.* at 18.) [2]

21  /////

22  _____

23  [2]  Plaintiffs' reliance on the decision in *United States Youth Soccer* is misplaced.  Although that
    decision did state that a special relationship exists when a plaintiff is particularly vulnerable and
24  dependent on a defendant who has some control over the plaintiff's welfare, it concerned a
    negligence claim brought under state law, not a § 1983 claim.  *United States Youth Soccer Assn.,*
25  *Inc.*, 8 Cal. App. 5th at 1129.  Although the test for negligence and that applicable to a § 1983
    failure to act claim both use the term "special relationship," they are applicable to wholly
26  different scenarios, with the § 1983 test dealing with situations akin to "incarceration" or
    "institutionalization."  *See DeShaney*, 489 U.S. at 200.  Moreover, even if *United States Youth*
27  *Soccer Assn., Inc.* did apply here, the defendants in that case acted as "quasi-parents" by
    assuming responsibility for the safety of players whose parents were not present.  *Id.* at 1130.
28  Here, the decedents' mother was at all times present with them.

1    In contrast, the county defendants argue that "[t]here is simply no authority for the

2    proposition that in temporarily separating the parents or not stopping Langdon from leaving with

3    the twins, the TCSD 'took custody' of the twins."  (Doc. No. 41-1 at 12.)

4        With respect to the Tulare County officers, the court finds plaintiffs' arguments to be

5    unpersuasive.  Nothing in the FAC suggests that the county defendants ever took custody of the

6    decedents and the analysis the court conducted in its previous order holds just as true now.  *See*

7    *DeShaney*, 489 U.S. at 190 ("No [affirmative duty to protect] existed here, for the harms

8    petitioner suffered occurred not while the State was holding him in its custody, but while he was

9    in the custody of his natural father, who was in no sense a state actor.").  Once again, there are no

10   factual allegations supporting plaintiffs' argument that the decedent children "were ever in

11   custody."  (Doc. No. 35 at 11.)  Even if juveniles are, in some sense, always in a sort of custody

12   as plaintiffs now assert, the court noted in its previous order that the decedents were always in the

13   custody of their mother and the facts alleged in the FAC do not suggest otherwise.  The county

14   defendants allegedly responded to plaintiff Murguia's 911 call and then allowed Langdon to leave

15   with the decedents, while simultaneous preventing plaintiff from intervening, but neither the

16   decedents nor Langdon were ever put into any form of custody by the county defendants.  (FAC

17   at ¶¶ 73–78.)  Ultimately, merely alleging in conclusory fashion that the decedents were in *de*

18   *facto* custody is not sufficient to negate plaintiffs' factual allegations showing that Langdon

19   always maintained custody of the children.

20                iii.        State-Created Danger Exception

21       Plaintiffs' complaint also fails to allege facts supporting application of the state-created

22   danger exception.

23       In its previous order, the court concluded that because the children were always in

24   Langdon's custody "it cannot be alleged that the deputies placed them there."  (Doc. No. 35 at

25   11.)  The court cited the decision in *Kerper*, in which the court found the state was not liable

26   under the state-created danger exception because it did not place the plaintiff, who was sexually

27   abused while in the custody of her convicted sex offender father, in her father's custody in

28   /////

1   violation of the conditions of his probation.  (Doc. No. 35 at 11) (citing *Kerper*, 1999 WL 803319

2   at *5.)

3          Plaintiffs now argue that defendants increased the level of danger faced by the decedents

4   in "separating them from a mentally competent father and knowingly entrusting them to their

5   violent, deranged mother."  (Doc. No. 46 at 20.)  Plaintiffs attempt to assert that Langdon no

6   longer had custody pursuant to California Family Code § 3010(b), which states that "[i]f one

7   parent is dead, is unable or refuses to take custody, or has abandoned the child, the other parent is

8   entitled to custody of the child."  (FAC at ¶ 102.)  Defendants in contrast argue that "Courts have

9   jurisdiction to award custody of children, not law enforcement officers."  (Doc. No. 41-1 at 19.)

10  Defendants further contend that they played no part in creating the danger that the decedents

11  faced "nor did [county defendants] do anything to render them any more vulnerable to [the

12  dangers]."  (*Id.* at 13.)

13         Plaintiffs are correct that officials may remove a child from the custody of their parent

14  without prior judicial authorization; however, officials may do so only if the information they

15  possess at the time of the seizure "is such as provides reasonable cause to believe that the child is

16  in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably

17  necessary to avert that specific injury."  *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000).

18  The allegations of the FAC reflect that defendants in this case never terminated Langdon's

19  custody of her children, as explained in this court's previous order.  Indeed, as the Supreme Court

20  in *DeShaney* stated, "had they moved too soon to take custody of the [children] away from their

21  [mother], they would likely have been met with charges of improperly intruding on the parent-

22  child relationship."  *DeShaney*, 489 U.S. at 202; *see also Wallis*, 202 F.3d at 1140 (concluding

23  that a reasonable jury could find that the officers were liable because they "did not have

24  reasonable cause to remove the children without a court order.").  Thus, nothing in the allegations

25  of the FAC changes the court's previous analysis, which concluded that the complaint lacked

26  allegations of affirmative conduct on behalf of the officers.  (Doc. No. 35 at 11.)  The decedents

27  were in their mother's custody before the officers arrived on the scene, and they remained in her

28  custody after the officers intervened.  Accordingly, for the same reasons stated in the court's

1 | previous order, plaintiffs have not sufficiently alleged that the "state-created danger" exception

2 | applies to their claims.

3 |   Because the FAC does not allege facts supporting a cognizable failure to protect claim

4 | against Tulare County officers Lewis and Cerda, their motion to dismiss all federal claims

5 | brought against them will be granted.

6 |       b. *Child Welfare Services Social Worker Torres*

7 |   In their first and second causes of action, plaintiffs also bring the same federal claims

8 | against defendant Torres, a social worker at Child Welfare Services ("CWS").  (FAC at ¶ 6.)

9 | Specifically, plaintiffs assert violations of their substantive due process rights under of the

10 | Fourteenth Amendment, violations of their right to be free from unreasonable seizures under the

11 | Fourth Amendment, and violations of their right to familial association under the First

12 | Amendment.  (*Id.*)  County defendants argue that plaintiffs have failed to allege facts supporting

13 | an exception to the rule against liability based upon an alleged failure to act with respect to

14 | defendant Torres.  (Doc. No. 41-1 at 20.)

15 |   In opposing this aspect of the motion to dismiss, plaintiffs contend that defendant Torres

16 | "increased the [decedents'] danger when she falsely told Garcia that Langdon had no history of

17 | child abuse" and "deliberately ignored the statutory and policy duties to immediately investigate

18 | in person."  (Doc. No. 46 at 20.)  Plaintiffs argue that defendant Torres had a "statutory duty to

19 | investigate all allegations that a child may be in danger of *suspected* abuse, neglect, or

20 | exploitation."  (Doc. No. 46) (emphasis in original.)  Plaintiffs assert that California Welfare and

21 | Institutions Code § 16504 requires CWS to carry out an immediate "in-person response" in

22 | situations like the one at issue here.  (*Id.* at 30.)

23 |   As an initial matter, the argument that defendant Torres increased the level of danger

24 | posed to the decedents when she allegedly told Garcia that Langdon had no history of abuse is the

25 | same argument plaintiffs made in opposition to defendants' previous motions to dismiss.  (*See*

26 | Doc. No. 35 at 12.)  Once again the court concludes that

27 |
28 |     [t]he children were in their mother's custody before and after Torres failed to act and the complaint does not allege that the children were ever in CWS's custody.  It therefore cannot be asserted that

1
2

     defendant Torres affirmatively placed the decedents in danger under
the facts alleged.

3  (*Id.*) (citing *Kerper*, 1999 WL 803319 at *5 and *DeShaney*, 489 U.S. at 190).

4     With respect to defendant's alleged failure to investigate, California Welfare and

5 Institutions Code § 16504 states that "[a]n immediate in-person response shall be made by a

6 county child welfare services department social worker in emergency situations in accordance

7 with regulations of the departments."  However, § 16504 also states that "an in-person response is

8 not required when the county child welfare services department, based upon an evaluation of risk,

9 determines that an in-person response is not appropriate."  Notably, in their FAC, plaintiffs assert

10 that Torres "concluded that Langdon was not a danger to the twins, and set CWS's investigative

11 response time for 10 days from the call."  (FAC at ¶ 105.)  But the FAC then alleges that Torres

12 and her supervisor did a further assessment and "[t]he matter was then reclassified for immediate

13 in-person investigation because 'the caregivers' behavior is bizarre and dangerous to the

14 emotional health of the children.'"  (*Id.* at ¶ 116.)  The FAC does not specify who the referred to

15 supervisor was, nor does the FAC provide any specific factual allegations to support the

16 allegation that the situation was reclassified as an emergency requiring an immediate in-person

17 investigation.  In other words, the allegations of the FAC do not support its conclusory assertion

18 that defendant Torres abused her discretion in determining that an in-person response was not

19 appropriate.  Nevertheless, defendant Torres' alleged failure to abide by § 16504 could only give

20 rise to a state negligence claim and does not provide a basis for a cognizable § 1983 claim.

21 *DeShaney* is once again instructive here.

22    In *DeShaney* the Supreme Court held that a social worker in Wisconsin could not be found

23 liable under § 1983 for her alleged failure to investigate and interfere with suspected child abuse.

24 *DeShaney*, 489 U.S. at 191.  Relevant to plaintiffs' case here, Wisconsin had established a child-

25 welfare system that placed upon the local departments of social services "a duty to investigate

26 reported instances of child abuse."  *Id.* at 208 (J. Brennan, dissenting).  "Even when it [was] the

27 sheriff's office or police department that receive[d] a report of suspected child abuse, that report

28 [was] referred to local social services departments for action."  *Id.*  Had Justice Brennan's dissent

won the day, the court would have held that "[i]n this way, Wisconsin law invites—indeed, directs—citizens and other governmental entities to depend on local departments of social services . . . to protect children from abuse." *Id.*  According to the dissent in *DeShaney*, through its child protection program, Wisconsin "actively intervened in [the abused child's] life . . . and by virtue of this intervention, acquired ever more certain knowledge that [the abused child] was in grave danger." *Id.* at 210.  In *DeShaney*, the social worker had compiled substantial evidence of the child's abuse and admitted that "[she] just knew the phone would ring some day and [the abused child] would be dead." *Id.* at 209.  Nonetheless, the majority held that despite the state statutory obligations and despite the knowledge of suspected abuse, the failure to intervene did not support a cognizable § 1983 cause of action.  *Id.* at 202–03; *see also Seagrave v. City of Lake*, No. 89-cv-1834-EFL, 1995 WL 86552, at *5 (N.D. Cal. Feb. 21, 1995) ("Just as there is no federal constitutional right to be free from private violence under the principles set out in *DeShaney*, there is no such right to an investigation of reports of child abuse."); *Jimma v. Wash. St. Dep't of Hum. & Soc. Servs.*, No. 19-cv-1840-JCC, 2020 WL 832330, at *2 (W.D. Wash. Feb. 20, 2020) (concluding that failure to protect a child from abuse does not violate the Due Process Clause "even 'if the State knew that [the child] faced a special danger of abuse . . . and specifically proclaimed, by word and by deed, its intention to protect [the child] against that danger.'"); *Engler v. Arnold*, 209 F. Supp. 3d 988, 992–93 (N.D. Ohio 2016), *aff'd*, 862 F.3d 571 (6th Cir. 2017) (finding that even if the defendant acted "'in derogation of his responsibilities under Ohio law . . . the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.'") (citation omitted).

The Supreme Court in *DeShaney* instructed that states, through their courts and legislatures, may "impose such affirmative duties of care and protection upon [their] agents as [they wish].  But not 'all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.'"  *Id.* at 202 (quoting *Daniels v. Williams*, 474 U.S. 327, 335 (1986)).  In this vein, as in *DeShaney*, any remedy plaintiffs seek here must be through state channels, not federal claims brought pursuant to 42 U.S.C. § 1983.  *See, e.g.*, Rudolph Alexander, Jr., *The Legal Liability of Social Workers after* DeShaney, 38 Social Work

16

64 (1993) ("Social workers employed in child protective services who heard of the ruling in *DeShaney* do not really have a safeguard against lawsuits.  Given the current state of the law, they still may be sued and damages may be awarded, but this legal battle must occur at the state court level.").

Accordingly, as with their claims brought against the Tulare County Sherriff's officers, plaintiffs have failed to allege that they were deprived of a constitutional right by defendant Torres' alleged failure to act.  The court will therefore grant the motion to dismiss filed on behalf of defendant Torres with respect to the federal claims asserted against her in this action.

          c.     *City of Visalia Officers*

Plaintiffs assert their fifth and sixth claims against defendant Hernandez, a police officer for the City of Visalia.  (FAC at 45–51.)  As with the county defendants, plaintiffs bring their claims under § 1983, alleging violations of their Fourteenth Amendment due process rights, violations of their Fourth Amendment right to be free from unreasonable seizure, and violations of their First Amendment right to familial association.  (*Id.*)

Defendant Hernandez is alleged to have breached his duties by ignoring plaintiff Murguia, failing to call CWS, and by taking the twins and their mother to Lighthouse Shelter ("Lighthouse"), an act that allegedly "increased the danger to the twins and reduced the probability that Langdon would get the mental help she needed and wanted."  (Doc. No. 47 at 7.)

Plaintiffs contend that defendant Hernandez had a "mandatory duty to obtain an 'evaluation' or professional analysis of Langdon's 'medical, psychological, education, . . . conditions as may appear to constitute a problem.'"  (*Id.* at 9) (citing Cal. Welf. Inst. Code § 5008(a)).  Plaintiffs also contend that the City of Visalia's own policy required defendant Hernandez to be alert to a variety of signs of mental health issues.  (*Id.*)  Lastly, plaintiffs argue, once again, that California Welfare and Institutions Codes §§ 305 and 627 created mandatory duties that defendant Hernandez failed to perform.  (*Id.* at 11.)  For the reasons articulated above, however, neither the internal policy of the Visalia Police Department nor California Welfare and Institutions Codes §§ 305, 627, and 5008 created any constitutionally mandated duty on the part of defendant Hernandez.  Accordingly, plaintiffs' arguments in this regard remain unpersuasive.

Plaintiffs also argue that the FAC cures their previous failure to allege in their original complaint that defendant Hernandez took custody of the decedents because they now allege that he had *de facto* custody of the twins.  (Doc. No. 47 at 15.)  However, merely alleging *de facto* custody in a conclusory fashion does not make it so.  For the same reasons articulated above with respect to the other officer defendants, the court concludes that plaintiffs have not sufficiently alleged that defendants took plaintiffs into custody or created a special relationship with them.  "[P]laintiffs have simply failed to allege that any party involved in this tragic incident was taken into custody and held by authorities against their will."  (Doc. No. 35 at 13) (citing *Patel*, 648 F.3d at 972).  "Although VPD officers allegedly took Langdon to Lighthouse Shelter and left her and the children there . . . this factual allegation is insufficient, even if proven, to establish that they were taken into 'custody' for purposes of establishing a special relationship between the decedents and the police."  (*Id.*)  These allegations of the FAC at most allege that defendant Hernandez drove Langdon and her two children to a shelter where they would be able to stay for a night.  In the case of a minor child, "custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs."  *Patel*, 648 F.3d at 974; *see also DeShaney*, 489 U.S. at 201 ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter.").  Because the decedents here were never separated from the custody of their mother, the "special relationship" exception does not apply.

Finally, plaintiffs reassert their claims and arguments with respect to the state created danger exception.  (Doc. No. 47 at 12.)  Hernandez was the officer who allegedly drove Langdon and the decedents from the church to Lighthouse.  Plaintiffs argue that defendant Hernandez "could have delivered the twins to José and connected Langdon to psychiatric help.  Instead, he sent the twins away from their father, where they would be safe, and on to Lighthouse Shelter, where they would be with a deranged Langdon[.]"  (*Id.*)  For the same reasons that the court will grant the pending motion to dismiss with respect to the "special relationship" exception, the court will also grant the pending motion as to plaintiffs' claim based upon the "state created danger" exception.  The FAC fails to allege facts sufficient to find the state-created danger exception applicable in this case.  As noted above, under the facts alleged in the FAC, the decedent children

18

1   were always in their mother's custody and the mother was never in the custody of the Visalia

2   Police Department.  Officer Hernandez therefore played no affirmative role in placing the

3   decedent children in greater danger than they otherwise faced when originally with their mother.

4   *See DeShaney*, 489 U.S. at 190; *Kerper*, 1999 WL 803319 at *5.

5          For these reasons, the court concludes that plaintiffs have not alleged sufficient facts to

6   state a cognizable claim that the City of Visalia defendants deprived them of any constitutional

7   right.  The court will therefore grant the motion to dismiss filed on behalf of the City of Visalia

8   defendants with respect to all federal claims.

9                      d.   *City of Tulare Officers*

10         Plaintiffs assert their ninth and tenth claims against defendants Sargent Garcia, Officer

11  Davis, and Officer Valencia of the *City* of Tulare Police Department ("city defendants").  (FAC at

12  56–62.)  As with the county defendants and City of Visalia defendants, plaintiffs appear to bring

13  their claims against the city defendants under § 1983, alleging violations of their Fourteenth

14  Amendment due process rights, their Fourth Amendment right to be free from unreasonable

15  seizure, and their First Amendment right to familial association.  (*Id.*)

16         Plaintiffs assert that the city officers knew that the decedents were in danger because they

17  had no competent adult caring for them and that the officers had to protect the decedents under

18  the same statutes and internal policies cited above.  (Doc. No. 54 at 7–8.)  Plaintiffs also aver that

19  the officers took *de facto* custody of the decedents when they drove them from Lighthouse to the

20  motel and that the officers enhanced the danger to the decedents by "taking them and their

21  deranged mother to a motel, an affirmative act that eliminated any chance that Langdon would get

22  the mental help she needed and led to the [decedents'] drowning."  (*Id.* at 8.)

23         First, plaintiffs' arguments that city defendants had a mandatory duty to act pursuant to

24  internal policies and California statutes are all unpersuasive for the reasons addressed at length

25  above with respect to the other named individual defendants.

26         Second, plaintiffs' arguments that city defendants had *de facto* custody over plaintiffs,

27  which would create a "special-relationship," are likewise unpersuasive for the same reasons

28  addressed above with respect to the other individual defendants.  The city defendants simply

1    never restrained the liberty of plaintiffs, and decedents were at all times in the custody of their

2    mother.

3        As to plaintiffs' state-created danger arguments, plaintiffs argue that city defendants

4    increased the danger "by not assessing Langdon's mental state, not having her evaluated by a

5    psych professional, either in the field or at a facility, not contacting Jose to take the twins, and

6    actively discouraging CWS from investigating the deferral or detaining the children

7    immediately." (Doc. No. 54 at 13.) Additionally, plaintiffs assert that the officers increased the

8    decedents' danger by "driving them away from Jose's house, where the twins would be safe, and

9    driving Langdon and the twins to the Virginia Motor Lodge." (*Id.* at 14.) The court looks at the

10   situation the decedents would have been in absent any interference by the city defendants. Based

11   on the allegations of the FAC, the decedents would have either been at the Lighthouse Shelter

12   with their mother or would have been removed from the shelter and forced to find some unknown

13   new location. Instead, the city defendants took the decedents and their mother to a motel to get

14   them a room and to avoid any additional altercations with third parties. Here, the risk to the

15   decedents was that they lived with an adult mother who was prone to psychiatric incidents and

16   delusions. Although defendants were "allegedly derelict in their failure to extricate" the

17   decedents from that situation, "no facts are alleged that suggest that [defendants] placed [the

18   decedents] in danger or affirmatively increased the risk of harm to [them] through their inaction."

19   *Slusher*, 2015 WL 8527411 at *5.

20       The court concludes that plaintiffs have not alleged sufficient facts to state a cognizable

21   constitutional claim against city defendants. The court will therefore grant the motion to dismiss

22   filed on behalf of the individual city defendants with respect to all federal claims.[3]

23   ───────────────

24   [3] Plaintiffs also claim that their Fourth Amendment rights to be free from unreasonable seizures
     were violated. (*See, e.g.*, Doc. No. 54 at 22.) Plaintiffs assert that because defendants took *de*

25   *facto* custody and control of the twins without calling Jose, defendants committed a wrongful
     seizure. (*Id.*) Because the court concludes that defendants never took custody of the twins, this

26   argument is without merit. Similarly, plaintiffs allege a violation of their First Amendment rights
     to a familial relationship. (Doc. No. 46 at 21.) However, plaintiffs' First Amendment rights to

27   familial associated "are measured by the same standard as Fourteenth Amendment rights to
     familial association based on the Ninth Circuit's analysis" in *Lee v. City of Los Angeles*, 250 F.3d

28   668, 685 (9th Cir. 2001). *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 973 (E.D. Cal. 2017).

2.     *Monell* Claims Against the City of Visalia, County of Tulare, and City of Tulare

Municipalities "may not be held vicariously liable for the unconstitutional acts of [their] employees under the theory of *respondeat superior*." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Rather, for a municipality to be liable under § 1983, a plaintiff must allege and ultimately prove that an official municipal policy caused his or her constitutional deprivation. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). As the Ninth Circuit has stated:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a [§] 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'

*Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).

However, "[a] government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "[S]ome evidence of constitutional violations is required to maintain the *Monell* claim" in this case. *Johnson v. City of Vallejo*, 99 F. Supp. 3d 1212, 1222 (E.D. Cal. 2015). Plaintiffs here have failed to adequately allege that any state actor deprived them of their constitutional rights. Because no underlying constitutional violation has been alleged here, plaintiffs' *Monell* claim must also be dismissed. The court will therefore grant defendants' motions to dismiss with respect to all of plaintiffs' *Monell* claims.

/////

/////

---

Because the court concludes that plaintiffs have not alleged a claim under the due process clause of the Fourteenth Amendment, so too have they not alleged a cognizable First Amendment claim.

1    **B.    State Claims**

2          This case was originally filed in this court based on federal question jurisdiction.  The

3    court has concluded that defendants' motions to dismiss must be granted as to all of plaintiffs'

4    federal claims, leaving only state law causes of action remaining against them.[4]  Once all federal

5    claims have been dismissed from a case, whether to retain jurisdiction over any remaining state

6    law claims is left to the discretion of the district court.  *See* 28 U.S.C. § 1367 (c)(3); *Acri v.*

7    *Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997); *Moore v. Kayport Package Exp., Inc.*,

8    885 F.2d 531, 537 (9th Cir. 1989).  Generally, if federal claims are dismissed prior to trial, state

9    law claims should be remanded to state court "both as a matter of comity and to promote justice

10   between the parties, by procuring for them a surer-footed reading of applicable law."  *United*

11   *Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484

12   U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated

13   before trial, the balance of factors to be considered . . . will point toward declining to exercise

14   jurisdiction over the remaining state-law claims."); *Acri*, 114 F.3d at 1000.  If the court declines

15   to exercise jurisdiction over the state-law claims in a case initially filed in federal court, the court

16   must dismiss those claims without prejudice.  *See Carnegie-Mellon Univ.*, 484 U.S. at 350–51

17   ("When the balance of these factors indicates that a case properly belongs in state court, . . . the

18   federal court should decline the exercise of jurisdiction by dismissing the case without prejudice. .

19   .. [Where] the plaintiff [has] filed his suit in federal court, remand [is] not an option."); *Gini v.*

20   *Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994).  The factors to be weighed in

21   making this determination are "the values of judicial economy, convenience, fairness, and

22   comity."  *Id.* at 350.

23         Because the court is not persuaded that plaintiffs have alleged any cognizable federal

24   claims, the court will not consider the merits of their state law claims.  The court finds that the

25   exercise of supplemental jurisdiction is not warranted in this case.  The court elects not to retain

26   ───────────────────────

27   [4]  The claims brought against First Assembly (FAC at 91–93) are all based in state law.  Those
     claims are therefore not addressed in this order, but the court will nonetheless grant First
     Assembly's motion to dismiss (Doc. No.40) because the court will not retain supplemental

28   jurisdiction over the remaining state law claims.

1   the state matters because the parties have raised arguments related solely to California law.  (*See*

2   FAC at ¶¶ 340–502.)  These issues are best resolved by a state court.  For the federal court to

3   address state law claims would be an attempt to divine how the California Supreme Court would

4   rule on a particular issue.  *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994).

5   Declining to exercise supplemental jurisdiction respects the dual sovereignty of the federal

6   government and the state of California, whose courts are better suited to these claims.  Further,

7   given the extreme caseload under which this court currently labors, considerations of judicial

8   economy militate against the exercise of supplemental jurisdiction over the plaintiff's state law

9   claims.  All parties to this case are in California and represented by California lawyers, so any

10  concerns regarding fairness or convenience are negligible.

11        Accordingly, the court finds that the interest of justice is best served if the court does not

12  exercise supplemental jurisdiction over plaintiffs' remaining state law claims.  Plaintiffs' state

13  law claims will therefore be dismissed without prejudice.[5]

14  **C.    Leave to Amend**

15        Generally, "[c]ourts are free to grant a party leave to amend whenever 'justice so

16  requires,' and requests for leave should be granted with 'extreme liberality.'"  *Moss v. U.S. Secret*

17  *Serv.*, 572 F.3d 962, 972 (9th Cir. 2009).  There are several factors a district court considers in

18  whether to grant leave to amend, including undue delay, the movant's bad faith or dilatory

19  motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

20  to the opposing party, and futility.  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th

21  Cir. 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The court has now twice

22  considered the adequacy of the federal claims asserted in this action and it is evident that the

23  granting of further leave to amend would be futile.  The undersigned recognizes the horrific and

24

25  [5]  The court also notes that any applicable statute of limitations under state law has been tolled during the pendency of this action.  *See* 28 U.S.C. § 1367(d) (tolling the limitation period for any

26  claim asserted in a federal action by way of supplemental jurisdiction both while the claim is pending "and for a period of 30 days after it is dismissed unless State law provides for a longer

27  tolling period"); *Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, i.e., to stop

28  the clock.").

Case 1:19-cv-00942-DAD-BAM   Document 57   Filed 10/01/21   Page 24 of 24

1    tragic facts of this case.  Perhaps this heartbreaking incident could possibly have been prevented

2    had different courses of action been pursued.  But, as in *DeShaney*, the harm was inflicted not by

3    the State of California, but by Maddox and Mason's mother.  *DeShaney*, 489 U.S. at 202.  "The

4    most that can be said of the state functionaries in this case is that they stood by and did nothing

5    when suspicious circumstances dictated a more active role for them."  *Id.*  The court will

6    therefore deny further leave to amend.

7                                            **CONCLUSION**

8            For the reasons set forth above, the court grants defendants' motions to dismiss (Doc. Nos.

9    38, 40, 41, 43) with the plaintiffs' state law claims being dismissed without prejudice to their

10   presentation in state court.  The Clerk of the Court is directed to close this case.

11   IT IS SO ORDERED.

12      Dated:   __**September 30, 2021**__          _____

13                                                   UNITED STATES DISTRICT JUDGE

24