**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE MURGUIA, for himself and for the Estates of Mason and Maddox Murguia, | No. 21-16709 |
| *Plaintiff-Appellant,* | D.C. No. 1:19-cv-00942-DAD-BAM |
| v. | |
| HEATHER LANGDON; COUNTY OF TULARE; LEWIS, Deputy at Tulare County Sheriff Department; ROXANNA TORRES, Social Worker at the Child Welfare Service; CITY OF TULARE; GARCIA, Sergeant at Tulare Police Department; FIRST ASSEMBLY OF GOD OF VISALIA; CERDA, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted December 6, 2022
Pasadena, California

Filed March 14, 2023

Before:  Carlos T. Bea, Sandra S. Ikuta, and Morgan
Christen, Circuit Judges.

Opinion by Judge Bea;
Partial Dissent by Judge Ikuta

## SUMMARY[*]

### Civil Rights

In an action brought pursuant to 42 U.S.C. § 1983
involving the application of the "state-created danger"
doctrine in the context of a welfare check, the panel reversed
in part and vacated in part the district court's dismissal of
Plaintiffs' action for failure to state a claim, and remanded.

According to the First Amended Complaint, Plaintiff
Jose Murguia called 911 seeking emergency mental health
assistance for Heather Langdon, with whom he lived and had
five children. This call set in motion a chain of events that
ultimately led to the death of Langdon's and Jose's ten-
month-old twin sons, at Langdon's own hand.

Over the course of that day, Langdon interacted with
three groups of law enforcement officers.  First, Tulare
County Sheriff's Department Deputies Lewis and Cerda
arrived at the Murguia home where they separated Jose from
Langdon, leaving her with the twins; the deputies then
allowed Langdon and a neighbor (Rosa) to take the twins to

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

a church and prevented Jose from following. Second, a City of Visalia police officer drove Langdon and the twins from the church to a women's shelter. Third, City of Tulare police officers, acting in part based on information provided by a County of Tulare social worker, transported Langdon and the twins from the shelter to a motel to spend the night. Left unsupervised at the motel where she continued to suffer from a mental health crisis, Langdon drowned the twins.

The panel first made clear that the only two exceptions to the general rule against failure-to-act liability for § 1983 claims presently recognized by this court were the special-relationship exception and the state-created danger exception. The panel therefore rejected Plaintiffs' assertion that the failure to comply with a legally required duty, without more, can give rise to a substantive due process claim. The panel further held that the district court correctly held that the special-relationship exception did not apply here because Defendants did not have custody of the twins.

The panel next held that Plaintiffs' state-created danger claim against deputies Lewis and Cerda failed because Plaintiffs failed to allege facts from which one could plausibly conclude that Defendants created or enhanced any danger to the twins. The panel could not say, however, that amendment would be futile given Plaintiffs' vague allegations and because the district court applied an incorrect "custody" standard—asking whether the twins were in Langdon's custody before and after Lewis and Cerda intervened rather than asking whether the twins were rendered more vulnerable by Lewis's and Cerda's actions. Accordingly, the panel vacated the district court's dismissal order with an instruction to allow Plaintiffs to amend their complaint.

The panel held that Plaintiffs adequately stated their § 1983 claims against City of Tulare Police Sergeant Garcia under the state-created danger exception. The panel agreed with Plaintiffs that Garcia increased the risk of physical harm to the twins by arranging a room for them at a motel, transporting Langdon and the twins from the shelter to the motel, and leaving them there. The panel further concluded that Plaintiffs pleaded facts plausibly demonstrating that Garcia acted with deliberate indifference to the risk that Langdon would physically harm the twins.

The panel similarly concluded that Plaintiffs adequately alleged a state-created danger claim against social worker Torres. When Torres provided Garcia with false information, she rendered the twins more vulnerable to physical injury by Langdon by eliminating the most obvious solution to ensuring the twins' safety: returning them to Jose's custody. Given the allegations that Torres knew about Langdon's history of abuse, the panel concluded that the complaint alleged that Torres was aware of the obvious risk of harm Langdon presented to the twins and acted with deliberate indifference.

Addressing Plaintiffs' arguments that Defendants' wrongful affirmative acts deprived Plaintiffs of their constitutional rights, the panel rejected assertions that Lewis and Cerda deprived Plaintiffs of their rights to familial association by temporarily separating Jose and the twins, and deprived Jose of his Fourth Amendment right to be free from unreasonable seizure. Plaintiffs' remaining allegations of wrongful acts did not require a separate analysis. Finally, because the panel reversed the dismissal of some of Plaintiffs' § 1983 claims against social worker Torres and Sergeant Garcia, the panel reversed the district court's dismissal of Plaintiffs' *Monell* claims against the County and

City of Tulare, reversed the dismissal of Plaintiffs' state law claims, and remanded for further proceedings.

Dissenting in part, Judge Ikuta stated that the majority's expansion of the state-created danger doctrine into the realm of tort law conflicts with Supreme Court precedent and is out of step with this Court's broad state-created danger doctrine. The majority made three mistakes. First, the majority opinion found a substantive due process violation in the absence of any abusive exercise of state authority. Second, the majority opinion indicated that officials may be liable for failing to take affirmative actions to protect children from a dangerous parent. But, as *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), held, that failure to protect is not an egregious abuse of state-assigned power. Finally, the majority imposed liability for substantive due process violations when the plaintiffs' allegations amounted to mere negligence.

## COUNSEL

Robert A. Rees (argued), Rees Law Firm P.C., Los Angeles, California; Steven P. Beltran, Beltran Smith LLP, Beverly Hills, California; for Plaintiff-Appellant.

Amy I. Terrible Myers (argued), Deputy County Counsel; Kathleen A. Taylor, Chief Deputy County Counsel; Jennifer M. Flores, County Counsel; The Office of Tulare County Counsel; Visalia, California; Bruce D. Praet, Ferguson Praet & Sherman, Santa Ana, California; for Defendants-Appellees County of Tulare, Deputy Lewis, Sergeant Cerda, and Roxanna Torres.

Diana L. Field (argued) and Bruce D. Praet, Ferguson Praet & Sherman, Santa Ana, California, for Defendants-Appellees City of Tulare, Sergeant Garcia, Officer Davis, and Officer Valencia.

Leonard C. Herr and Ron Statler, Herr Pedersen & Berglund, Visalia, California, for Defendants-Appellees City of Visalia and Officer Hernandez.

Heather Langdon, Patton, California, pro se Defendant-Appellee.

Michael E. Lehman and Carol A. Seita, Ericksen Arbuthnot, Fresno, California, for Defendant-Appellee First Assembly of God of Visalia.

Katherine Perez, LMU Loyola Law School, Los Angeles, California, for Amici Curiae the Coelho Center for Disability Law Policy and Innovation, Mental Health Advocacy Services, and Disability Rights Education and Defense Fund.

## OPINION

BEA, Circuit Judge:

This case concerns the application of the "state-created danger" doctrine of 42 U.S.C. § 1983 liability in the context of a welfare check gone wrong. According to Plaintiffs' First Amended Complaint ("FAC"),[1] on December 5, 2018, Heather Langdon experienced a mental health crisis. Jose Murguia, with whom Langdon lived and had five children, called 911 seeking emergency mental health assistance for Langdon. This call set in motion a chain of events that ultimately led to the death of Langdon's and Jose's ten-month-old twin sons, Mason and Maddox, at Langdon's own hand.

Over the course of that day, Langdon interacted with three groups of law enforcement officers. First, deputies from the County of Tulare arrived at the Murguia home where they separated Jose from Langdon, leaving her with the twins; the deputies then allowed Langdon and a neighbor (Rosa) to take the twins to a church and prevented Jose from following. Second, a City of Visalia police officer drove Langdon and the twins from the church to a women's shelter. Third, City of Tulare police officers, acting in part based on information provided by a County of Tulare social worker, transported Langdon and the twins from the shelter to a motel to spend the night. Left unsupervised at the motel where she continued to suffer from a mental health crisis, Langdon drowned the twins.

---

[1] These facts are taken from the First Amended Complaint ("FAC") and are accepted as true for this appeal. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

Jose, on behalf of himself and the estates of twins Mason and Maddox, brought this § 1983 action against the state actors who interacted with Langdon on December 5, 2018: Deputy Lewis and Sergeant Cerda of County of Tulare's Sheriff's Department, Social Worker Torres of County of Tulare's Child Welfare Services, and Sergeant Garcia of City of Tulare's Police Department. This court must decide whether Plaintiffs have properly stated claims for § 1983 relief against each of these state actors based on their roles in creating the circumstances that caused the twins' deaths.

## I.   FACTS

### a.   Langdon's background of child abuse and erratic behavior

Jose Murguia and Heather Langdon met in or about 2004. They married and, prior to the birth of the twins, had three sons: Jayden, Josiah, and Kaze. The couple had a turbulent relationship, which was well documented due to multiple encounters with the legal system and County of Tulare's Child Welfare Services ("CWS").

As early as June 2011, CWS was aware that Langdon had committed domestic violence against Jose. On January 5, 2015, a court ordered sole physical and legal custody of the three sons to Jose, with monitored visits for Langdon; the court issued a Temporary Restraining Order ("TRO") against Langdon, which included a stay away order and required her to undergo a mental health evaluation. In April 2015, the marriage ended. The court awarded sole physical and legal custody of the three children to Jose, with monitored visits for Langdon.

On January 22, 2016, Langdon was arrested for drunk driving and willful cruelty to a child. She pleaded guilty to

both counts. On October 24, 2016, Langdon was arrested for willful cruelty to a child and inflicting injury on a child. She pleaded guilty to both counts.[2] On November 1, 2016, the court awarded sole legal and physical custody of the three children to Jose, with no visitation to Langdon.

Jose and Langdon rekindled their relationship in Spring 2017, and Langdon soon became pregnant with twins. On May 1, 2017, CWS opened a case against Langdon for child abuse of her oldest son, Jayden. On August 4, 2017, Langdon was convicted of battery against Jose. As of December 6, 2018 (the date of the twins' death), CWS had at least one open case against Langdon, although it is not clear from the FAC what this open case involved.

On January 12, 2018, Langdon gave birth to twin sons: Mason and Maddox. There was no formal custody order for the twins. The family's living arrangement at this time is unclear, but the complaint implies that Langdon and the twins lived together in a separate home from Jose and the three older sons.

In February 2018, Jose reported to CWS that he observed Langdon drunk while in charge of the twins in her own apartment. In March 2018, two of Langdon's friends, Rosa and Brittany, reported to CWS that they observed Langdon drunk while in charge of the twins.

In May 2018, Langdon told Jose that the twins were too much work for her and asked Jose to take custody of all five children. Jose agreed. Between August 2018 and early December 2018, Langdon and the twins moved back into

---

[2] The FAC does not specify whether the January 22, 2016, and October 24, 2016, incidents involved Langdon's own children.

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 10 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 10 of

10                          MURGUIA V. LANGDON

Jose's home. As of December 5, 2018, Langdon and Jose lived together with all five children at Jose's home.

Langdon's erratic behavior began to escalate in late November 2018. She told Jayden—her oldest son at 14 years-old—that she and he were special in the eyes of God, that these were "End Times" because a fire had destroyed the town of Paradise,[3] and that she was "thinking at a higher power."

On December 3 or 4, 2018, Langdon called her church, First Assembly of God of Visalia ("Church"), and reported that Jayden had threatened to shoot up an elementary school. The Church reported the call to Tulare County Sheriff's Department ("TCSD"), which investigated the threat and concluded that Langdon had made a false report.

### b.  TCSD deputies respond at the Murguia home

On December 4, 2018, Jose got home from work at around 6:30 p.m. When he arrived home, Langdon told him to get ready for jail because the police were coming to arrest him. Langdon was "erratic" and repeatedly shouted "I refute you Satan." Jose called 911, described Langdon's behavior, and requested mental health assistance for Langdon.

In response to Jose's call, TCSD Deputy Lewis and an unnamed TCSD deputy went to the Murguia home. As stated in the FAC, "Jose reported Langdon's history to the deputies," although it is unclear exactly what "history" Jose reported (e.g., whether Jose told the deputies that Langdon had a history of child cruelty resulting in multiple

---

[3] It is unclear from the FAC whether Langdon was referring to the town of Paradise, California, which was devastated by a fire in November 2018, or to "Paradise" in the sense used by Dante in his *Divine Comedy.*

convictions and child abuse against her own son). Jose asked the deputies to get professional help for Langdon. The deputies refused to assist in obtaining psychological help or a mental health evaluation for Langdon that night. They told Jose to call back if Langdon threatened herself or anyone else, in which case the deputies would take Langdon into custody on an involuntary psychiatric hold.

The next morning, December 5, 2018, Langdon woke up at 4:00 a.m. and began "behaving erratically and bizarrely." She held one of the baby twins up high towards the ceiling fan, shouting "haneeshewa." She bathed and put on makeup three times in a row. At around 11:00 a.m., she told Jose that Jesus told her to drink bleach and vinegar to cleanse the demons in her soul. She told Jose that she had already drunk some bleach; Jose saw her drinking vinegar. Jose called 911, reported what Langdon said about drinking bleach and vinegar, and again asked for assistance in getting psychological help for Langdon.

Several TCSD deputies[4] and EMTs arrived at the Murguia home in response to Jose's call. Among them were Deputy Lewis and Sergeant Cerda. The FAC states, "Before arriving at Jose's home, Lewis and Cerda *knew or should have known* that Langdon had a history of mental illness, attempting suicide, and violence towards children, that Langdon had falsely reported a school shooting threat two days earlier and Langdon had behaved bizarrely the prior evening and that she had an open CWS case." (emphasis added).

---

[4] We refer to the TCSD deputies collectively, including Deputy Lewis and Sergeant Cerda, as "Deputies."

When the Deputies arrived at the Murguia home, they "took command of the scene." Lewis, with Cerda's approval, ordered Jose to step outside, away from the twins. An unnamed deputy took Jose's driver's license and checked him against the California Law Enforcement Telecommunications System ("CLETS") "and then *knew or should have known* of Langdon's history of mental illness, cruelty to children and CWS history." (emphasis added). The FAC does not specify whether the deputy then communicated this information to Lewis, Cerda, or any other individuals present.

According to the FAC, "Lewis and Cerda observed and knew that Langdon was gravely disabled, based on her language, behavior and information from Jose and a neighbor Rosa." The FAC alleges that Jose told the Deputies about Langdon's bizarre behavior that morning, but does not otherwise specify what information Jose and Rosa provided about Langdon's present condition, past experiences with mental illness, or past violent behavior. A County of Tulare fireman who was present at the Murguia home asked Langdon, in the presence of Lewis and Cerda, if she had any medical problems. Langdon answered, "yeah, I'm crazy. I'm crazy. Everyone thinks I'm crazy." Lewis responded, "who cares what everyone thinks?" Langdon replied, "No, I really want to go see a doctor."

Langdon told Lewis and Cerda that she sees dead people and demons, that she talks to God, and that she was going into another realm. She said that Jose was a devil worshipper but did not realize it. She claimed to have another husband waiting for her. In addition to making these bizarre statements, she "showed rage, anger, and agitation." Langdon also said she had been awake for days and wanted

to see a doctor so she could go back to her "normal life." She asked Lewis and Cerda to take her to see a doctor.

Jose told the Deputies "that Langdon was not okay and that she needed to be evaluated professionally" and told them "about Langdon drinking bleach and vinegar, her multiple baths, and the other bizarre behavior." Jose told the Deputies that he wanted to take Langdon to the hospital for a mental evaluation, but the Deputies did not permit him to do so. He reminded the Deputies of the previous night's call, in which Lewis and the other deputy had promised to get Langdon a psychiatric evaluation if she threatened to harm herself or others.

The Deputies continued to keep Jose out of his house, away from Langdon and the twins. Jose walked to the home of Rosa, a friend of Langdon and neighbor of the Murguias. He asked Rosa to come to the Murguia home to talk to Langdon "because Langdon had been talking crazy." When Rosa arrived at the Murguia home, an unnamed deputy allowed Rosa to go inside and again told Jose to stay outside.

Rosa worked at a hospital and had supervised people on involuntary psychiatric holds. On December 5, 2018, Rosa believed that the Deputies should take Langdon for mental health help on an involuntary hold. She "told the [Deputies] that Langdon needed professional help, and that Langdon should not have charge of the twins."[5] In response, an unnamed deputy told Rosa that Langdon had agreed to go to the hospital and was waiting for Rosa to take her. According

---

[5] It is unclear from the FAC what the Deputies knew about Rosa, e.g., whether they knew that Rosa worked at a hospital and therefore had specialized knowledge regarding Langdon's condition.

to the FAC, "Neither Rosa nor the [Deputies] believed the babies were safe with Langdon."

Rosa told Langdon that she would take her to the hospital, but Langdon replied, "No we're taking the babies to Church." Langdon told Rosa that Jose's house was hexed. The Deputies overheard this conversation, and an unspecified deputy told Langdon, "This is a new deal. You said you were going to the hospital."

In preparation for going to the Church, Langdon packed a bag containing only nail polish. Rosa told Langdon, "Okay, let's get it together," and pointed out that Langdon had no food or water for the babies. Jayden supplied Rosa with water, diapers, and two cans of milk. Rosa and Langdon then walked to Rosa's house with the twins.

While Jose waited outside, an unnamed deputy asked him if Langdon was on any drugs. Jose answered that he did not know. The deputy told Jose, "You should know your wife better. You have been married longer than me and my wife and I would know this about my wife." Jose asked the Deputies to prevent Langdon from leaving with the twins and to let him have custody of the twins. He "told the [Deputies] the twins were not safe with Langdon and asked the [Deputies] to stop Langdon from taking the twins." The Deputies told Jose that they were going to let Langdon leave with Rosa. An unnamed deputy told Jose to "just let her go."

After Langdon and Rosa left with the twins, the Deputies stayed parked outside of the Murguia home for 30 minutes, "watching Jose and affirmatively showing their authority and restricting Jose's movement, causing Jose [to] fear that if he followed the twins, the [Deputies] would arrest him."

### c.  City of Visalia officer responds at the Church

Rosa took Langdon and the twins to Rosa's house, where Langdon continued to behave erratically. Langdon made odd comments such as "follow the bunnies" and said that the San Andreas Fault would destroy the world. Rosa took Langdon and the twins to the Church, where Rosa told the Church receptionists that the twins were in danger and asked for help getting the twins away from Langdon. One of the receptionists told Rosa not to worry because the Pastor would take good care of Langdon and the twins were in good hands.

Meanwhile, Langdon told the Pastor that she was homeless and needed shelter, and that she needed mental health help. The Pastor said that he would help her find a place to stay. He asked Langdon if she would like to go to a mental health center for an evaluation, and she said "yes." The Pastor called the police, and a Visalia Police Department officer arrived at the Church in response. The officer drove Langdon and the twins from the Church to Lighthouse, a women's shelter. The officer did not provide the Lighthouse staff with information about Langdon's prior requests for mental health help, Langdon's willingness to go to a mental health clinic, Langdon's criminal history, Langdon's "bizarre" behavior, or Rosa's concerns about the safety of the twins. Rosa did not accompany Langdon and the twins to Lighthouse.

### d.  Tulare Police Department officers respond at Lighthouse

Langdon continued to act "bizarrely" at Lighthouse. The director of Lighthouse and the office manager conducted an intake interview of Langdon and thought that she was "crazy." Langdon told the Lighthouse staff that the door

chimes would "happen as long as I am here." She told the staff that she controlled the office manager's computer. She was "argumentative" and told one of the interviewers, "I don't like your spirit."

Langdon told the Lighthouse office manager that she had been raped the night before and needed to go to the hospital to have an emergency abortion. The Lighthouse staff called an ambulance. EMTs arrived and informed Langdon that they could take her to the hospital but could not take the twins. Langdon became angry. Lighthouse staff then called City of Tulare's Police Department ("TPD"). When the TPD officers arrived, they dismissed the EMTs and the ambulance.

Langdon yelled at the TPD officers, and the officers also observed her yelling at the Lighthouse staff. The officers described her as "loud and belligerent." Langdon said she "felt" pregnant. An officer asked Langdon if she had taken a pregnancy test. Langdon became even angrier. She yelled at the officer and told him he needed to read the Bible, that he was not in charge of the situation, and that her "Father" was going to take care of her and her kids. She refused to go to a hospital for a mental health evaluation. The Lighthouse manager told Langdon that she would be forced to leave if she did not stop creating a disturbance. Eventually, the TPD officers left without having obtained psychological help or an evaluation for Langdon.

Langdon continued to yell at the Lighthouse personnel, who again called the police. The same TPD officers were dispatched to Lighthouse a second time approximately 40 minutes after they had left. When they arrived at Lighthouse, the Lighthouse staff told them "Langdon was being uncooperative, loud, and disruptive, and was talking

'crazy.'" The Lighthouse staff also told the officers "that the twins looked like they had not been fed, and Langdon did not have a diaper bag, diapers, changes of clothing or baby bottles."

Langdon tried to go outside to pray. An officer told Langdon that she had to remain in Lighthouse's dining area. Langdon then collapsed on the floor, yelling that she was having contractions. She repeated "Yeshua, Yeshua, Yeshua!" and tried to scoot towards the door while sitting down.

A TPD officer called for Sergeant Garcia—TPD's Crisis Intervention Technician Officer—to come to Lighthouse and updated Garcia on the calls. After Sergeant Garcia was called to Lighthouse, Langdon again collapsed on the floor, claiming to be in labor. She got up several minutes later and began sifting through her makeup bag, then asked another female at Lighthouse if she wanted to have her nails done. Garcia repeatedly attempted to communicate with Langdon, but she did not provide much information to assist the officers.

According to the FAC, "[the] TPD officers observed and knew that Langdon was unable to care properly for the twins. Langdon had no baby food, diapers, or other baby supplies and her behaviors presented an immediate threat to the children's health and safety because the twins were functionally unattended."

Garcia called CWS and spoke to Emergency Response Social Worker Torres. Garcia told Torres that he was not requesting immediate assistance and was thinking only of arresting Langdon for disturbing the peace. Torres offered to come to Lighthouse to take custody of the twins but said that TPD would have to take Langdon into custody.

According to the FAC, Garcia and Torres each provided the other with incorrect information about Langdon and her situation. Torres "falsely reported to Garcia that CWS had no history of Langdon in its system." In addition, "CWS falsely stated [to Garcia] that Langdon was homeless. CWS falsely stated that Langdon had no history of child abuse, even though CWS [k]new of three criminal convictions for child cruelty and prior cases including one open case against Langdon." Garcia told Torres that he did not want to separate Langdon from the twins. Garcia "falsely stated that Langdon had been evaluated at a hospital" and did not meet the criteria for involuntary commitment. He also "falsely stated that Langdon had everything she needed for the kids, meaning food, diapers, and baby supplies." Neither Torres nor Garcia informed the other that Jose was an available parent and could take custody of the twins.[6]

Torres concluded that Langdon did not present an immediate danger to the twins. She set CWS's investigative response time for 10 days from the call, and CWS did not conduct an immediate in-person investigation at Lighthouse. Torres and her supervisor later "did a further risk assessment 'because the mother sounded delusional and might be a threat to the children.' The matter was then reclassified for immediate in-person investigation because 'the caregivers'

---

[6] The FAC seemingly contradicts itself regarding what Garcia and Torres knew about Jose's availability to take custody of the twins. First it states that, during his phone call with Torres, "Garcia concealed information about Jose's availability to take the twins." This allegation implies that Garcia—but not Torres—knew that Jose was an available parent who could take custody of the twins. But the FAC then states, "Ms. Torres failed to inform Sgt. Garcia that Jose was an available parent who could take custody of the twins." This allegation implies that Torres—but not Garcia—knew about Jose's availability.

behavior [wa]s bizarre and dangerous to the emotional health of the children.'" The FAC is unclear as to when this "further risk assessment" occurred, whether it occurred on the same night as Torres's call with Garcia, and what prompted the further assessment. No CWS investigator was assigned to Langdon and the twins between December 5 and December 6, 2018.

After Garcia's phone call with Torres, Garcia and two TPD officers arranged for a motel to provide Langdon with free lodging and drove Langdon and the twins from Lighthouse to the motel. Early the next morning, Langdon's screaming led a bystander at the motel to call 911. Paramedics arrived at the motel and found the babies drowned and naked on a bed at the motel

Langdon was eventually prosecuted for murder of the twins. She was found not guilty by reason of insanity.

## II.    PROCEDURAL HISTORY

In July 2019, Plaintiffs filed a complaint in the Eastern District of California, bringing 54 federal and state claims against 22 named and unnamed defendants, including Langdon, the deputies and officers who intervened on December 5, 2018, and several municipalities. The complaint included § 1983 claims against the individual state actors as well as *Monell*[7] claims against the County of Tulare and the City of Tulare. The district court granted dismissal without prejudice under Federal Rule of Civil Procedure 12(b)(6). In July 2020, Plaintiffs filed the FAC, listing 36 federal and state claims. In October 2021, the district court granted dismissal with prejudice, finding that Plaintiffs failed to state any federal claims and declining to exercise

---

[7] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 20 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 20 of

20                          MURGUIA V. LANGDON

supplemental jurisdiction over the state law claims. Plaintiffs appealed.

After voluntarily dismissing some defendants, Plaintiffs continued to press claims against four remaining individuals ("Individual Defendants"): TCSD Deputy Lewis, TCSD Sergeant Cerda, TPD Sergeant Garcia, and CWS Social Worker Torres; two governmental entities: the County of Tulare and the City of Tulare; and First Assembly of God of Visalia.[8] Although Plaintiffs also initially appealed the dismissal of claims against Officer Hernandez of the City of Visalia Police Department, TPD Officers Davis and Valencia, and the City of Visalia, these claims have since been dismissed with prejudice per Plaintiffs' requests.

## III.   STANDARD OF REVIEW

The court reviews de novo a district court's dismissal of a complaint for failure to state a claim. *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 772 (9th Cir. 2002). In assessing a Rule 12(b)(6) motion to dismiss, the court must take all factual allegations as true and draw all reasonable inferences in favor of the nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). To survive a 12(b)(6) motion, the facts alleged must "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 566 U.S. 662, 679 (2009).

## IV.   LEGAL FRAMEWORK

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or

---

[8] Plaintiffs alleged only state law claims against the Church.

statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Here, Plaintiffs alleged that Defendants deprived them of constitutional rights under the First Amendment right to familial association, the Fourth Amendment right to be free from unreasonable seizure, and the Due Process Clause of the Fourteenth Amendment.

Plaintiffs' claims are rooted in the substantive component of the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause is a *limitation* on state action rather than a *guarantee of minimum levels* of state protections, so the state's failure to prevent acts of private parties is typically insufficient to establish liability under the Due Process Clause. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). However, this circuit has recognized two exceptions to this rule: (1) "when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger (the state-created danger exception)"; and (2) "when a special relationship exists between the plaintiff and the state (the special-relationship exception)." *Patel*, 648 F.3d at 971–72 (internal quotation marks omitted).

Plaintiffs urge the court to recognize a third exception to the general rule against § 1983 liability based on a state's failure to act—a *legal requirement* exception. Plaintiffs direct the court to *Preschooler II v. Clark County School Board of Trustees*, in which we stated: "a person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or *omits to perform an act which he is legally required to do that causes the*

*deprivation of which complaint is made.*'" 479 F.3d 1175, 1183 (9th Cir. 2007) (emphasis added) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). Plaintiffs contend that *Preschooler II* and *Johnson v. Duffy*—from which *Preschooler II* quotes—establish that "a state actor commits a [§ 1983] deprivation when he fails to perform an act he is legally required to do." We reject this argument—neither *Johnson* nor *Preschooler II* supports this theory of liability for a substantive due process claim.

In *Johnson*, the court held that a county sheriff deprived the incarcerated plaintiff of his property without due process by failing to satisfy the procedural requirements of a state statute prior to forfeiting the plaintiff's accumulated earnings from work performed at an honor camp. *Johnson*, 588 F.2d at 742–44. The relevant statute provided that honor camp earnings are forfeited when (1) the superintendent of an honor camp reports to a "Classification Committee" that the prisoner refused to abide by camp rules; (2) the Classification Committee makes an order transferring the prisoner to jail; and (3) the earnings in the prisoner's account have not been ordered paid to someone dependent on the prisoner. *Id.* at 742–43. A related statute required the county sheriff to appoint members of the Classification Committee, which would then be required to meet at least once a week. *Id.* at 43. The county sheriff admitted that the Classification Committee never met or acted upon the plaintiff's transfer as required by the statute as a prerequisite for forfeiture, but the county sheriff argued that he could not be held liable under § 1983 for this deficiency because he never took any affirmative actions—he merely failed to act. *Id.* The court rejected this argument, finding that "personal participation" is not strictly required for § 1983 liability. *Id.* The court reasoned:

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of Section 1983, if he does an affirmative act, participates in another's affirmative acts, *or omits to perform an act which he is legally required to do* that causes the deprivation of which complaint is made. Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Id.* at 743–44 (emphasis added) (citations omitted). The court concluded that, "[the sheriff's] omission to act, in violation of the duties imposed upon him by statute and by regulations, thus may subject him to liability under section 1983." *Id.* at 744.

Plaintiff brings claims for deprivation of substantive due process. *Johnson* is easily distinguished because it relied on the plaintiff's *procedural* due process claim, not on a *substantive* due process claim. *Id.* at 742. The requirements for substantive due process claims differ from the requirements for procedural due process claims. Where a person is entitled to certain process, the failure to provide it can deprive the individual of a procedural due process right, *see, e.g.*, *Armstrong v. Reynolds*, 22 F.4th 1058, 1066–67

(9th Cir. 2022), but a failure to act to protect an individual from private violence does not deprive an individual of substantive due process, except in narrow circumstances. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989); *Patel*, 648 F.3d at 971–72. *DeShaney* held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199–200. The plaintiff in *DeShaney* was not in custody at the time he was harmed and the Court explained that "[w]hile the State may have been aware of the dangers [the plaintiff] faced . . ., it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

*Preschooler II* is similarly unhelpful to Plaintiffs. That case involved a supervisory liability claim arising from the alleged abuse of a non-verbal and severely disabled four-year-old child by his teacher in a public-school setting. 479 F.3d at 1177, 1182. After finding that the complaint alleged the teacher committed a constitutional violation by abusing the child on several occasions over a period of several months, including slapping his hands, hitting his head and face, and body slamming him, *id.* at 1180, the court was tasked with determining whether the complaint alleged sufficient facts to state a § 1983 claim against the teacher's supervisors. *Id.* at 1182–83. The complaint alleged the supervisory officials knew of the teacher's abuse of the child yet permitted the teacher to continue to work with the child and did not report the abuse or put a stop to it. *Id.* at 1182. *Preschooler II* reiterated that respondeat superior did not exist for these claims, reaffirmed our circuit's "limited supervisory liability doctrine," and decided the complaint survived the motion to dismiss because the supervisory

defendants' own conduct included failing to discipline the teacher or report the abuse. *Id.* at 1182–83.

*Preschooler II* did not establish that the mere failure to perform a legally required act is grounds for § 1983 liability based on a substantive due process violation, as Plaintiffs suggest, and the defendants here are officers being sued for their own actions and failures to act, rather than state officials being sued for their supervisory roles in the actions or failures to act of others.[9]

Neither *Johnson* nor *Preschooler II* held that the failure to comply with a legally required duty, without more, can give rise to a substantive due process claim. Indeed, such a conclusion is foreclosed by *DeShaney*. In keeping with our well-established case law, we make clear that the only two exceptions to the general rule against failure-to-act liability for § 1983 claims presently recognized by this court are the special-relationship exception and the state-created danger exception. *See, e.g., Patel*, 648 F.3d at 971–72; *Martinez*, 943 F.3d at 1271; *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012). We discuss the special-relationship exception and the state-created danger exception in turn.

## V.    SPECIAL-RELATIONSHIP EXCEPTION

The special-relationship exception "applies when [the] state 'takes a person into its custody and holds him there against his will.'" *Patel*, 648 F.3d at 972 (quoting *DeShaney*,

---

[9] Plaintiffs argue that Garcia has supervisory liability because he saw "TPD officers violating TPD policies and did nothing to enforce policies or correct the officers' errors." Plaintiffs cite no authority for the proposition that the failure to comply with police department policies is enough to state an underlying substantive due process claim against the officers, and we know of none.

489 U.S. at 199–200). Examples of custody include "incarceration, institutionalization, or other similar restraint[s] of personal liberty." *DeShaney*, 489 U.S. at 200. "When a person is placed in these types of custody, we allow due process claims against the state for a fairly simple reason: a state cannot restrain a person's liberty without also assuming some responsibility for the person's safety and well-being." *Patel*, 648 F.3d at 972. "In the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs." *Id.* at 974.

The district court correctly held that the special-relationship exception does not apply here because Defendants did not have custody of the twins. *Murguia v. Langdon*, 2021 WL 4503055, at *6, 11 (E.D. Cal. Oct. 1, 2021). In reaching this conclusion, the district court reasoned that the twins were always in the custody of Langdon and that "merely alleging in conclusory fashion that the decedents were in *de facto* custody is not sufficient to negate [P]laintiff's factual allegations showing that Langdon always maintained custody of the children." *Id.* at *6. Plaintiffs argue that the district court erred by failing to "address th[e] issue of who has custody when the available parent cannot care for the children."

Plaintiffs rely on three sources of authority for their argument that the peace officers had de facto custody of the twins. First, Plaintiffs quote *Schall v. Martin*, a United States Supreme Court case regarding the constitutionality of a New York state law, for the proposition that children "are always in some form of custody" and "by definition, are not assumed to have the capacity to take care of themselves." 467 U.S. 253, 265 (1985). Next, Plaintiffs cite California

Welfare and Institutions Code § 300(b)(1)[10] and California Family Code § 3010(b) together for the propositions that "[w]hen there is a temporary custody vacuum, a peace officer should take temporary custody and find a parent with capacity" and "[w]here a parent cannot care for a child, that child should be placed with a parent with capacity." Based on these authorities, Plaintiffs argue that "each peace officer as the only sane adults with the twins, had control and custody of the twins and a *special relationship* under *DeShaney*."

We reject Plaintiffs' argument. As an initial matter, the statutes cited do not adequately support Plaintiffs' argument that the state actors had de facto custody of the twins. California Welfare and Institutions Code § 300(b)(1) provides that a child "is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court" when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately [sic] supervise or protect the child," including when the parent's inability is due to mental illness. California Family Code § 3010(b) provides, "If one parent is dead, is unable or refuses to take custody, or has abandoned the child, the other parent is entitled to custody of the child." These statutes pertain to the scope of the juvenile court's jurisdiction and the rights of parents to seek custody of a child under certain circumstances, including when one parent is incapable of taking care of the child. Neither statute provides that custody automatically transfers at the moment the parent becomes

---

[10] Plaintiffs cite section "300b(b)(1)," which does not exist. The court assumes Plaintiffs meant to cite § 300(b)(1).

incapable of caring for the child. Neither statute imposes a mandatory duty on any state actor to take custody of a child if that officer discovers that a parent is incapable of caring for the child. And neither statute discusses the rights or duties of *peace officers* in interfering with a parent's custody of the child.

Moreover, Plaintiffs' suggestion that the Defendants had "custody" of the twins under a tedious reading of the cited authorities is misguided. Regardless whether any Defendant had "custody" in some sense of the word, the facts of this case simply do not resemble those in which courts have found a custodial relationship for the purposes of imposing § 1983 liability. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding that the government has an obligation to provide medical care to incarcerated persons); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) (holding that involuntarily committed individuals have a constitutional right to safe conditions); *Henry A.*, 678 F.3d at 1000–01 (holding that the special-relationship exception applies to children in foster care and requires the state to respond to suspected abuse in a foster home).

The case law demonstrates that "custody" for the purposes of the special-relationship exception is a restriction on the plaintiff's liberty that limits the ability of the plaintiff (or the plaintiff's parents) to meet the plaintiff's basic needs (e.g., incarceration, institutionalization, foster care). *See Patel*, 648 F.3d at 972–74 (holding that mandatory school attendance did not give rise to the special-relationship exception when the child was at school because the student lived at home with her mother, who was her primary caretaker, and "unlike incarceration or institutionalization, compulsory school attendance does not restrict a student's liberty such that neither the student nor the parents can attend

to the student's basic needs"). Here, Individual Defendants never formally took the twins into custody; the twins remained with Langdon at all times, and the twins were not institutionalized or placed in foster care. Although Jose was temporarily physically separated from the twins, Jose and Langdon retained long-term responsibility for the care of the twins, as well as long-term control over decisions regarding the twins. The special-relationship exception therefore does not apply in this case.

## VI.    STATE-CREATED DANGER EXCEPTION

The state-created danger exception has its origins in *DeShaney*, in which the United States Supreme Court held that social workers and local officials were not liable under § 1983 on a failure-to-act theory for injuries inflicted on a child by his father. 489 U.S. at 191. The state actors had received complaints that the child was abused by his father but failed to remove the child from his father's custody. *Id.* The court reasoned that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it *played no part in their creation*, nor did it do *anything to render him any more vulnerable* to them." *Id.* at 201 (emphasis added). The court acknowledged that the state once took temporary custody of the child and then returned him to his father, but reasoned that the state "placed [the child] in no worse position than that in which he would have been had it not acted at all[.]" *Id.* Given that the state actors did not create or enhance any danger to the child, the state did not have a constitutional duty to protect him from the private violence inflicted by his father. *Id.*

This court "ha[s] interpreted *DeShaney* to mean that if affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate

indifference to that plaintiff's safety, a claim arises under §
1983." *Penilla v. City of Huntington Park*, 115 F.3d 707, 710
(9th Cir. 1997). The state-created danger exception has two
requirements.**[11]** "First, the exception applies only where
there is 'affirmative conduct on the part of the state in
placing the plaintiff in danger.' Second, the exception
applies only where the state acts with 'deliberate
indifference' to a 'known or obvious danger.'" *Patel*, 648
F.3d at 974 (internal citation omitted) (quoting *Munger v.
City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir.
2000) and then quoting *L.W. v. Grubbs*, 92 F.3d 894, 900
(9th Cir. 1996)).

To satisfy the first requirement, a plaintiff "must show
that the officers' affirmative actions created or exposed
[him] to an actual, particularized danger that [he] would not
otherwise have faced." *Martinez*, 943 F.3d at 1271. "In
examining whether an officer affirmatively places an
individual in danger, we do not look solely to the agency of
the individual, nor do we rest our opinion on what options
may or may not have been available to the individual.
Instead, we examine whether the officers left the person in a
situation that was more dangerous than the one in which they
found him." *Munger*, 227 F.3d at 1086. "The critical
distinction is not . . . an indeterminate line between danger
creation and enhancement, but rather the stark one between
state action and inaction in placing an individual at risk."
*Penilla*, 115 F.3d at 710. Furthermore, the plaintiff's

---

[11] This court has on occasion analyzed the state-created danger exception
under a three-prong test by dividing the first requirement into two
components: (1) affirmative conduct creating or enhancing a danger to
the plaintiff, and (2) foreseeability. *See, e.g.*, *Martinez v. City of Clovis*,
943 F.3d 1260, 1271 (9th Cir. 2019).

ultimate injury must have been foreseeable to the defendant. *Martinez*, 943 F.3d at 1273. "This does not mean that the exact injury must be foreseeable. Rather, 'the state actor is liable for creating the foreseeable danger of injury given the particular circumstances.'" *Id.* at 1273–74 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006)).

As to the second requirement, "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (*Bryan Cnty v. Brown*, 520 U.S. 397, 410 (1997)). This standard is higher than gross negligence and requires a culpable mental state. *Id.* at 974. When assessing non-detainee failure-to-protect claims, we apply a purely subjective deliberate indifference test. *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1161 (9th Cir. 2021). "For a defendant to act with deliberate indifference, he must 'recognize[] the unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Id.* at 1158 (quoting *Grubbs*, 92 F.3d at 899). In other words, the state actor must "know[] that something *is* going to happen but ignore[] the risk and expose[] [the plaintiff] to it." *Grubbs*, 92 F.3d at 900 (emphasis in original). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Patel*, 648 F.3d at 974.

The district court held that Plaintiffs failed to allege affirmative conduct on the part of any of the Individual Defendants because "[t]he decedents were in their mother's custody before the officers arrived on the scene, and they remained in her custody after the officers intervened." *Murguia*, 2020 WL 4503055 at *7. The district court erred

in limiting the analysis to whether Langdon had custody of the twins. Unlike the special-relationship exception, the state-created danger exception does not require that the state actor have custody of the plaintiffs. Furthermore, in limiting the analysis to whether Langdon had custody of the twins, the district court ignored other factors that affected the risk of physical harm that Langdon posed to the twins, including the presence of third parties. Rather than ask whether Langdon had custody of the twins prior to and after the intervention of each Individual Defendant, the district court should have asked more broadly "whether the officers left the [twins] in a situation that was more dangerous than the one in which they found [them]." *Munger*, 227 F.3d at 1086. We address this issue as to each of the Individual Defendants in turn.

### a. Lewis and Cerda

Plaintiffs' state-created danger claim against Lewis and Cerda fails because Plaintiffs have failed to allege facts from which one can plausibly conclude that Lewis and Cerda created or enhanced any danger to the twins. Plaintiffs argue that Lewis and Cerda enhanced the vulnerability of the twins by allowing Langdon to remove the twins from their home and preventing Jose from following Langdon and the twins to the Church. Plaintiffs assert, "Lewis and Cerda increased the twins' danger by ignoring [Langdon's] request [for mental health help], separating [the twins] from a sane father presumed by law to be more fit than Langdon, and entrusting them to their violent, deranged mother." This argument ignores the fact that Lewis and Cerda did not entrust the twins to Langdon alone. Rather, Lewis and Cerda entrusted Langdon and the twins to Rosa, Langdon's friend and

neighbor, who herself had experience supervising people with mental health disorders.[12]

This court and other circuits have applied the state-created danger exception in situations where an officer abandoned the plaintiff in a dangerous situation, separated the plaintiff from a third-party who may have offered assistance, or prevented other individuals from rendering assistance to the plaintiff. *See Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989) (holding that the plaintiff raised a triable issue of fact as to whether an officer placed the plaintiff in danger by arresting the driver of the car plaintiff was riding in, impounding the car, and leaving her alone in a high-crime area at 2:30 a.m.); *Penilla*, 115 F.3d at 710 (holding that officers increased the risk of harm to a gravely-ill individual by cancelling a 911 call and locking him in his home where it would be impossible for anyone to provide him with emergency care); *Kneipp v. Tedder*, 95 F.3d 1199, 1208–09 (3d Cir. 1996) (holding that officers increased the risk of harm to a severely intoxicated woman who was struggling to walk home with the assistance of her husband when the officers detained the plaintiff, let her husband leave, then sent the plaintiff to walk home unescorted in near-freezing conditions that resulted in hypothermia and brain damage). Under this case law, if Lewis and Cerda had left the ten-month-old twins alone with Langdon in her dangerous and unstable condition, such conduct would

---

[12] The FAC alleges, "Rosa works at a hospital and has supervised people on [California Welfare and Institutions Code] § 5150 holds. Rosa is familiar with the standards for involuntary holds." Section 5150 establishes the circumstances under which certain state actors can take a person into custody for assessment or treatment regarding a mental health disorder. The FAC does not provide Rosa's job title or explain her role in "supervising" individuals on § 5150 holds.

almost certainly have constituted affirmative action enhancing a risk of physical harm to the twins.

However, it is unclear given the vague allegations in the complaint that Lewis's and Cerda's conduct enhanced the twins' vulnerability to physical harm. The FAC alleges that these defendants separated Jose from the twins, thereby preventing him from exercising his custodial role and leaving Langdon and the twins to be supervised by Rosa. But the FAC does not include any factual allegations from which we could conclude that Rosa was incapable of supplementing Langdon's care of the twins or was likely to separate from Langdon and the twins after leaving the Murguia home. Given that Lewis and Cerda merely replaced one competent adult—Jose—with another competent adult—Rosa, we are not convinced that "the officers left the [twins] in a situation that was more dangerous than the one in which they found [them]." *Munger*, 227 F.3d at 1086.

However, Plaintiffs should have the opportunity to amend their complaint because we cannot say amendment would be futile given their vague allegations and because the district court applied the incorrect "custody" standard. The court reviews for abuse of discretion the district court's decision to dismiss without leave to amend. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). "[T]he first step of [the] abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial court failed to do so, we must conclude it abused its discretion." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009). As discussed above, the district court used the wrong standard in applying the state-created danger exception by asking whether the twins were in Langdon's custody before and after Lewis and Cerda intervened rather

than asking whether the twins were rendered more vulnerable by Lewis's and Cerda's actions. Accordingly, we vacate the district court's dismissal order with an instruction to allow Plaintiffs to amend their complaint.

### b. Garcia

Plaintiffs have adequately stated their § 1983 claims against TPD Sergeant Garcia under the state-created danger exception. Plaintiffs argue that Garcia increased the risk of physical harm to the twins by arranging a room for them at a motel, transporting Langdon and the twins from Lighthouse to the motel, and leaving them there. We agree. When Garcia left Langdon and the twins at the motel, he removed them from the supervision of the Lighthouse staff and rendered the twins more vulnerable to physical injury by Langdon as a result of their isolation with her. *See Penilla*, 115 F.3d at 710.[13]

We further conclude that Plaintiffs have pleaded facts plausibly demonstrating that Garcia acted with deliberate indifference to the risk that Langdon would physically harm the twins. We admit that this is a close case. There are no allegations that Garcia was aware of Langdon's history of child cruelty, violence, or previous mental health difficulties. To the contrary, Torres affirmatively told Garcia that

---

[13] Plaintiffs also argue that Garcia is liable under § 1983 for misrepresenting the situation at Lighthouse to Torres by telling her that: (1) Langdon had everything she needed to care for the twins, and (2) Langdon had been evaluated and did not meet the criteria for involuntary commitment. Because we hold that Plaintiffs adequately alleged their § 1983 claims against Garcia under the state-created danger exception based on his action of transporting Langdon and the twins to the motel, we do not address whether Garcia's proffering of false statements also satisfies the state-created danger exception.

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 36 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 36 of

36                              MURGUIA V. LANGDON

Langdon did *not* have any history of child abuse. Furthermore, Plaintiffs alleged that the City of Visalia officer who drove Langdon and the twins to Lighthouse did not provide Lighthouse with information about Langdon's prior requests for mental health help, Langdon's earlier bizarre behavior, or Rosa's concerns about the twins' safety. Thus, the complaint does not allege that Garcia knew about Langdon's worrisome behavior prior to her arrival at Lighthouse or that a friend of the family (Rosa) felt the twins were unsafe with Langdon.

But Plaintiffs allege that Garcia knew about the events that occurred at Lighthouse—those events he learned of from his colleagues as well as those he witnessed himself. Prior to Garcia's arrival at Lighthouse, Langdon was refused shelter at Lighthouse because she was acting "crazy," and the Lighthouse staff twice called the police for help in dealing with Langdon. Langdon told the Lighthouse staff that she had been raped the night before and needed to go to the hospital for an emergency abortion. Langdon was argumentative, loud, and belligerent. For example, she yelled at an officer and told him he needed to read the Bible and shouted at him that he was not in charge of the situation and that God was. Langdon told the officers that her "Father" was going to take care of her and her children. When officers told Langdon that she could not exit Lighthouse to "go outside to pray," Langdon collapsed on the floor and yelled that she was having contractions. She repeated "Yeshua, Yeshua, Yeshua!" and tried to scoot towards the door while sitting down, claiming that something was "sucking her out" of the door. According to the FAC, making all reasonable inferences in favor of Plaintiffs, Garcia learned about the above events when a TPD officer updated Garcia on the call.

After Garcia arrived at Lighthouse, Langdon again collapsed on the floor and stated that she was going into labor. She got up only a few minutes later and began looking through her makeup bag, then asked another female at Lighthouse if she wanted a manicure. Langdon was unprepared to care for the twins, as she did not have a diaper bag, diapers, changes of clothing, or baby bottles; the FAC describes the twins as "functionally unattended." When Garcia attempted to communicate with Langdon, she refused or was unable to provide much information.

Based on these allegations, Garcia was aware that Langdon was undergoing a mental health crisis but was not aware that Langdon had a history of violent behavior. Given the extreme vulnerability of the ten-month-old twins, the complaint adequately alleges Garcia was aware that Langdon posed an obvious risk of physical harm to the twins based on her worrisome behavior. If the twins had been teenagers at the time, our conclusion might differ. But the twins were ten months old and entirely dependent on the care of others for survival. At such a young age, the failure to provide care can be fatal, yet Garcia left the twins alone with Langdon in a motel room overnight. Whether the twins perished because they were left unattended in the bath tub, or because their mother drowned them as a tragic result of her mental health crisis, or because they succumbed to a different danger associated with their mother's failure to provide adequate care, the legal analysis does not change: Garcia can be charged with deliberate indifference for ignoring the obvious risk of leaving the babies unattended with Landon. The allegations that Langdon was incapable of caring for the twins to such an extent that they were left "functionally unattended" are sufficient to establish that Garcia was deliberately indifferent. We conclude that the

complaint adequately alleges Garcia knew Langdon's
mental health crisis posed a serious risk of physical harm to
the twins but nonetheless disregarded this risk and left the
twins in a situation that was more dangerous than how he
found them.[14]

### c.   Torres

We similarly conclude that Plaintiffs adequately alleged
a state-created danger claim against CWS Social Worker
Torres. Plaintiffs alleged that Torres lied to Garcia about
Langdon's circumstances and history of abuse. The FAC
states, "CWS [Social Worker Torres] falsely stated that
Langdon was homeless. CWS falsely stated that Langdon
had no history of child abuse, even though CWS [k]new of
three criminal convictions for child cruelty and prior cases
including one open case against Langdon." Although
Plaintiffs could have been more precise in their wording, we
take these allegations to mean that Torres herself possessed
the knowledge that Langdon had a history of child abuse,

---

[14] The dissent insists that we expand the state-created danger exception
to apply in cases of mere negligence. We strongly disagree. At the 12(b)
stage, we accept as true the allegations in the complaint. The complaint
alleges deliberate indifference. Garcia was not merely a taxi driver
giving Langdon a lift as the dissent suggests. Garcia was aware that
Langdon was undergoing a mental health crisis, yet arranged for
Langdon to stay at a motel and left the babies alone with her there. In
doing so, Garcia exercised his authority to force the twins into an
obviously dangerous situation. This is not a case where it can be said the
state "played no part" in creating the danger the twins faced. *See
DeShaney*, 489 U.S. at 201. Rather, Garcia placed the twins in harm's
way by leaving them alone with Langdon.

including abuse against her own son, and that CWS had an open case against Langdon.**[15]**

When Torres provided Garcia with false information, she rendered the twins more vulnerable to physical injury by Langdon by eliminating the most obvious solution to ensuring the twins' safety: returning them to Jose's custody. Absent Torres's affirmative misrepresentation, Garcia may have conducted an independent investigation into Langdon's criminal history and living situation prior to settling on the decision to take the family to the motel.

*Martinez v. City of Clovis* is illustrative of how revealing certain information can enhance the risks facing a plaintiff. 943 F.3d 1260 (9th Cir. 2019). In *Martinez*, we held that a police officer committed a constitutional violation by telling the plaintiff's abuser about the plaintiff's allegations of abuse against him and telling him that plaintiff was not "the right girl" for him, after which the abuser further physically abused the plaintiff. *Id.* at 1272. In finding that the officer affirmatively exposed the plaintiff to an actual, particularized danger, the court reasoned that "[a] reasonable jury could find that [the officer's] disclosure provoked [the abuser], and that her disparaging comments emboldened [the

---

[15] The FAC does not directly define "CWS" as equating to Torres herself. Instead, it defines "CWS" as County of Tulare's Child Welfare Services. It describes "CWS workers" as including Torres and an unnamed employee of CWS. However, the FAC repeatedly uses "CWS" when it appears to refer to Torres as an individual. For example, the FAC states "CWS told [Garcia] it could take custody of the twins but only if the mother was taken into custody," and later clarifies that "Ms. Torres told Sgt. Garcia CWS would not take the babies unless [the police] arrested the mother or put her on a psychiatric hold." The FAC also later clarifies that Torres told TPD officers that Langdon was homeless and that Torres "concealed Langdon's history of child cruelty convictions."

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 40 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 40 of

40                          MURGUIA V. LANGDON

abuser] to believe that he could further abuse [the plaintiff], including by retaliating against her for her testimony, with impunity." *Id.* The court further found that the injury to plaintiff—further abuse—was objectively foreseeable as a matter of common sense. *Id.* at 1273–74.

The facts alleged here parallel those in *Martinez*, where the officer provided the abuser with information that may have changed his course of action. Torres potentially changed Garcia's course of action in responding to the situation at Lighthouse when she falsely represented that Langdon was homeless and did not have a criminal record of prior child cruelty. It was foreseeable "as a matter of common sense" that Langdon—who Torres allegedly knew had a history of abusing her own children and who was exhibiting signs of rage and behaving erratically at Lighthouse—might harm the twins if left alone with them. *See id.* at 1274. It was similarly foreseeable that the misinformation Torres provided would impact Garcia's decision about whether to separate Langdon from the twins.

Moreover, Plaintiffs have alleged that Torres acted with deliberate indifference. The complaint alleges that Torres was aware of three criminal convictions and prior CWS cases against Langdon, including two convictions for child cruelty, a case against Langdon for abuse of her own son, and a case that remained open. When Torres affirmatively told Garcia that Langdon had no criminal background history, Torres implied that she personally knew Langdon's history or that she had conducted a background check on Langdon (a representation consistent with the allegation that Torres knew about Langdon's history of child cruelty). According to the FAC, a background check of Langdon would reveal "Langdon's history of mental illness, cruelty to children and CWS history." In addition, Torres knew that

Garcia was considering arresting Langdon for disturbing the peace. We can further infer from the complaint's allegations that Torres knew that the situation at Lighthouse involved a mental health crisis given that Garcia discussed the possibility of involuntary commitment.

Given the allegations that Torres knew about Langdon's history of abuse—including abuse of her own son—we conclude that the complaint alleges Torres was aware of the obvious risk of harm Langdon presented to the twins. *Kennedy v. City of Ridgefield* is demonstrative of how past violent acts can put an officer on notice of a risk to plaintiffs. 439 F.3d 1065 (9th Cir. 2006). In *Kennedy*, the plaintiff reported to the defendant police officer that the plaintiff's 13-year-old neighbor molested the plaintiff's daughter. *Id.* at 1057. The plaintiff warned the officer that the neighbor was violent and repeatedly asked the officer not to inform the neighbor of her allegations without first notifying the plaintiff so she could protect her family. *Id.* at 105. The police officer knew the neighbor had a history of violent behavior. For example, the plaintiff told the officer that the neighbor had been involved in fights at school, had lit a cat on fire, had broken into his girlfriend's house and attacked her with a baseball bat, and had thrown rocks at a downtown building. *Id.* at 1057–58. The officer later learned that the neighbor had also been investigated for sending death threats to a classmate, though the investigation concluded he was not responsible. *Id.* at 1058. Despite this knowledge, the officer ignored the plaintiff's request to warn her prior to informing the neighbor of the allegations. *Id.* The officer drove to the neighbor's house and informed the neighbor's mother of the allegations without first warning the plaintiff. *Id.* The officer then drove to the plaintiff's house and informed her that he had told the neighbor's mother of the

allegations. *Id.* Approximately 15 minutes passed between
the officer's conversation with the neighbor's mother and his
conversation with the plaintiff. *Id.* The plaintiff and her
family decided to spend the night in their home and planned
to leave town the next day. *Id.* But early the next morning,
the neighbor broke into the plaintiff's house and shot the
plaintiff and her husband, killing the husband. *Id.*

This court affirmed denial of summary judgment for the
officer. In finding that the officer acted with deliberate
indifference, the court considered the fact that the officer
knew about the neighbor's violent tendencies, including
several specific incidents of "alarming, aggravated
violence." *Id.* at 1064. The court also noted that the plaintiff
had left several messages with the police department
expressing fear for her family's safety and requesting notice
before the department notified the neighbor of the
allegations. *Id.* The court therefore concluded that the officer
"knew that telling [the neighbor] about the allegations
against him without forewarning the [plaintiff's family]
would place them in a danger they otherwise would not have
faced." *Id.*

Making all reasonable inferences in favor of Plaintiffs,
the FAC alleges that Torres knew about Langdon's history
of violence and mental illness, including multiple specific
instances of physical violence against her own family
members, including her son. A reasonable jury could find
that Torres was aware of the risk that Langdon would
physically harm the twins and nevertheless lied to Garcia
about Langdon's background, and in doing so ignored the
consequences of her actions. Our conclusion is bolstered by

the young age and utter defenselessness of the ten-month-old twins.**16**

## VII.   DEFENDANTS' AFFIRMATIVE ACTIONS

We next address Plaintiffs' arguments that Defendants' wrongful affirmative acts deprived Plaintiffs of their constitutional rights. Plaintiffs identify four wrongful acts by the Individual Defendants that Plaintiffs contend give rise to § 1983 liability as "affirmative acts" rather than omissions. Specifically, Plaintiffs allege: (1) Lewis and Cerda deprived Plaintiffs of their rights to familial association by temporarily separating Jose and the twins; (2) Lewis and Cerda deprived Jose of his Fourth Amendment right to be free from unreasonable seizure by preventing him from following the twins; (3) Garcia committed a wrongful

---

[16] The dissent argues that Torres cannot be held liable because she did not intend to cause harm to the twins or know that her actions would lead to violence against the twins, but our case law does not require *intent to cause harm* or knowledge of *certain* harm. The deliberate indifference standard is satisfied when a state actor "recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks *without regard* to the consequences to the plaintiff." *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996) (emphasis added) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 n.8 (10th Cir. 1995)). In other words, the state actor must take an intentional action with knowledge that his actions will expose the plaintiff to an unreasonable risk. But the state actor need not know with certainty that the risk will materialize or intend for the plaintiff to face the risk. For example, in *Kennedy v. City of Ridgefield*, there was no finding that the officer intended to expose the plaintiff to danger or knew with certainty that his actions would result in violence to the plaintiff's family. 439 F.3d 1055, 1064–65 (9th Cir. 2006)). Nevertheless, the officer was deliberately indifferent because he intentionally told the plaintiff's neighbor about the allegations of abuse even though he knew that doing so would place the plaintiff's family "in a danger they otherwise would not have faced." *Id.* 1064.

affirmative act by misrepresenting the situation at Lighthouse to Torres; and (4) Torres committed a wrongful affirmative act by lying about Langdon's living situation and criminal background to Garcia.

### a.  Familial association

Plaintiffs' first allegation is that Lewis and Cerda violated Plaintiffs' constitutional rights to familial association when they separated Jose and the twins. The FAC includes the following relevant allegations: "Deputy Lewis with the approval of Sgt. Cerda affirmatively ordered Jose to step outside, away from the twins and denied him custody of the twins." "[W]hen Langdon said she did not want Jose in his own home, Lewis ordered Jose to stay out and away from the twins." When Jose asked the deputies to stop Langdon from taking the twins, "[the] deputies told Rosa and Jose that the deputies were going to let Langdon take the babies. One [County] deputy ordered Jose to "just let her go." The deputies then "stayed parked outside of [Jose's] house for 30 minutes, watching Jose and affirmatively showing their authority and restricting Jose's movement, causing Jose [to] fear that if he followed the twins, the [County] deputies would arrest him." The FAC does not allege that the Deputies expressly threatened to arrest Jose if he followed the twins. The FAC also does not include any allegations suggesting that separating Jose and the twins was necessary to prevent imminent danger to the twins, nor do Defendants make this argument in their answering brief.

The constitutional right to familial association derives from the First and Fourteenth Amendments. *Keates v. Koile*, 883 F.3d 1228, 1236 (2018). The standard for analyzing a § 1983 claim for interference with the right to familial

association depends on the context in which the case arises. *See Brittain v. Hansen*, 451 F.3d 982, 989–90 (9th Cir. 2006) (distinguishing cases where the state terminated parental rights due to allegations of child abuse from cases where a state actor intervened in a child custody dispute). When the case involves the seizure of children from their parents based on suspicions of danger to the child, "[o]fficials may not remove children from their parents without a court order unless they have 'information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury.'" *Keates*, 883 F.3d at 1236 (quoting *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007)). When the case involves the intervention of a state officer in an ongoing custody dispute, the parent "must show both a deprivation of [his] liberty and conscience shocking behavior by the government." *Brittain*, 451 F.3d at 991.

In *Brittain v. Hansen*, this court found that an officer's interference with a non-custodial parent's visitation rights did not amount to a constitutional violation. *Id.* at 996. The father had sole legal custody of the child, and the mother had visitation rights governed by a visitation schedule. *Id.* at 985. The father attempted to take the child on vacation at a time when the mother believed she was entitled to a week of visitation. *Id.* at 986. The father arrived at the mother's house with a police officer. *Id.* The officer believed the father was entitled under the visitation schedule to take the child that week and threatened to arrest the mother if she did not comply. *Id.* at 986–87. The mother allowed the child to leave with the father, but later brought a § 1983 action against the officer for violating her right to familial association.

As the case involved the state's intervention in a custody dispute *between two parents* rather than the government's

*seizure* of the children *from* the parents, the court reasoned that the mother needed to show that the officer deprived her of her liberty in a way that shocked the conscience. *Id.* at 991. Although the mother had a liberty interest in the companionship, care, custody, and management of her child, the court reasoned that "a relatively minor infringement on this liberty interest in visitation will not give rise to a Section 1983 substantive due process claim." *Id.* at 992. Thus, "a single *instance* of visitation, of a single week in duration, [was not] a 'fundamental' right." *Id.* at 994, 996.

There are obvious differences between *Brittain* and the present case: Jose had presumptive joint *custody* of the twins,[17] not mere *visitation* rights,[18] and there was no formal custody or visitation agreement in dispute. Further, Jose and Langdon lived together with the twins, and Langdon was experiencing a mental health crisis. But there are several key similarities between this case and *Brittain*. In both cases, a state officer transferred a child from the care of one (or both) parents to the other parent. Both the mother in *Brittain* and Jose believed they had an entitlement to their children at the relevant time. Both cases involved the same aspect of the right to familial association (namely, the right to *physically be with* the child at a particular time).[19] In both cases, the state officers restricted this right by threatening arrest or

---

[17] Cal. Fam. Code § 3010.

[18] As we repeatedly recognized in *Brittain*, "visitation is a lesser interest than legal custody." *Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006).

[19] Although Jose had custody rights of the twins rather than mere visitation rights, he does not allege that any privileges specific to the custodial relationship were violated (e.g., the ability to participate in decisions about the children's care).

intimidating the parent into thinking he would be arrested if he did not comply. Given the strong similarities between the present case and *Brittain*, we follow *Brittain* and conclude that the physical separation of Jose and the twins while Langdon took the twins to Church with Rosa was a "relatively minor infringement on [Jose's] liberty interest" and therefore not sufficient to form a basis for a § 1983 claim.

### b. Seizure

Plaintiffs' second allegation arising from "affirmative act[s]" is that Lewis and Cerda seized Jose without cause when they sat outside Jose's home for 30 minutes, preventing Jose from following Langdon and the twins. "A person is seized . . . and thus entitled to challenge the government's action . . . when the officer, by means of physical force or show of authority, terminates or restrains [the person's] freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted). "When the actions of the police do not show an unambiguous intent to restrain . . . a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 255 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The FAC states that the Deputies "restrained [Jose's] liberty by ordering Jose to get away from his children and repeatedly ordering Jose to stay away and not follow his children when they left. The Deputies reinforced these words with a show of authority by staying 30 minutes [outside Jose's home] to intimidate him from following the children."

Plaintiffs have not adequately pleaded a § 1983 claim for the unreasonable seizure of Jose. Jose alleged that the Deputies' show of authority prevented him from *following the twins*. He did not allege that the Deputies prevented him from leaving his house for other purposes—he could have driven off in another direction. Jose's gripe is not that he was *seized*, but that he was separated from his children.

Plaintiffs' third allegation, that Garcia committed a wrongful act by misrepresenting the situation at Lighthouse to Torres, and fourth allegation, that Torres committed a wrongful act by lying to Garcia about Langdon's living situation and criminal background, simply recast as "affirmative act[s]" claims addressed under the state-created danger exception and do not require separate analysis.

## VIII.  *MONELL* LIABILITY

Having found that Plaintiffs failed to allege that any state actor deprived them of their constitutional rights, the district court dismissed Plaintiffs' *Monell* claims against the County of Tulare and the City of Tulare. Because we reverse the district court's dismissal of some of Plaintiffs' § 1983 claims against County of Tulare Social Worker Torres and City of Tulare Sergeant Garcia, we reverse the district court's dismissal of Plaintiffs' *Monell* claims and remand for further proceedings.

## IX.    SUPPLEMENTAL JURISDICTION

The district court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims after having dismissed all of Plaintiffs' federal claims. Because we reverse the district court's dismissal of some of Plaintiffs' federal law claims, we reverse the district court's dismissal

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 49 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 49 of

Murguia v. Langdon                          49

of Plaintiffs' state law claims and remand for further proceedings.

## X.  CONCLUSION

For the reasons discussed above, we reverse the district court's dismissal of Plaintiffs' § 1983 claims against Garcia and Torres under the state-created danger doctrine. We vacate the district court's dismissal order as to Plaintiffs' § 1983 claims against Lewis and Cerda and remand with instructions to grant Plaintiffs leave to amend. On remand, the district court will have an opportunity to apply the correct standard. Lastly, we reverse and remand for further proceedings Plaintiffs' *Monell* claims against the County of Tulare and the City of Tulare, as well as all state law claims.

**REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

---

IKUTA, Circuit Judge, dissenting in part:

Tragic consequences may flow from negligence, mistakes of judgment, and the failure to provide safety and security to those who need it, as the case before us sadly shows. But victims of such lapses must pursue redress through tort law, because these mistakes do not rise to the level of egregious abuse of government power that violates citizens' constitutional rights. Here, the majority loses sight of the fundamental principles of substantive due process and instead turns the Fourteenth Amendment into a "font of tort law," *County of Sacramento v. Lewis*, 523 U.S. 833, 842–43 (1998), contrary to Supreme Court direction. Therefore, I respectfully dissent.

I

A

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.

The Supreme Court has recognized a substantive component of the Due Process Clause.  According to the Court, the clause places "a limitation on the State's power to act" that "was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) (cleaned up) (citation and quotation marks omitted).  The Court's conclusion is based on "the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations and quotation marks omitted).  The Supreme Court has "emphasized time and again that 'the touchstone of due process is protection of the individual against arbitrary action of government.'" *Lewis*, 523 U.S. at 845 (citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

"[O]nly the most egregious official conduct" qualifies as "abusive executive action" that violates the substantive component of the Due Process Clause.  *Id.* at 846.  Official conduct meets this high standard only when the "executive abuse of power" is so outrageous that it "shocks the conscience," *id.*, such as when a state official engages in "conduct *intended* to injure in some way unjustifiable by any government interest," *id.* at 849 (emphasis added).  If there is no "affirmative abuse of power" by the state, then there is

no violation of substantive due process.  *Daniels*, 474 U.S. at 330.

The Supreme Court has been "reluctant to expand the concept of substantive due process" beyond these narrow bounds.  *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).  Given the limited scope of the doctrine, the Supreme Court has identified a state abuse of power only in situations, "when the State takes a person into its custody and holds him there against his will."  *DeShaney*, 489 U.S. at 199–200.  In such custodial situations, the state's egregious abuse of authority, such as forcibly pumping the stomach of a detainee, *Rochin v. California*, 342 U.S. 165, 166, 172–73 (1952), or purposely using objectively unreasonable force against a detainee, *Kingsley v. Hendrickson*, 576 U.S. 389, 395–96 (2015), violates a detainee's substantive due process rights.  And when the state holds a person against his will, "the Constitution imposes upon [the state] a corresponding duty to assume some responsibility for his safety and general well-being."  *DeShaney*, 489 U.S. at 199–200.  Therefore, the state abuses its authority when it fails to discharge the state's minimal responsibility for the safety and well being of detainees.

But when the state has not taken on custodial responsibilities, the state is generally "under no constitutional duty to provide substantive services." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982).  The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests."  *DeShaney*, 489 U.S. at 196.  Nor does the clause constitute "a guarantee of certain minimal levels of safety and security."  *Id.* at 195. Because "[t]he Due Process Clause does not require the State to provide its citizens with particular protective services, it

follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97.

Whether a person is injured in a custodial situation or not, the Court has been clear that mere negligence or mistakes on the part of the state actor does not give rise to a constitutional claim. *See Daniels*, 474 U.S. at 333. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. For example, in *Daniels*, the Court rejected an inmate's claim that his due process rights were violated when he slipped on a pillow negligently left on a stairway by a county official. 474 U.S. at 332. "Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person." *Id.* For the same reason, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 333 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Indeed, even the state's negligent failure to protect a prisoner from attack by another inmate does not "abus[e] governmental power." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). A fortiori, outside of custody, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. Thus, even in a case where state social workers returned an abused child to the custody of his abusive father, and the child subsequently was the victim of further abuse resulting in severe brain damage, the state could not be held liable for a due process violation. *Id.* at 201–02.

B

Although the Supreme Court has recognized a substantive due process violation only when the state abuses its power in custodial situations, we have expanded this doctrine to apply when the state abuses its power by acting with deliberate indifference to expose a person to a foreseeable danger that the person would not have faced absent the state's intervention. *See Henry A. v. Wilden*, 678 F.3d 991, 1002 (9th Cir. 2012). We based this so-called "state-created danger doctrine" on statements in *DeShaney* that although "the State may have been aware of dangers [the child] faced in the free world, it played no part" in the creation of those dangers nor in rendering the child more vulnerable to them, notwithstanding the state's act of returning the abused child to his abusive father. 489 U.S. at 201. From these statements, we inferred that a state *would* have liability under the Due Process Clause had the state played a part in creating such a danger or rendering an individual more vulnerable. *See L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992).

Although our substantive due process jurisprudence has elaborated and expanded Supreme Court doctrine to a significant degree, until today we were careful to remain within the Supreme Court's framework. Thus, our cases have generally reflected the Court's principles that the state-created danger doctrine applies only when an injury is caused by a state's abuse of its executive power undertaken with the intent to injure someone in a "way unjustifiable by any government interest," *Lewis*, 523 U.S. at 849, not when the injury is the result of mere negligence.

The majority of our cases applying the doctrine involved state officials who abused the power entrusted to them as

officers of the state by intentionally putting a person in harm's way. In *Munger*, we held that police responding to a 911 call from a bartender regarding a disturbance created by Munger were liable for taking "Munger physically by the arm and walk[ing] him out" of the bar and instructing him not to drive his truck home or reenter the bar, even though "Munger was very obviously drunk" and wore only a t-shirt and jeans in 11 degree weather. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1084 (9th Cir. 2000). We explained that the officers, responding to a request for government assistance and acting as agents of the state, "affirmatively place[d] Munger in a position of danger," knowing "the danger that he was in." *Id.* at 1087. *See also Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) (per curiam) (holding that officers responding to a 911 call were liable for a substantive due process violation because their affirmative acts, including cancelling a request for paramedics and moving a gravely ill man inside the house and locking the door, made "it impossible for anyone to provide emergency medical care to Penilla").

We have likewise applied our doctrine when the harm is caused by a third party, but only when state officials exercised their authority to force an individual into a dangerous situation where injury by the third party was foreseeable. For example, in *Wood v. Ostrander*, a police officer abused his official powers by arresting a driver and impounding the driver's car, which stranded the female passenger in a high-crime area at 2:30 a.m. 879 F.2d 583, 590 (9th Cir. 1989). Noting "the [F]ourteenth [A]mendment's purpose of redressing abuses of power by state officials," we explained that in leaving the woman "by the side of the road at night in a high-crime area," the officer "show[ed] an assertion of government power" and

"disregard for [the woman's] safety." *Id.* at 588.  Similarly, in *Hernandez v. City of San Jose*, police officers forced attendees of a political rally to exit by walking through a crowd of violent protestors, knowing that the "protesters posed an immediate threat to the Attendees." 897 F.3d 1125, 1133, 1136 (9th Cir. 2018).  Without the officers' abuse of authority, the attendees would have taken a different route. *Id.* at 1129; *see also Bracken v. Okura*, 869 F.3d 771, 778–80 (9th Cir. 2017) (holding that police officers could be held liable for preventing the plaintiff from leaving a party and placing him under the control of security guards who assaulted him).  We have applied the same reasoning when state officials exercised their authority to intentionally assign a nurse to work alone in a medium security custodial facility's clinic with an inmate, whom they knew  "was a violent sex offender who had failed all treatment and was likely to assault a woman if alone with her." *L.W.*, 974 F.2d at 123.  Similarly, we have held that state officials abused their authority and violated children's due process rights by "removing [children] from their homes and placing them in the care of foster parents" with known histories of abuse and neglect. *See Henry A.*, 678 F.3d at 1002; *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 843–46 (9th Cir. 2010).

At the furthest reach of this doctrine, we have extended liability to state officials who abused their state authority by intentionally acting in a way they knew would provoke a third party to injure the plaintiff.  For example, in *Kennedy v. City of Ridgefield*, a police officer deliberately informed a person known to be violent that his neighbor had reported him to the police for child molestation, without giving that neighbor any advance warning (despite his promise to do so). 439 F.3d 1055, 1057–58, 1063–64 (9th Cir. 2006).  And in *Martinez v. City of Clovis*, police officers abused their

authority by first informing a suspect (who was also a police officer) that his girlfriend had made a police report accusing him of domestic violence, and then (after making disparaging remarks about the girlfriend) telling the suspect that he would not be arrested for domestic violence, even though the police had probable cause to do so. 943 F.3d 1260, 1273 (9th Cir. 2019). We held that this interchange emboldened the suspect to further abuse the girlfriend. *Id.* Although it is questionable whether the state officials' conduct in these cases rises to the level of an egregious abuse of power that the Supreme Court has held necessary for a substantive due process violation, at least these cases stop short of holding that officers could be liable for due process violations based on mere negligence or mistakes.

II

Today the majority jettisons even these meager limits on our state-created danger doctrine. Contrary to Supreme Court precedent (and our own), the majority finds a substantive due process violation despite the absence of any abuse of power entrusted to the state. Instead, the majority holds that plaintiffs can state a claim for a violation of their due process rights based solely on negligence and mistake, exactly what the Supreme Court has told us not to do. *See Daniels*, 474 U.S. at 333.

Starting with Deputy Lewis and Sergeant Cerda, the complaint alleges that in response to a 911 call from Murguia, Deputy Lewis and Sergeant Cerda arrived at the Murguia home and ordered Murguia to step outside the home while they spoke to Langdon. After Murguia asked his neighbor Rosa to help, Lewis and Cerda told Murguia to allow the neighbor, Rosa, to drive Langdon and the twins to a local church. The majority agrees that these allegations are

not enough to state a claim for a due process violation against Lewis and Cerda, but asserts that plaintiffs could state a claim simply by alleging facts from which it could be inferred that "the twins were rendered more vulnerable by Lewis's and Cerda's actions." Maj. Op. at 35.

But under the Supreme Court's framework, such allegations are largely irrelevant, because the officers' actions did not constitute an abuse of authority. Neither Lewis nor Cerda exercised their authority to order the twins into a position of danger. Separating the parties to a domestic disturbance is standard procedure. *See Martinez*, 943 F.3d at 1268. And the allegations show only that the officers failed to stop a parent, her children, and her friend from leaving while warning the other parent to let them go, all without incident. No case has suggested that this conduct is such an egregious abuse of authority as to "shock the conscience," amounting to a constitutional violation. *Collins*, 503 U.S. at 126. While Lewis and Cerda may have been negligent in failing to recognize that Langdon was experiencing a mental health crisis and that the twins would be safer at home with Murguia, the Supreme Court has been clear that the negligent "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. Even our state-created danger cases do not hold that mere negligence is enough to give rise to a due process violation. *See, e.g.*, *Wood*, 879 F.2d at 588 (stating that the officials acted with a degree of culpability higher than negligence); *L.W.*, 974 F.2d at 122 (same); *Hernandez*, 897 F.3d at 1135 (stating that substantive due process claims "require[] a culpable mental state . . . higher than gross negligence" (citation and quotation marks omitted));

*Kennedy*, 439 F.3d at 1064 (same); *Martinez*, 943 F.3d at 1274 (same).

At least Lewis and Cerda exercised some state authority—even if they did not exercise it in an abusive way intending to cause harm.  The other defendants in this case did not exercise such authority at all.  Officer Garcia was called to the Lighthouse shelter after Langdon created a disturbance, and the shelter refused to allow Langdon and the twins to stay there.  Based on the complaint, Garcia's conduct was limited to driving Langdon and the twins from the Lighthouse shelter to a motel and arranging for them to stay there overnight.  Contrary to the majority's assertion that Garcia "exercised his authority to force the twins into an obviously dangerous situation," Maj. Op. 38 n.14, the complaint does not allege that he ordered or compelled Langdon and the twins into the car or directed them to stay at the motel.  Thus, although Garcia was cloaked with the state authority of a police officer, he acted solely as a chauffeur and a Good Samaritan—not as an instrument of the state—in giving Langdon and the twins a ride and asking the motel to let them stay overnight for free.  The majority asserts that Garcia violated the plaintiffs' substantive due process rights because he should have known that Langdon was incapable of caring for the twins given that she was suffering a mental health crisis, and therefore his transportation of Langdon and the twins to the motel rendered the twins more vulnerable to injury by Langdon. Maj. Op. 37–38.  But negligently leaving an incapacitated mother and her children in a motel gives rise only to a tort claim; it is not an abuse of the state's power.  The fact that Garcia was a police officer, as opposed to a taxi driver or a Good Samaritan giving Langdon a lift, does not transform his bad decision into a constitutional violation.  *See Lewis*,

523 U.S. at 848; *Daniels*, 474 U.S. at 332–33.  Even our state-created danger cases involving third party violence do not go that far; rather, they identify a substantive due process violation only when an officer's exercise of authority forced a victim into contact with the attacker in the first instance, *see Wood*, 879 F.2d at 588, 590*; Hernandez*, 897 F.3d at 1129; *Bracken*, 869 F.3d at 778–80; *L.W.*, 974 F.2d at 123; *Henry A.*, 678 F.3d at 1002; *Tamas*, 630 F.3d at 843–46, or provoked a dangerous person to attack the victim, *see Kennedy*, 439 F.3d at 1057–58, 1063–64; *Martinez*, 943 F.3d at 1273.

Nor did Torres, a social worker, abusively exercise state authority in a manner that shocks the conscience.  Torres became involved when Garcia called her for information about Langdon.  The complaint alleges that the County of Tulare's Child Welfare Services (CWS) "falsely stated that Langdon was homeless" and "falsely stated that Langdon had no history of child abuse."  It also alleges that Torres failed to inform Garcia "that Jose was an available parent who could take custody of the twins."  But there is no allegation that Torres (or CWS) made these false statements or failed to provide relevant information in order to cause harm to the children, nor is that a reasonable inference. Therefore, even if Torres's conduct could be the basis for a tort action based on intentional or negligent misrepresentation, Torres did not engage in the sort of abuse of executive power intended to cause harm that could give rise to a substantive due process claim.  *See Lewis*, 523 U.S. at 849 (stating that an official's conduct shocks the conscience when the official "intended to injure" the plaintiff).  Even *Martinez* and *Kennedy* do not go that far. In both those cases, the police officer intentionally gave information obtained from a confidential police report to the

accused perpetrator, knowing that it would lead to violence against the victim.

The majority's explanation of how Torres could be held liable is not plausible. According to the majority, "[a]bsent Torres's affirmative misrepresentation, Garcia may have conducted an independent investigation into Langdon's criminal history and living situation prior to settling on the decision to take the family to the motel." Maj. Op. at 39. But because of the misrepresentation, the majority asserts, "Torres potentially changed Garcia's course of action in responding to the situation at Lighthouse," Maj. Op. at 40, "eliminating the most obvious solution to ensuring the twins' safety: returning them to [Murguia's] custody," Maj. Op. at 39. It is doubtful that a plaintiff could prevail even on a claim of *negligence* based on this speculative chain of causation. *See State Dep't of State Hosps. v. Super. Ct.*, 61 Cal. 4th 339, 356 (2015) (holding that "[p]laintiff's showing of 'but for' causation is weak" where the plaintiff alleges a chain of intervening discretionary acts because the results of those acts is "speculative and conjectural"). Even if Torres's conduct was negligent and reprehensible, an allegation that she exercised her state authority to intentionally injure plaintiffs is implausible.

## III

In short, the majority makes three mistakes that conflict with the Supreme Court's doctrine and, in doing so, finally tears our state-created danger doctrine clear of its moorings.

First, the majority opinion finds a substantive due process violation in the absence of any abusive exercise of state authority. This is directly contrary to the Supreme Court's rulings that the substantive due process doctrine "was intended to prevent government from abusing its

Case: 21-16709, 03/14/2023, ID: 12673447, DktEntry: 74-1, Page 61 of 61
se 1:19-cv-00942-NODJ-BAM   Document 66   Filed 03/14/23   Page 61 of

MURGUIA V. LANGDON                       61

power, or employing it as an instrument of oppression," *DeShaney*, 489 U.S. at 195–96 (cleaned up) (citation and quotation marks omitted), and absent the "affirmative abuse of power" by the state, there is no substantive due process violation, *Daniels*, 474 U.S. at 330.

Second, the majority opinion indicates that officials may be liable for failing to take affirmative actions to protect children from a dangerous parent. But, as *DeShaney* held, that failure to protect is not an egregious abuse of state-assigned power. 489 U.S. at 201–03. Moreover, *DeShaney* made clear that the state has "no constitutional duty to protect [a child] against his [parent's] violence," and therefore the "failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." *Id.* at 202.

Finally, the majority imposes liability for substantive due process violations when the plaintiffs' allegations amount to mere negligence. But "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.

The majority's expansion of our state-created danger doctrine into the realm of tort law conflicts with Supreme Court precedent and is out of step even with our broad state-created danger doctrine. Because the majority erroneously erodes "[t]he guarantee of due process" into a "guarantee [of] due care," *Davidson*, 474 U.S. at 348, I respectfully dissent.