1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MURGUIA, for himself and for the Estates of Mason and Maddox Murguia,<br><br>Plaintiff,<br><br>v.<br><br>HEATHER LANGDON, et al.,<br><br>Defendants. | No. 1:19-cv-00942-KES-BAM<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS<br><br>(Docs. 97, 98) |

Defendants City of Tulare, Sergeant Garcia, County of Tulare, Sergeant Ricardo Cerda, Deputy Jeffrey Lewis, and Roxanna Torres move to dismiss plaintiffs' second amended complaint ("SAC"). Docs. 97, 98. This matter is suitable for resolution without a hearing pursuant to Local Rule 230(g). For the reasons set forth below, the motions to dismiss are granted in part and denied in part.

///

///

1

1    I.    **BACKGROUND**

2        A.    <u>**Factual Background**</u>[1]

3        Plaintiff Jose Murguia and defendant Heather Langdon married in 2004 and had three

4    children prior to the birth of their twins.[2]  SAC, Doc. 96 ¶ 38.  Langdon had a history of mental

5    illness and violence towards her family.  SAC, Doc. 96 ¶ 39.  In 2014, Langdon admitted to a

6    social worker that she had hit her oldest son.  *Id.*  The state court issued a temporary restraining

7    order against Langdon on January 5, 2015, and initially awarded sole physical and legal custody

8    of the three older children to Murguia, with monitored visits and a mental health evaluation for

9    Langdon.  *Id.* ¶ 39.  Murguia and Langdon terminated their marriage in April 2015, and the state

10   court awarded sole physical and legal custody of the three children to Murguia with monitored

11   visits for Langdon.  *Id.* ¶ 40.

12       In 2016, Langdon pleaded guilty to drunk driving and later also pleaded guilty to willful

13   cruelty to her child and inflicting injury to her child.  *Id.* ¶ 41.  The state court "awarded sole legal

14   and physical custody" of the three older children to Murguia with no visitation to Langdon.  *Id.*

15   Tulare County Child Welfare Services ("CWS") opened a case against Langdon for child abuse

16   of her oldest child and still had at least one open case against Langdon on October 4, 2017.[3]

17   Langdon was convicted of battery against Murguia in August 2017.  *Id.* ¶ 43.

18       In the Spring of 2017, Murguia and Langdon started seeing each other again and Langdon

19   become pregnant with twins.  *Id.* ¶ 42.  In January 2018, Langdon gave birth to twins, Mason and

20   Maddox.  *Id.* ¶ 44.  Although there was no formal custody order for the twins, Murguia visited

21   Langdon and the twins frequently and helped pay for the twins' expenses.  *Id.* ¶ 45.  In February

22
23   [1] The facts below are set forth in the SAC.  The factual allegations in the SAC are presumed to be true for purposes of the motions to dismiss.  *See Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023).

24
25   [2] As plaintiff Jose Murguia is bringing this action both on behalf of himself and on behalf of the estates of his deceased children, Mason and Maddox Murguia, this Order refers to Jose Murguia individually as "Murguia," and refers to Jose Murguia and the decedents' estates collectively as "plaintiffs."

26
27   [3] The SAC alleges that CWS had at least one open case against Langdon, but it is not clear from the SAC what the open case involved.

28

2018, Murguia reported to CWS that he observed Langdon drunk while in charge of the twins in her apartment. *Id.* The following month, two of Langdon's friends reported to CWS that they saw Langdon drunk while she was with the twins. *Id.* In May 2018, Langdon told Murguia that the twins were too much work for her and asked him to take custody of all five children. *Id.* ¶ 46. Murguia agreed to take the twins and let Langdon move into his home. *Id.* ¶ 46.

By late 2018, Langdon was experiencing an ongoing and escalating mental health crisis. *Id.* ¶¶ 47–49. In November 2018, Langdon told her oldest son, then 14 years old, that they were special in the eyes of God, that these were "End Times" because a fire had destroyed the town of Paradise, and that she was "thinking at a higher power." *Id.* ¶ 47. On December 3 or 4, Langdon called her church, First Assembly, and falsely stated that her oldest son had threatened to "shoot up" an elementary school. *Id.* ¶ 48. The church reported the call to the Tulare County Sheriff's Department ("TCSD"), which investigated the threat and concluded that the threat was false. *Id.*

### 1.    TCSD deputies respond to Murguia's home

In early December 2018, Langdon and Murguia lived together with all five children at Murguia's home. On December 4, 2018, Langdon was erratic and repeatedly shouting "I refute you Satan" and told Murguia to get ready to go to jail. *Id.* ¶ 49. Murguia called 911, described Langdon's behavior, and requested mental health services for Langdon. *Id.* TCSD Deputy Lewis and another TCSD deputy[4] were dispatched to Murguia's home. *Id.* ¶ 50. Murguia asked the deputies to get professional help for Langdon, but the deputies refused to facilitate mental health services or call the Psychiatric Emergency Team. *Id.* ¶ 51. Instead, the TCSD deputies told Murguia to call back if Langdon threatened herself or the twins and they would put Langdon on an involuntary psychiatric hold. *Id.*

The next morning, December 5, 2018, Langdon woke up at 4:00 a.m. and lifted one of the twins up high, shouting "haneeshewa." *Id.* ¶ 52. She then bathed and put on makeup three consecutive times. *Id.* Around 11:00 a.m., she told Murguia that Jesus told her to drink bleach and vinegar to cleanse the demons in her soul and that she had already drunk some bleach. *Id.*

---

[4] The SAC does not identify the other TCSD deputy who was dispatched to Murguia's home. SAC ¶ 50.

1    ¶ 54.  Murguia saw her drink vinegar.  *Id.*  Murguia called 911, reported the repeated bathing and

2    what Langdon said about drinking bleach and vinegar, and urgently requested psychological

3    services for Langdon.  *Id.*

4         Defendants Lewis, Cerda, and at least one EMT arrived at Murguia's home.  *Id.* ¶ 55.

5    Before arriving at Murguia's home, Lewis and Cerda knew that Langdon had lost custody of

6    several of the children due to her violence towards the children, that she had a history of mental

7    problems and convictions for cruelly abusing her older children, that she had made a false report

8    of a school shooting two days earlier, and that Lewis had conditionally recommended an

9    involuntary hold.  *Id.* ¶ 56.

10        Upon arrival and with the approval of Cerda, Lewis ordered Murguia to exit his home

11   without the twins.  *Id.* ¶ 58.  Lewis and Cerda saw Langdon behave erratically.  *Id.* ¶ 61.

12   Langdon told Lewis and Cerda that she saw dead people and demons, that she talks to God and

13   she was going to another realm, that Murguia was a devil worshipper, and that she had another

14   husband waiting for her.  *Id.*  Langdon showed rage, anger, and agitation.  *Id.*  Murguia told the

15   TCSD deputies about Langdon's bizarre behavior, told them that Langdon needed to be

16   professionally evaluated, and reminded the deputies of the previous night's call and of Lewis's

17   promise to get Langdon a psychiatric evaluation.[5]  *Id.* ¶ 62.  Murguia said he wanted to take

18   Langdon to the hospital or a clinic for a mental health evaluation, but the TCSD deputies said

19   they would not permit it.  *Id.*  Langdon told a paramedic, in the presence of the TCSD deputies,

20   that she was crazy, had been awake for days, and wanted to see a doctor.  *Id.* ¶ 66.  The deputies

21   did not assess Langdon or consult with any mental health expert.  *Id.* ¶ 65.

22        After being separated from his twins, Murguia asked his neighbor Rosa for help.  *Id.* ¶ 68.

23   When Rosa arrived at Murguia's home, there were three TCSD deputies present.  *Id.*  A TCSD

24   deputy allowed Rosa to enter the house, but with Cerda's approval, barred Murguia from entering

25   the house.  *Id.*  A TCSD deputy told Rosa that Langdon had voluntarily agreed to go to the

26

27   _____

     [5] The SAC at times refers to the "TCSD deputies" and at other times refers specifically to Lewis
     and Cerda.

28

hospital and was waiting for Rosa to take her. *Id.* ¶ 69. Neither Rosa nor the TCSD deputies believed the babies were safe if left alone with Langdon. *Id.* The TCSD deputies told Rosa that she, and not the deputies, should take Langdon to the hospital and that Rosa should thereafter take custody of the twins. *Id.* The TCSD deputies knew that Rosa had no legal authority over Langdon or the twins, and that Rosa had not agreed to stay with the twins. *Id.* Rosa then communicated to Langdon that they were going to the hospital, but Langdon insisted she wanted to take the twins to church, and the TCSD deputies, though surprised, agreed to let Langdon do so. *Id.* ¶¶ 70-71. Rosa told the TCSD deputies that Langdon had no food or water for the babies, and Langdon's son provided Rosa with water, diapers, and cans of milk. *Id.* ¶ 71.

Outside the house, Murguia begged the TCSD deputies not to let Langdon leave with the twins and asked that he be allowed to have custody of them. *Id.* ¶ 72. Murguia told the TCSD deputies the twins were not safe with Langdon and asked the deputies to stop Langdon from taking the twins. *Id.* The FAC alleges that Rosa had no authority to take custody of the twins or challenge Langdon for control of the twins. *Id.* at 75. Rosa had her own children to care for and at no time agreed to be a full-time guardian for the twins. *Id.* Rosa could have been legally separated from the twins at any time. *Id.*

The TCSD deputies ordered Murguia to stay at the house and, after Langdon left with the twins and Rosa, the TCSD deputies stayed parked outside Murguia's house for 30 minutes watching him and "affirmatively showing their authority over him and restricting" his movement. *Id.* at 72. Murguia believed that he was not free to leave because he had been ordered by the TCSD deputies to stay and feared that he would be arrested if he left his house, even if he left in a different direction. *Id.* Cerda was a TCSD supervisor and observed the events, he did not restore custody of the twins to Murguia, and he approved the TCSD deputies' order to restrain Murguia from protecting the twins. *Id.* at 76. Murguia alleges that the TCSD deputies' actions placed the twins in greater danger than if Murguia had never called 911. *Id.* ¶ 77.

### 2.    Langdon arrives at First Assembly Church

Rosa took Langdon and the twins to the First Assembly church. *Id.* ¶ 78. No TCSD or other deputies were present when Rosa, Langdon, and the twins arrived at the church. *Id.* Rosa

1  told the church's receptionists that the twins were in danger and asked the church to help Rosa get

2  the twins away from Langdon.  *Id.*  Rosa also told them that she was a friend and neighbor and

3  that she and the twins' father were worried about the twins and Langdon's mental state.  *Id.*  Rosa

4  was told that the pastor would take good care of Langdon and not to worry because the twins

5  were in good hands, and Rosa then left.  *Id.*  The pastor called 911 and the City of Visalia Police

6  Department responded to the church.  *Id.* ¶ 79.  An unspecified City of Visalia police officer then

7  arranged for someone to drive Langdon and the twins to Lighthouse Shelter, a women's shelter in

8  Tulare.  *Id.*

9                      **3.       Langdon arrives at Lighthouse Shelter**

10        At the shelter, the director and officer manager conducted an interview of Langdon and

11  thought Langdon was "crazy."  *Id.* ¶ 80.  Langdon alarmed the staff with abusive screaming and

12  bizarre delusions.  *Id.*  Langdon was argumentative and told staff that she controlled the

13  manager's computer and told the interviewer that she did not like their "spirit."  *Id.*  Langdon also

14  told the interviewer that she had been raped the night before and needed to go to the hospital for

15  an emergency abortion.  *Id.* ¶ 81.  The shelter called an ambulance.  *Id.*  EMTs arrived and

16  informed Langdon that they could transport her, but not the twins, to the hospital.  *Id.*  Langdon

17  got angry and the shelter called the Tulare Police Department ("TPD").  *Id.*  TPD dismissed the

18  EMTs and ambulance without anyone performing an assessment of Langdon's mental state.  *Id.*

19        TPD officers observed Langdon's bizarre behavior at the shelter.  *Id.* ¶ 83. Langdon yelled

20  at the TPD officers, and the officers described Langdon as "loud and belligerent."  *Id.*  Langdon

21  said she "felt" pregnant, and an officer asked her if she had taken a pregnancy test.  *Id.*  Langdon

22  became angrier and yelled at the officer and told him that he needed to read the Bible.  *Id.*

23  Langdon shouted that the officer was not in charge and that God was.  *Id.*  The shelter manager

24  told Langdon that if she did not stop the disturbance, she would be forced to leave.  *Id.* ¶ 84.

25  Langdon calmed down, but after the TPD officers left, she continued to yell at the shelter

26  personnel.  *Id.*

27        The same TPD officers were again dispatched to the shelter about forty minutes after they

28  had left.  *Id.*  The shelter staff told the officers that Langdon was being uncooperative, loud,

disruptive, and was talking "crazy."  *Id.*  The shelter staff also informed TPD that the twins

looked like they had not been fed, and that Langdon did not have a diaper bag, diapers, changes

of clothing, or baby bottles.  *Id.*

Langdon tried to go outside and pray but was told by a TPD officer that she had to remain

in the dining area.  *Id.* ¶ 85.  Langdon collapsed on the floor, yelling that she was having

contractions, and repeating "Yeshua, Yeshua, Yeshua!"  *Id.*  She also tried to scoot towards the

door while sitting down and claimed that something was "sucking her out" of the door.  *Id.*

Langdon then again collapsed on the floor and stated she was going into labor.  *Id.* at ¶ 86.

Langdon then got up a few minutes later, began sifting through her makeup bag, and started

talking to another woman in the shelter.  *Id.*

A TPD officer called defendant Garcia, TPD's Crisis Intervention Officer, to respond and

informed Garcia about the events at the shelter.  *Id.* ¶ 87.  The TPD officers and Garcia saw that

Langdon was unable to properly care for the twins.  *Id.* ¶ 89.  Garcia knew that the twins were

functionally unattended, and that Langdon was gravely disabled.  *Id.* ¶ 88.  Langdon did not have

baby food, diapers, or other baby supplies and her behavior "presented an immediate threat to the

children's health and safety because the twins were functionally unattended."  *Id.* ¶ 89.

Garcia's initial instinct was to arrest Langdon for disturbing the peace so he called CWS

and spoke with defendant Torres, an Emergency Response social worker, and discussed where the

twins should go.  *Id.* ¶¶ 90-91.  Garcia and Torres each provided the other with false information.

Garcia asked Torres whether Langdon had any history with CWS.  *Id.* at 90.  "Torres falsely

stated that Langdon had no history of child abuse, even though Torres knew of prior criminal

convictions for child cruelty, prior CWS cases against Langdon, and Langdon had lost custody of

her older children."  *Id.*  Torres also falsely reported to Garcia that Langdon was homeless.

Torres told Garcia that if TPD took Langdon into custody, CWS would take custody of the twins,

and Garcia told Torres repeatedly that he did not want to take the twins from Langdon.  *Id.* ¶¶ 91-

92.  Garcia falsely told Torres that Langdon had been evaluated at a hospital and did not meet the

criteria for an involuntary commitment.  *Id.* ¶ 91.  Garcia also falsely told Torres that Langdon

had everything she needed to take care of the twins, meaning food, diapers, and other baby

1    supplies.  *Id.*  Torres initially concluded that Langdon was not a danger to the twins and set the

2    CWS's Emergency Investigative Response for ten days later.  *Id.*  Neither Torres nor Garcia

3    attempted to contact Murguia.

4          Torres and her supervisor later conducted a "further risk assessment because the mother

5    sounded delusional and might be a threat to the children."[6]  *Id.*  ¶ 98 (internal quotation marks

6    omitted).  The matter was then reclassified for immediate in-person investigation because

7    Langdon's behavior was bizarre and dangerous to the emotional health of the children.  *Id.*

8    Although this situation met all the criteria for an immediate in person investigation because

9    Langdon was mentally unstable, was gravely disabled, and had a history of child abuse, no

10   immediate in person investigation occurred.  *Id.*  No CWS investigator was assigned to Langdon

11   and the twins prior to the twins' death.  *Id.* ¶ 99.

12         After Garcia's call with Torres, Garcia decided not to arrest Langdon or get psychiatric

13   help for her.  *Id.* ¶ 100.  Instead, Garcia arranged for Langdon and the twins to stay overnight at a

14   motel.  *Id.*  Garcia put the twins and Langdon in a police cruiser for transport to a motel.  *Id.*  At

15   TPD's request, the motel agreed to provide Langdon with free accommodation for the night.  *Id.*

16   Garcia left the twins alone with Langdon even though he had been briefed by TPD officers about

17   Langdon's behavior and had witnessed Langdon's delusional state and inability to communicate

18   and saw that Langdon did not have any diapers or bottles.  *Id.*

19         Early the next morning, on December 6, 2018, Langdon screamed for someone to call

20   911.  *Id.* ¶ 102.  Langdon had drowned the twins and the twins' bodies were found on the bed in

21   the motel room.  *Id.*  Langdon was subsequently prosecuted for murder and was found not guilty

22   by reason of insanity.  *Id.* ¶ 103.  As of the date of the filing of the SAC, neither Tulare County

23   nor the City of Tulare had investigated or disciplined any officers or social workers in connection

24   with this incident.  *Id.*

25   ///

26   ///

27   ─────────────────

28   [6] The SAC is unclear as to when the further risk assessment occurred or what prompted the
     further assessment.

1

### B.   Procedural Background

2   This Court dismissed plaintiffs' original complaint with leave to amend; it subsequently

3   dismissed plaintiffs' first amended complaint ("FAC") without leave to amend.  Docs. 35, 57.  In

4   dismissing the FAC, the Court found that plaintiffs failed to state section 1983 claims against the

5   individual defendants and that, therefore, plaintiffs also failed to state *Monell* claims against the

6   City and County.  Doc. 57.  The Court declined to exercise supplemental jurisdiction over the

7   remaining state law claims.  *Id.*  Plaintiffs appealed the dismissal of the case.  Doc. 59.

8   On March 14, 2023, the Ninth Circuit reversed the dismissal order in part, vacated in part,

9   and remanded this action with instructions to grant plaintiffs leave to amend.  *Murguia v.*

10   *Langdon*, 61 F.4th 1096, 1120 (9th Cir. 2023).[7]  As to plaintiffs' claims under the Due Process

11   Clause of the Fourteenth Amendment, the Ninth Circuit considered whether plaintiffs had stated a

12   claim under the state-created danger exception to the general rule that a failure to act does not

13   raise a Due Process claim.[8]  *Id.* at 1112-17.

14   The Ninth Circuit held that the allegations that Lewis and Cerda allowed Langdon to

15   remove the twins from their home, prevented Murguia from following Langdon and the twins to

16   the church, ignored Langdon's request for mental health help, and separated the twins from their

17   father and allowed Langdon to leave with them were insufficient to state a claim under the state-

18   created danger exception, because Lewis and Cerda did not entrust the twins to Langdon alone as

19   they also entrusted them to the care of Rosa.  *Id.* at 1112.  As Lewis and Cerda replaced one

20   competent adult (Murguia) with another (Rosa), the FAC did not sufficiently allege that Lewis

21   and Cerda placed the twins in a more dangerous situation than the one in which they found them.

22   *Id.* at 1113.  The Court noted that "the FAC [did] not include any factual allegations from which

23   [the Court] could conclude that Rosa was incapable of supplementing Langdon's care of the twins

24

25   [7] This case was subsequently reassigned to the undersigned in March 2024.  Doc. 95.

26   [8]  The Ninth Circuit also considered the special-relationship exception but found it did not apply
27   because defendants did not have custody of the twins.  *Murguia*, 61 F.4th at 1109.  While the
Court noted that defendants Lewis and Cerda temporarily physically separated Murguia from the
28   twins, it found that Murguia (and Langdon), not defendants, retained long-term responsibility for
the twins and long-term control over the decisions regarding the twins.  *Id.* at 1110.

or was likely to separate from Langdon and the twins after leaving the Murguia home." *Id.* The Court found "it is unclear given the vague allegations in the [FAC] that Lewis's and Cerda's conduct enhanced the twins' vulnerability to physical harm." *Id.* Given the vague allegations in the FAC and because the dismissal order applied the incorrect standard in analyzing the state-created danger exception, the Ninth Circuit vacated the dismissal order with an instruction to allow plaintiffs leave to amend these claims.[9] *Id.*

With regard to defendant Garcia, the Ninth Circuit held that plaintiffs adequately stated a claim under the state-created danger exception. *Id.* at 1112. The Court held that when Garcia left Langdon alone with the twins at the motel, he removed them from the supervision of the shelter staff and rendered the twins more vulnerable. *Id.* As Garcia was aware that Langdon was undergoing a mental health crisis, and given the "extreme vulnerability" of the ten-month-old twins, Garcia was deliberately indifferent to the risk that Langdon would physically harm the twins. *Id.* at 1113-14.

The Ninth Circuit also held that plaintiffs adequately alleged a claim against Torres under the state-created danger exception. *Id.* at 1115. The Court held that Torres rendered the twins more vulnerable to physical injury when she provided Garcia with false information and removed the option of the twins being returned to Murguia's custody. *Id.* As Torres is alleged to have been aware of Langdon's criminal convictions and prior CWS cases, and it could be inferred that Torres knew that Langdon was experiencing a mental health crisis at the shelter, Torres was deliberately indifferent to the risk to the twins. *Id.* at 1116.

As the Court reversed the dismissal of the section 1983 claims as to Garcia and Torres and granted leave to amend with respect to the section 1983 claims against Lewis and Cerda, the Court also reversed the dismissal of the *Monell* claims and the state law claims and remanded for

---

[9] As to plaintiffs' other theories on their section 1983 claims, the Court held that Lewis and Cerda's physical separation of Murguia from the twins when they let Langdon and Rosa leave with the twins to go to the church was a "relatively minor infringement" on Murguia's right to familial association. *Id.* at 1118–19. The Court also held that Murgia did not state a separate claim based on a Fourth Amendment right to be free from unreasonable seizure with respect to Lewis and Cerda's preventing him from following Langdon and the twins. *Id.* at 1119.

10

1    further proceedings. *Id.* at 1120.

2          Plaintiffs assert claims in the SAC against defendants Lewis, Cerda, Torres, the County of

3    Tulare, Garcia, the City of Tulare, and Heather Langdon.[10]  Doc. 96.  The SAC sets forth 10

4    federal claims pursuant to 42 U.S.C. § 1983.  *Id.*  The SAC also sets forth 14 claims under state

5    law, four of which are solely against defendant Langdon.[11]  *Id.*

6          Defendants City of Tulare and Sergeant Garcia (collectively referred to as "City

7    defendants") filed a motion to dismiss the SAC under Rules 8 and 12(b)(6).  Motion to Dismiss

8    ("City's Motion"), Doc. 97.  Defendants County of Tulare, Sergeant Cerda, Deputy Jeffrey

9    Lewis, and Roxanna Torres (collectively referred to "County defendants") also filed a motion to

10   dismiss under Rules 8 and 12(b)(6).  County defendants' Motion to Dismiss ("County's

11   Motion"), Doc. 98.  After receiving leave to file untimely oppositions, plaintiffs filed their

12   oppositions to the motions to dismiss.  Docs. 109, 110.  The moving defendants timely replied.

13   Docs. 111, 113.

14   **II.    LEGAL STANDARD**

15         Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.

16   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a

17   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

18   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  In evaluating a motion to

19   dismiss under Rule 12(b)(6), the Court presumes the factual allegations within the complaint to be

20   true and draws all reasonable inferences in favor of the nonmoving party.  *Murguia*, 61 F.4th at

21   [10] The SAC incorrectly lists in the case caption certain defendants that plaintiff previously

22   voluntarily dismissed from this action.  *See* Docs. 63, 64, 96.  The case caption also lists First
     Assembly of God of Visalia as a defendant.  However, the SAC does not state any causes of

23   action against First Assembly of God of Visalia, nor does it include this entity in the "Parties"
     section of the SAC.  *See* SAC.  At the February 20, 2024, status conference before the assigned

24   magistrate judge, plaintiffs' counsel represented that First Assembly of God of Visalia was no
     longer a defendant in this action.  Doc. 92.  Accordingly, First Assembly of God of Visalia is

25   dismissed from this action and the Clerk of Court is directed to update the docket to reflect that it

26   is no longer a defendant in this action.

27   [11] As defendant Langdon has not filed a motion to dismiss or otherwise responded to the SAC,
     this Order does not address whether the SAC adequately pleads the state law claims against

28   Langdon.

1  1106 (citing *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987)).

2      Rule 8(a) requires that a pleading contain "a short and plain statement of the claim

3  showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556

4  U.S. 662, 677–78 (2009).  Under federal notice pleading standards, the complaint must "give the

5  defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic*

6  *v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).  "This simplified

7  notice pleading standard relies on liberal discovery rules and summary judgment motions to

8  define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema*

9  *N.A.*, 534 U.S. 506, 512 (2002).  Though Rule 8(a) does not require detailed factual allegations, a

10  plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."

11  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Iqbal*, 556 U.S. at 677–78.  "[I]it demands

12  more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at

13  678.  "[B]are assertions . . . amount[ing] to nothing more than a formulaic recitation of the

14  elements . . . are not entitled to be assumed true." *Id.* at 681.  "A claim has facial plausibility

15  when the plaintiff pleads factual content that allows the court to draw the reasonable inference

16  that the defendant is liable for the misconduct alleged." *Id.* at 678.  The complaint must contain

17  facts that "nudge[] [the plaintiffs] claims across the line from conceivable to plausible."

18  *Twombly*, 550 U.S. at 570.

19      If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to

20  amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  The "underlying purpose of Rule 15

21  [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v.*

22  *Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up).  However, a court has

23  discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of

24  the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

25  prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of

26  amendment." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

27  ///

28  ///

1  **III.    DISCUSSION**

2        The City defendants argue that (i) plaintiffs fail to comply with Rule 8, (ii) plaintiffs' state

3  law claims must be dismissed as plaintiffs fail to allege compliance with the California Tort

4  Claims Act, (iii) the City of Tulare has immunity under Government Code § 818.2, and (iv) the

5  SAC fails to state a claim that Garcia breached mandatory duties as asserted in claims 7, 8, 9, 10,

6  17, 18, and 19.  City's Motion, Doc. 97-1 at 4–5.

7        The County defendants argue that (i) plaintiffs fail to comply with Rule 8, (ii) plaintiffs

8  fail to state a due process violation under the state-created danger exception as to defendants

9  Cerda, Lewis, and Torres, (iii) Cerda, Lewis, and Torres are entitled to qualified immunity,

10  (iv) plaintiffs fail to adequately plead their *Monell* claims against the County of Tulare,

11  (v) plaintiffs' state law claims must be dismissed as plaintiffs fail to allege compliance with the

12  California Torts Claims Act, (vi) plaintiffs fail to establish standing for Murguia to file suit on

13  behalf of the estates of the twins or as the children's successor in interest, and (vii) the County

14  defendants are immune from liability on the state law claims.  *See generally*, County's Motion,

15  Doc. 98.  The County defendants seek dismissal of the claims against Lewis, Cerda, and Torres

16  (claims 1-3), of two of the three *Monell* claims against the County (claims 4-5), and of the state

17  law causes of action against the County defendants (claims 11-16).[12]  *Id.*

18        **A.  Rule 8**

19        The City and County defendants move to dismiss the SAC pursuant to Rule 8.  The City

20  defendants argue that the SAC violates Rule 8 because of its length and because it is "replete with

21  unnecessary" and redundant details.  City's Motion, Doc. 97-1 at 2-3.  The City defendants

22  further argue that a defendant should not be required to specifically admit or deny pages of non-

23  materials facts.  *Id.* at 3.  The County defendants similarly argue that the SAC is ambiguous, that

24  they have no notice of what claims plaintiffs allege against the County defendants, and that

25  dismissal is proper under Rule 41(b).  County's Motion, Doc. 98 at 2.  The County defendants

26  argue that plaintiffs "once again burden their adversaries" with combing through a large

27  
28  _____

[12] In their motion, the County defendants move to dismiss only two of the three *Monell* claims against the County; they do not move to dismiss claim 6.  *See* Doc. 98.

1   complaint to determine which allegations must be defended.  County's Motion, Doc. 98-1 at 15.

2   County defendants also argue that, despite the two prior dismissal orders cautioning plaintiffs

3   regarding potential Rule 8 violations, plaintiffs' SAC grew to more than 100 pages.  *Id.* at 15-16.

4   The County defendants urge the Court to dismiss the SAC for failure to comply with Rule 8 and

5   to deny leave to amend.  *Id.* at 16.  Plaintiffs argue that, although the SAC is long, it is not

6   unnecessarily long and that its length reflects the complexity of the matter and the number of

7   claims and parties involved.  Opposition to County's Motion, Doc. 109 at 14; Opposition to

8   City's Motion, Doc. 110 at 13-14.

9        "While 'the proper length and level of clarity for a pleading cannot be defined with any

10   great precision,' Rule 8(a) has 'been held to be violated by a pleading that was needlessly long, or

11   a complaint that was highly repetitious, or confused, or consisted of incomprehensible

12   rambling.'"  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1059 (9th Cir.

13   2011) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (3d

14   ed.2010)).  However, a complaint does not violate Rule 8(a) solely because it is excessive in

15   length.  *Hearns v. San Bernardino Police Dep't,* 530 F.3d 1124, 1131 (9th Cir. 2008).  Rather, the

16   issue is whether the complaint is written with sufficient clarity and organization such that the

17   defendants can respond to the claims.  *Id.*

18        Although the SAC is more than 100 pages in length and contains more than 438

19   paragraphs and could perhaps be better organized and contain less detail, it is not so lengthy and

20   unclear that the defendants would be prejudiced by having to respond to it.  Moreover, the Ninth

21   Circuit has held that the FAC, which contained these same factual allegations, sufficiently stated

22   certain claims.  *Murguia*, 61 F.4th at 1113–18.  That is the law of the case.  *Askins v. U.S. Dep't*

23   *of Homeland Sec.,* 899 F.3d 1035, 1042 (9th Cir. 2018) (the law of the case "doctrine applies

24   most clearly where an issue has been decided by a higher court; in that case, the lower court is

25   precluded from reconsidering the issue and abuses its discretion in doing so" except in limited

26   circumstances).  Defendants' motions to dismiss the case for failure to comply with Rule 8 are

27   denied.

28

### B. Federal Claims

The SAC sets forth ten federal claims pursuant to 42 U.S.C. § 1983. *See* SAC. Plaintiffs'

assert section 1983 claims against both the individual defendants and, pursuant to *Monell v. Dept.*

*of Social Services*, 436 U.S. 658, 691 (1978), against the City and County. As the *Monell* claims

require an underlying constitutional violation as an essential element of the claims, the Court first

addresses whether the SAC sufficiently states section 1983 claims against the individual

defendants.

#### 1. Claims Against Individual Defendants

The Ninth Circuit found that plaintiffs had sufficiently pleaded their section 1983 claims

as to defendants Garcia and Torres under the state-created danger exception. *Murguia*, 61 F.4th

at 1113–16. That holding is the law of the case. The remaining issue is whether plaintiffs' SAC

now sufficiently pleads section 1983 claims against defendants Lewis and Cerda under the state-

created danger exception.

To state a claim under 42 U.S.C. § 1983, plaintiffs must allege that "(1) the conduct

complained of was committed by a person acting under color of state law; and (2) the conduct

deprived the plaintiff of a federal constitutional or statutory right." *Murguia*, 61 F.4th at 1106

(internal quotation and citation omitted). Plaintiffs allege, and defendants do not dispute, that the

individual defendants were acting under color of state law. Plaintiffs' federal claims are "rooted

in the substantive component of the Due Process Clause of the Fourteenth Amendment."

*Murguia*, 61 F.4th at 1106. "The Due Process Clause is a limitation on state action rather than a

guarantee of minimum levels of state protections, so the state's failure to prevent acts of private

parties is typically insufficient to establish liability under the Due Process Clause." *Id.* (citing

*Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019)). However, there are two

exceptions to this rule: "(1) when the state affirmatively places the plaintiff in danger by acting

with deliberate indifference to a known or obvious danger (the state-created danger exception);

and (2) when a special relationship exists between the plaintiff and the state (the special-

relationship exception)." *Id.* (internal quotation marks and citation omitted). The Ninth Circuit

held that the special-relationship exception did not apply based on plaintiffs' allegations. *Id.* at

1110.

The Ninth Circuit found plaintiffs' allegations in the FAC failed to state a claim as to defendant Lewis and Cerda under the state-created danger exception but granted plaintiffs leave to amend as to those claims. *Id.* at 1112–13. The state-created danger exception has two requirements: (1) there must be "affirmative conduct on the part of the state in placing the plaintiff in danger" and (2) the state must act "with deliberate indifference to a known or obvious danger." *Id.* at 1111 (internal quotation marks and citation omitted). To satisfy the first requirement, plaintiffs must show that the state actor's affirmative actions "created or exposed" them to "an actual, particularized danger" that they "would not otherwise have faced." *Id.* (quoting *Martinez*, 943 F.3d at 1271). The central inquiry is whether the state actors left the plaintiffs in a situation that was more dangerous than the one in which they found them. *Id.* The ultimate injury must have been foreseeable to the defendant given the circumstances, although the exact injury need not have been foreseeable. *Id.* To satisfy the second requirement, plaintiff must show that the state actor acted with deliberate indifference to a known or obvious consequence of their action. *Id.* For non-detainee failure to protect claims, a subjective deliberate indifference test applies. *Id.*

The Ninth Circuit found that plaintiffs' FAC failed to state section 1983 claims against Lewis and Cerda under the state-created danger exception because it was "unclear given the vague allegations in the complaint that Lewis and Cerda's conduct enhanced the twins' vulnerability to physical harm." *Murguia*, 61 F.4th at 1113. Specifically, the Ninth Circuit found: "Given that Lewis and Cerda merely replaced one competent adult—[Murguia]—with another competent adult—Rosa, we are not convinced that the officers left the twins in a situation that was more dangerous than the one in which they found them." *Id.* (citation omitted).

Plaintiffs now allege in the SAC that Lewis and Cerda knew "that Rosa had no legal authority over Langdon or the twins," and that they effectively increased the twins' risk of danger "by placing the twins in Langdon's sole and unsupervised custody," while, somewhat inconsistently, also asserting that "the deputies directed Rosa to take Langdon to the hospital, then take custody of the twins." SAC ¶ 74. The SAC further alleges:

> Rosa was not a safe or adequate replacement for [Murguia] in
> protecting the twins. Rosa had no authority to take custody of the
> twins or challenge Langdon for control of the twins. . . . Rosa had
> no right or duty to supplement Langdon's care of the twins. Rosa
> had her own children to care for and at no time agreed to be a full-
> time guardian for the twins whereas [Murgia's] greatest interest
> was his children's health and safety, which TCSD deputies
> completely ignored. Lewis and Cerda could have foreseen that
> Rosa could have been legally separated from the twins at any time
> and that the Church could, and did tell Rosa to leave the twins,
> which she did. However, [Murguia] was a member of the Church
> and likely would have been allowed to stay with the twins at the
> Church.

SAC ¶ 75.

County defendants move to dismiss the section 1983 claims against defendants Lewis and Cerda, arguing that although plaintiffs have added additional "embellishing and entirely conclusory allegations," the additional allegations are insufficient to state a due process claim under the state-created danger exception. County's Motion, Doc. 98-1 at 19. The County defendants argue that there are no factual allegations to suggest that Rosa was "incapable of supplementing Langdon's care of the twins" or that that she was likely to separate from the twins and Langdon after leaving the Murguia home. *Id.* at 19–20. County defendants argue that plaintiffs' "conclusory allegations" do not show that Lewis and Cerda's actions rendered the twins more vulnerable. *Id.* at 20. Plaintiffs respond that "Rosa was not a safe or adequate replacement" for Murguia, as Rosa had no authority to take custody or to challenge Langdon's control of the twins. Opposition to County's Motion, Doc. 109 at 17-18.

The SAC's additional allegations are insufficient to show that it was reasonably foreseeable to Lewis and Cerda that their actions would place the twins in an actual, particularized danger that they would not otherwise have faced. The additional allegations do not change the fact that the officers did not leave Langdon alone with the children; the officers left the twins and Langdon with Rosa, who was a "competent adult." Although plaintiffs argue that Rosa was not the legal guardian of the twins and could therefore be "legally separated" from them, the SAC does not allege that Rosa ever indicated to Lewis or Cerda that she would accompany Langdon and the twins only briefly, or that she had other family obligations that

17

1   would require her to leave them by themselves.

2        While Lewis and Cerda would have known that Rosa had no legal authority over the

3   children, and it would have been reasonably foreseeable to them that Rosa would not remain

4   permanently with the children, there are no allegations in the SAC showing that it was reasonably

5   foreseeable to Lewis and Cerda that Rosa was likely to leave Langdon and the twins alone after

6   leaving Murguia's home.  Moreover, Rosa did *not* leave the twins alone with Langdon.  The SAC

7   alleges that Rosa alerted others at the church of Langdon's mental health state, that she was

8   concerned about the safety of the twins, and that she left Langdon and the twins at the church

9   with the pastor, another presumably competent adult.  *See* SAC ¶ 78.  The pastor then contacted

10   the Visalia police department, which responded to the church.  A Visalia police officer, who is

11   not a party to this case, then responded to the church and made the decision to transport Langdon

12   and the twins to a women's shelter.  Thereafter, the women's shelter contacted the Tulare Police

13   Department in response to Langdon's behavior, and TPD officers responded to that location.

14   After various TPD officers interacted with Langdon, defendants Torres and Garcia then

15   responded to the shelter.  Finally, after conferring with Torres, Garcia ultimately transported

16   Langdon and the twins to a motel, where he left them by themselves.

17        While this chain of events ended tragically with the death of the twins, the extended series

18   of events that ultimately culminated in the twins being left alone with Langdon was not

19   reasonably foreseeable when Rosa, Langdon, and the twins left the house together.  A series of

20   competent adults was present with Langdon and the twins over an extended period—including

21   police officers such as Garcia, and Torres, a CWS worker—long after defendants Lewis and

22   Cerda let Langdon and the twins leave with Rosa to go to the church.  Given the series of events

23   that occurred thereafter, it was not reasonably foreseeable to Lewis and Cerda that Langdon and

24   the twins would ultimately be left alone overnight, without a competent adult present, following

25   decisions by a CWS worker (Torres) and another law enforcement officer (Garcia).  Accordingly,

26   the SAC fails to plead claims against Lewis and Cerda under the state-created danger exception.

27        The Ninth Circuit also held that plaintiffs' FAC did not establish that defendants deprived

28   plaintiffs of their right to familial association by temporarily separating Murguia and the twins,

1    and did not establish that defendants unreasonably seized Murguia in violation of the Fourth

2    Amendment. *Murguia*, 61 F.4th at 1117–19. In finding that plaintiffs had not adequately pleaded

3    a section 1983 claim related to the seizure of Murguia, the Court reasoned: "[Murguia] alleged

4    that the Deputies' show of authority prevented him from following the twins. He did not allege

5    that the Deputies prevented him from leaving his house for other purposes—he could have driven

6    off in another direction. [Murguia's] gripe is not that he was seized, but that he was separated

7    from his children." *Id.* at 1119.

8           Plaintiffs appear to argue that the SAC now states a claim against Lewis and Cerda based

9    on the allegation that defendants' "forced separation" of Murguia from the twins was "permanent,

10   not temporary and was more than a minor deprivation of [Murguia's] custody." Opposition to

11   County's Motion, Doc. 109 at 17. The SAC also asserts that Murguia "feared that if he left the

12   property at all, even if he left in a different direction, Lewis and Cerda" would arrest him. SAC

13   ¶ 72. However, the SAC also alleges that defendants remained outside his house for only thirty

14   minutes, SAC ¶ 72, leaving Murguia free to leave thereafter. Construing the SAC in the light

15   most favorable to the plaintiffs, the SAC alleges that Lewis and Cerda, by show of authority,

16   prevented Murguia from following Langdon and the twins or otherwise from leaving his house

17   for 30 minutes, for fear that he would be arrested if he left.

18          Plaintiffs' allegation appears intended to support their substantive due process claims and

19   is not clearly pleaded as a separate Fourth Amendment claim based on a brief seizure of Murguia.

20   Moreover, as the Ninth Circuit noted with respect to similar allegations in the FAC, Murguia's

21   complaint is not that he was seized for thirty minutes, but that he was separated from his children.

22   *Murguia*, 61 F.4th at 1119. The SAC's allegations on this issue are consistent with the FAC in

23   material respects. Given the Ninth Circuit's holding that plaintiffs failed to establish a Fourth

24   Amendment claim based on an allegedly unreasonable seizure of Murguia, any such claim in the

25   SAC is also precluded by the law of the case. *See Askins*, 899 F.3d at 1042.

26          As plaintiffs have been unable to state a section 1983 claim despite being provided an

27   opportunity to amend their complaint for this purpose, the County's motion to dismiss the section

28   1983 against Lewis and Cerda (claims 1–3) is granted without leave to amend.

1       **2.**      **Murguia's standing to sue on behalf of the twins' estates and as a**

2            **successor in interest**

3       The County defendants argue that Murguia lacks standing to sue on behalf of the estates

4 of the twins and as the successor in interest. County's Motion, Doc. 98-1 at 28-30. The County

5 defendants point out that, at the time of filing their motion, Murguia had not filed a declaration

6 containing the information required by California Code of Civil Procedure section 377.32. *Id.* at

7 29. However, plaintiffs subsequently filed a declaration by Murguia that satisfies the

8 requirements of section 377.32. *See* Declaration of Jose Murguia, Doc. 108. Accordingly, the

9 motion to dismiss these claims against the County defendants based on Murguia's alleged lack of

10 standing is denied.

11       **3.**      **Qualified Immunity - County Defendants**

12       The County defendants also move to dismiss the section 1983 claims against Lewis,

13 Cerda, and Torres based on qualified immunity. As the Court is dismissing claims 1–3 as to

14 Lewis and Cerda based on plaintiffs' failure to state a claim, the Court need not reach the issue of

15 whether Lewis and Cerda would be entitled to qualified immunity.

16       Qualified immunity protects government officials from liability under section 1983

17 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of

18 their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018)

19 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Qualified immunity balances two

20 important interests—the need to hold public officials accountable when they exercise power

21 irresponsibly and the need to shield officials from harassment, distraction, and liability when they

22 perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Courts may

23 consider qualified immunity at the pleadings stage. However, the Ninth Circuit has cautioned

24 that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special

25 problems for legal decision making." *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018)

26 (citing *Kwai Fun Wong v. United States*, 373 F.3d 952, 956-57 (9th Cir. 2004)) (by considering

27 qualified immunity at the pleadings stage, "the courts may be called upon to decide far-reaching

28 constitutional questions on a nonexistent factual record.").

1    The County defendants argue that Torres is entitled to qualified immunity because

2  plaintiffs have failed to show that her actions violated a clearly established right.  Doc. 98-1 at 22.

3  In particular, the County defendants argue that there are no factual allegations that Torres, or the

4  County, "had actual knowledge that Langdon posed an immediate risk of serious bodily injury to

5  the twins."  County's Motion, Doc. 98-1 at 25.  However, it was clearly established at the time of

6  the incidents in the SAC that the state-created danger exception applied when (i) "there is

7  affirmative conduct on the part of the state in placing the plaintiff in danger," and (ii) "the state

8  [actor] acts with deliberate indifference to a known or obvious danger."  *Patel v. Kent School*

9  *Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).

10    Construing the SAC in the light most favorable to plaintiffs, the SAC sufficiently alleges

11  that Torres acted with deliberate indifference to a known and obvious risk to the twins.  Torres

12  knew from Langdon's history in the CWS system that Langdon had prior convictions for child

13  cruelty, had prior CWS cases, and had lost custody of her older children.  SAC ¶¶ 90-91, 97.

14  Torres also knew, and failed to mention to Garcia, that Murguia was a parent available to take the

15  twins.  *Id.* at ¶ 90.  Further, the SAC alleges that Torres and her supervisor conducted a "further

16  risk assessment because the mother sounded delusional and might be a threat to the children."

17  SAC ¶ 98.  It can thus reasonably be inferred from the SAC that Torres had knowledge that

18  Langdon posed an immediate threat to the children.  Plaintiffs also allege affirmative conduct by

19  Torres that placed the twins in danger: Torres falsely told Garcia that Langdon was homeless and

20  falsely stated that Langdon had no history of child abuse, when Garcia contacted Torres to

21  discuss where the twins should go.  *Id.* at ¶ 90.  The Court cannot find based on the allegations in

22  the SAC, and the undeveloped factual record, that Torres is entitled to qualified immunity.

23    ### 4.    *Monell* Claims

24    Plaintiffs allege *Monell* claims against the City of Tulare and the County of Tulare based

25  on allegedly inadequate policies and failure to train.  Claims for municipal liability are cognizable

26  under section 1983.  *Duarte v. City of Stockton*, 60 F.4th 566, 573 (9th Cir. 2023).  A

27  municipality "cannot be held liable solely because it employs a tortfeasor or, in other words, a

28  municipality cannot be held liable under [42 U.S.C. § 1983] under a respondeat superior theory."

1  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Castro v. Cnty. of L.A.*, 797 F.3d

2  654, 670 (9th Cir. 2015).

3         To sustain a *Monell* claim based on policy, a plaintiff must show that the action that

4  caused their constitutional injury was part of an "official municipal policy of some nature."

5  *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 811 (9th Cir. 2024) (quoting *Kirkpatrick v. Cnty.*

6  *of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016). "There are four criteria: "(1) [plaintiff] had a

7  constitutional right of which [they] were deprived; (2) the municipality had a policy; (3) the

8  policy amounts to deliberate indifference to [their] constitutional right; and (4) the policy is the

9  moving force behind the constitutional violation." *Id.* (internal quotation omitted).

10        "In limited circumstances, a local government's decision not to train certain employees

11  about their legal duty to avoid violating citizens' rights may rise to the level of an official

12  government policy for purposes of § 1983." *Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir.

13  2024) (internal quotation marks and citation omitted). "Failure to train may constitute a basis for

14  *Monell* liability where the failure amounts to deliberate indifference to the rights of those who

15  deal with municipal employees." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir.

16  2021). "To allege a failure to train, a plaintiff must include sufficient facts to support a

17  reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that

18  amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury

19  would not have resulted if the municipality properly trained their employees." *Id.* at 1153–54.

20                    *a.  County of Tulare*

21        The County defendants argue that claims 4 and 5 of the SAC fail to sufficiently allege

22  *Monell* claims.[13]  County's Motion, Doc. 98-1 at 26.  To the extent the *Monell* claims are based

23  on the underlying conduct of Lewis and Cerda, the claims fail as plaintiffs fail to establish an

24  underlying constitutional violation by Lewis and Cerda.  To the extent the *Monell* claims are

25  based on Torres's conduct, they also fail to state a claim.

26        The County defendants correctly point out that the SAC does not allege that the County's

27

28  [13] The County defendants do not move to dismiss claim 6, which similarly asserts a *Monell* claim
    against the County.

1    policies caused the deprivation of plaintiffs' constitutional rights; rather, plaintiffs allege that

2    Torres failed to follow the policies as required.  *Id.*  An employee's failure to follow a

3    constitutionally valid policy does not establish a *Monell* claim.  *Morrison v. City of Los Angeles*,

4    No. CV 19-1961-JGB (JPR), 2019 WL 3017762, at *5 (C.D. Cal. July 10, 2019) (collecting

5    cases) ("The failure of individual employees to follow municipal policies is insufficient to

6    establish *Monell* liability.").

7        Plaintiffs also argue that the County's CWS "failed to train Torres that when a social

8    worker thinks a child is in imminent danger, she must investigate immediately[.]"  *Id.* at 23.

9    However, the SAC's allegations are largely conclusory.  Plaintiffs have alleged only a single

10   instance—Torres's conduct in this case—in which CWS allegedly failed to adequately train an

11   employee.  "[G]enerally, a single instance of unlawful conduct is insufficient to state a claim for

12   municipal liability under section 1983."  *Benavidez*, 993 F.3d at 1154.  While "[s]ingle acts may

13   trigger municipal liability where 'fault and causation' were clearly traceable to a municipality's

14   legislative body or some other authorized decisionmaker[,]" the SAC does not allege any such

15   circumstances.  *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397,

16   405 (1997)).

17       In *Benavidez*, minors were removed from their home and were subjected to a medical

18   examination without their parents' knowledge or consent and without the opportunity for the

19   parents to be present at the examination.  In those circumstances, the Court held the plaintiffs had

20   properly pleaded claims against the individual defendants for the unconstitutional medical

21   examinations.  *Id.* at 1153.  However, the Court held that the plaintiffs failed to state a claim

22   against the municipality based on a failure to train theory because the limited instance of such a

23   failure was insufficient to establish a failure to train.  *Id.* at 1154.  The unsatisfactory training of

24   one officer "will not alone suffice to fasten liability on the [municipality], for the officer's

25   shortcomings may have resulted from factors other than a faulty training program."  *Id.* (internal

26   quotation marks and citation omitted).  *Id.*  Plaintiffs fail to allege or argue how the single

27   instance of Torres' conduct would support a *Monell* claim.

28       Accordingly, claims 4 and 5 are dismissed without leave to amend.

1

        *b.  City of Tulare*

2

        The City of Tulare appears to move to dismiss the *Monell* claims against it (claims 9-10)

3

on the ground that the SAC fails to allege that Garcia breached a mandatory duty and therefore

4

fails to state a section 1983 claim against either Garcia or the City.  Doc. 97-1 at 4.  The City does

5

not otherwise argue that it may not be held liable under *Monell*.  As the Ninth Circuit found that

6

plaintiffs adequately alleged section 1983 claims against Garcia, *Murguia*, 61 F.4th at 1113, the

7

City's argument that the section 1983 claims fail to state a claim against Garcia is precluded by

8

the law of the case.  Accordingly, the City's motion to dismiss claims 9 and 10 is denied.

9

      **C.**      **State Law Claims**

10

        The City and County defendants move to dismiss the state law claims on the grounds that

11

plaintiffs failed to plead compliance with the California Tort Claims Act.  City's Motion, Doc.

12

97-1 at 4; County's Motion, Doc. 98-1 at 30.  Plaintiffs point out that defendants did not

13

previously raise, in their prior motions to dismiss, the failure to plead compliance with the

14

California Tort Claims Act.  Opposition to City's Motion, Doc. 110 at 10–11.  Compliance with

15

the California Tort Claims Act is an essential element of a cause of action against a public entity,

16

and plaintiffs must allege facts in their complaint demonstrating or excusing compliance with the

17

Act.  *State of California v. Superior Ct.*, 32 Cal. 4th 1234, 1243 (2004).  The SAC is devoid of

18

any mention that plaintiffs complied with the California Government Tort Claims Act.  In their

19

opposition, plaintiffs represent that they did timely file a claim, and they request leave to remedy

20

the defect in pleading through amendment.  Opposition to City's Motion, Doc. 110 at 14-15.  The

21

state law claims against the City and County defendants are therefore dismissed with leave to

22

amend.[14]

23

      **D.**      **Breach of Mandatory Duties**

24

        The City defendants also argue that in claims 7, 8, 9, 10, 17, 18, and 19 the SAC fails to

25

state a claim that Garcia breached a mandatory duty.  *See* City's Motion, Doc. 97-1.  As to the

26

27

28

---

[14] As the state law claims against the City defendants and the County defendants are dismissed with leave to amend, the Court does not reach defendants' immunity arguments as to the state law claims.

federal claims (claims 7-10), the Ninth Circuit confirmed that plaintiffs could not pursue their section 1983 claims based on a "legal requirement exception" theory as to the individual defendants' alleged failures to act. *Murguia*, 61 F.4th at 1107 (holding that the only two exceptions to the general rule against failure-to-act liability for section 1983 claims are the special-relationship exception and the state-created danger exception). To the extent that the section 1983 claims (claims 7–10) are based in part on the legal theory that the individual defendants are liable under section 1983 simply for failure to do an act they were legally required under state law to perform, any such theory is foreclosed by the Ninth Circuit's decision.

As to the state law claims, the City defendants argue that there is no mandatory duty for Garcia to conduct a California Welfare and Institution Code ("WIC") § 5150 assessment, and that the other statutes or policies cited by plaintiffs throughout their complaint also fail to impose mandatory duties.[15] City's Motion, Doc. 97-1 at 4. The City defendants also argue that the Court has previously held that there is no mandatory duty under WIC § 5150 and that plaintiffs are realleging legal arguments already settled as the law of the case. Opposition to City's Motion, Doc. 97-1 at 4. They argue that none of the other underlying policies "contain any language plainly evidencing a mandatory duty to conduct such an assessment." City's Motion, Doc. 97-1 at 4. Plaintiffs do not meaningfully address the City defendants' arguments and instead repeat that the duties are "clearly" mandatory. Opposition to City's Motion, Doc. 110 at 116.

As noted in a prior order in this action, there is no mandatory duty to conduct a § 5150 assessment. Doc. 35 at 13 n.6. WIC § 5150 provides that "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to themselves, or gravely disabled, a peace officer . . . *may*, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the

---

[15] The City defendants point to SAC ¶¶ 13-37, 236, 239-240, 252-258, 267, 288, 363, 381, 398. In the SAC ¶¶ 13-37, plaintiffs set out the "framework for welfare checks" that are alleged throughout their complaint, which include Welfare and Institution Code §§ 5150, 5150(b), 5150.4, 5150.05, the Commission on Peace Officer Standards and Training ("POST") training and standards, and City of Tulare Police Department and Tulare County Sheriff's Department policies.

1   State Department of Health Care Services." Cal. Welf. & Inst. Code § 5150(a) (emphasis added).

2   As the statute uses the permissive word "may," it does not impose a mandatory duty.

3        As the state law claims are dismissed with leave to amend, the Court does not otherwise

4   reach the arguments raised with respect to the state law claims.

5        **E.**        **Leave to Amend**

6        Plaintiffs' section 1983 claims against Lewis and Cerda, and the *Monell* claims against the

7   County of Tulare at claims 4 and 5, are dismissed without leave to amend as plaintiffs have failed

8   to establish a constitutional violation despite previously having been granted leave to amend.

9        As to plaintiffs' state law claims, the Court finds that granting further leave to amend

10  would not be futile. Accordingly, plaintiffs will be granted thirty days from the date of service of

11  this order in which to file a third amended complaint consistent with this Order.

12  **IV.    CONCLUSION**

13       Based upon the foregoing, it is ORDERED that:

14       1.  Defendants' motion to dismiss, Docs. 97, 98, are granted in part and denied in part as

15           follows:

16           a.  The City and County defendants' motions to dismiss the SAC under Rule 8 are

17               denied;

18           b.  The County defendants' motion to dismiss the individual section 1983 claims

19               (claims 1-3) is denied as to Torres, and granted as to Lewis and Cerda without

20               leave to amend;

21           c.  Defendants Lewis and Cerda are dismissed from this action;

22           d.  The County defendants' motion to dismiss claims 4 and 5, which are *Monell*

23               claims against the County, is granted without leave to amend;

24           e.  The City and County defendants' motions to dismiss the state law claims

25               against them (claims 11 to 20), for failure to plead compliance with the

26               Government Tort Claims Act, is granted with leave to amend;

27  ///

28

f.  The City defendants' motion to dismiss the section 1983 claims (claims 7-10) is denied.

2.  Within thirty (30) days of the date of this order, plaintiffs may file a third amended complaint consistent with this Order.  If plaintiffs elect not to file a third amended complaint, this action shall proceed on their second amended complaint as to the remaining claims only.

3.  The Clerk of Court is also directed to update the docket to reflect that First Assembly of God is not a defendant in this action.

IT IS SO ORDERED.

Dated:    November 24, 2025

_____
UNITED STATES DISTRICT JUDGE

27